UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| In re: | Case No. 20bk21625 |
| Marshall Spiegel, | Chapter 11 |
| Debtor. | Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

### MEMORANDUM DECISION

The matter before the court comes on for consideration on the objection of the Official Unsecured Creditors' Committee (the "Committee") for the bankruptcy estate of Marshall Spiegel (the "Debtor") [Dkt. No. 855][1] (the "Objection") in the above-captioned case.  In the Objection, the Committee seeks the disallowance of the $475,000.00 claim scheduled by the Debtor in favor of his son Matthew Spiegel ("Matthew"), ostensibly for funds advanced by Matthew to the Debtor in order for the Debtor to collateralize a letter of credit issued in lieu of an appellate bond.

After briefing and a five-day evidentiary hearing, the matter was taken under advisement. After careful consideration of the evidence provided and the arguments of the parties and for the reasons more fully stated herein, the Objection is well taken and will, by separate order entered concurrently with this Memorandum Decision, be SUSTAINED.

### JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b).  District courts may refer these cases to the bankruptcy courts for their districts. 28 U.S.C. § 157(a).  In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois.  N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy court judge to whom a case has been referred has statutory authority to enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(1).  Bankruptcy court judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(3).  As to the former, the bankruptcy court judge may hear and determine such matters.  28 U.S.C. § 157(b)(1).  As to the latter, the bankruptcy court

---

[1]    References to docket entries in the above-captioned bankruptcy case will be denoted as "Dkt. No. ___."

judge may hear the matters, but may not decide them without the consent of the parties.  28 U.S.C. §§ 157(b)(1) & (c).  Absent consent, the bankruptcy court judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy court judge must also have constitutional authority to hear and determine a matter.  *Stern v. Marshall,* 564 U.S. 462 (2011).  Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court judge hearing and determining the matter.  *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court judge's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The Objection seeks a determination by the court whether a claim should be allowed or disallowed pursuant to section 502 of the Bankruptcy Code.  This contested matter, concerning the allowance or disallowance of a claim against the bankruptcy estate, is expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).  Further, in accordance with *Stern*, 564 U.S. at 499, the court has constitutional authority to decide claim objections, as such objections may arise only in a case under the Bankruptcy Code and necessarily stem from the bankruptcy case itself.  *In re Montalbano*, 486 B.R. 436, 438–39 (Bankr. N.D. Ill. 2013) (Barnes, J.) (*citing Lenior v. GE Capital Corp.* (*In re Lenior*), 231 B.R. 662, 667 (Bankr. N.D. Ill. 1999) (Schmetterer, J.); *Knox v. Sunstar Acceptance Corp.* (*In re Knox*), 237 B.R. 687, 693 (Bankr. N.D. Ill. 1999) (Schmetterer, J.)).

Accordingly, the court has the jurisdiction, statutory authority and constitutional authority to hear and determine the Objection.

BACKGROUND

On December 16, 2020, the above-captioned case (the "<u>Chapter 11 Case</u>") was commenced by the Debtor.  Voluntary Petition [Dkt. No. 1].

A.      <u>Prepetition History</u>

Prior to filing the Chapter 11 Case, the Debtor was involved in protracted and highly contentious state-court litigation against a variety of individual members and their spouses of the condominium association governing his residence.  That litigation, styled as *Spiegel v. Hall*, Case No. 15 L 10817 (the "<u>State Court Litigation</u>")[2] in the Circuit Court of Cook County (the "<u>Illinois Circuit Court</u>"), was commenced in 2015 and appears to continue in various forms of appeal.

On March 29, 2019, the Illinois Circuit Court imposed sanctions against the Debtor and his state court counsel, John Xydakis ("<u>Xydakis</u>"), in an amount in excess of $1 million (the "<u>Sanction Award</u>").  The Illinois Circuit Court stated in its order that the sanctions were for "abusive litigation

---

[2]      The actual caption of the State Court Litigation is difficult to determine, as it involved multiple lawsuits including some ostensibly commenced by the Debtor on behalf of the condominium association.

tactics of filing complaints filed with baseless accusations, misrepresenting case law by reversing or altering holdings, filing lawsuits for the sole purpose of harassment, increasing costs and delay, and filing objectively unreasonable motions to disqualify counsel and judges." Committee's Exh. 39.

On or about May 22, 2019, the Debtor and Wintrust Bank, N.A. ("Wintrust") entered into a letter of credit in the principal amount of $1,225,000.00 (the "Letter of Credit").[3]  The Letter of Credit was payable to Eugene E. Murphy Jr. (the "Beneficiary"), as the beneficiary to the recipients of the Sanction Award, upon the occurrence of certain conditions precedent.

On May 22, 2019, to partially fund the Letter of Credit, Matthew assigned and granted Wintrust a security interest in a certificate of deposit with Wintrust ending in -8763 ("Wintrust CD 8763"), which had a balance of $250,000.00, and second certificate of deposit with Wintrust ending in -4178 ("Wintrust CD 4178"), which had a balance of $225,000.00 (together, the "Matthew CDs").

On December 3, 2020, the Illinois First District Appellate Court affirmed the Sanction Award.  On December 11, 2020, the Beneficiary drew on the Letter of Credit.  Wintrust made a payment to the Beneficiary in the amount of $1,224,763.39.  Then, during the course of this bankruptcy case, Wintrust liquidated the Matthew CDs, which Matthew asserts gave rise to his claim for $475,000.00.

B.     Postpetition History

After the commencement of the Chapter 11 Case, on March 3, 2021, the Committee was appointed by the United States Trustee to act as the official committee of unsecured creditors in the Chapter 11 Case.  Appointment of Unsecure Creditors' Committee [Dkt. No. 81].  The Committee is made up of members who were or are related to the parties in the State Court Litigation opposite of the Debtor.

The Chapter 11 Case has given rise to substantial litigious activity with the involvement of several parties, but the disputes have been predominantly between the Debtor, Matthew and the Committee and in many ways act along the same lines as the State Court Litigation.  The Committee and the Debtor have been at odds for the duration of the case with motivations that seem to predate the Chapter 11 Case itself.

One of those disputes arose when counsel to the Committee filed their third interim fee application [Dkt. No. 686] (the "Fee Application").  A combined objection to the Fee Application was filed by the Debtor and Matthew.  Combined Objection to Marshall Spiegel and Matthew Spiegel to Third Interim Fee Application of Adelman & Gettlement [sic], Ltd. [Dkt. No. 739].  Additionally, 1116-22 Greenleaf Building, LLC ("Greenleaf"), an entity which the Debtor and Matthew are the sole members of, filed an objection to the Fee Application.  Objection of 1116-22 Greenleaf Building, LLC to Third Interim Fee Application of Adelman & Gettleman, Ltd. for Allowance and Payment of Interim Compensation and Reimbursement of Expenses as Counsel to the Official Committee of Unsecured Creditors and for Shortened Notice Thereof [Dkt. No. 736].

---

[3]     "[T]he Letter of Credit appears to have been issued to satisfy the bond requirement of the Illinois Supreme Court regarding the staying of monetary judgments pending an appeal.  *In re Marshall Spiegel*, 638 B.R. 606, 611 (Bankr. N.D. Ill. 2022) (Barnes, J.) (discussing the Letter of Credit in greater detail).

Those objections in large part asked the court to disallow the Committee's counsel's fees because of a perception that the Committee should not be in opposition to the Debtor.

In response to the objections, the Committee argued that both Matthew and Greenleaf lacked standing to object to the Fee Application as neither was scheduled as a creditor of the Debtor's bankruptcy estate or had filed a claim by the bar date for such claims, *see* Order and Notice Setting Bar Date for Filing Proofs of Claim [Dkt. No. 74] (setting, May 27, 2021, as the bar date for nongovernmental claims in the Chapter 11 Case), and each seemed to be acting as proxies for the Debtor. Given the obvious problems of such actions (if true), on January 4, 2023, the court ordered supplemental briefing on the issue of standing. Order Scheduling Briefing [Dkt. No. 771].

On January 16, 2023, while the issue of standing was still on briefing, the Debtor filed the Debtor's Fifth Amended Plan of Reorganization (the "Plan") [Dkt. No. 776]. The Plan listed an unsecured claim in favor of Matthew for $475,000.00. On February 16, 2023, the Debtor amended his schedule E/F which listed an unsecured claim in favor of Matthew for $475,000.00. Schedule E/F [Dkt. No. 805] (the "Matthew Claim").[4]

Matthew had not then and has not since either filed a proof of claim or sought authorization to file a tardy proof of claim in the Chapter 11 Case. Nonetheless, for the reasons discussed below, the Matthew Claim having been scheduled on Matthew's behalf by the Debtor gives rise to a claim in the Chapter 11 Case.[5]

C.      The Objection

The Committee thus objects to the Matthew Claim.

On May 17, 2023, a scheduling order was entered with respect to the Objection. [Scheduling] Order [Dkt. No. 899] (the "Scheduling Order"). In accordance with the Scheduling Order, Matthew filed his response, Matthew Spiegel's Response/Objection to Committee's Claim Objection [Dkt. No. 923] (the "Response"), and the Committee filed its reply. Reply in Support of Objection of the Official Committee of Unsecured Creditors to the Claim of Matthew Spiegel [Dkt. No. 941] (the "Reply").

On July 19, 2023, after considering the Objection, Response and Reply, the court ruled that the matter necessitated an evidentiary hearing. On August 23, 2023, an order was entered scheduling that evidentiary hearing. Order Governing Evidentiary Hearing [Dkt. No. 992] (the "Prehearing Order").

---

[4]      This was not the first amendment by the Debtor to his plan or his schedules. *See* [Dkt. Nos. 17, 160, 264, 635, 406, 728, 776, 918, 1038]. These changes have created more of a moving target on both the Debtor's financial circumstances and his plan for dealing with the same than is ordinary.

[5]      The existence of the Matthew Claim and, in the absence of the Objection at issue here, its presumed allowance, were initially addressed by the Court in ruling on the Fee Application. *In re Spiegel*, Case No. 20bk21625, 2023 WL 2564028, at *3 (Bankr. N.D. Ill. Mar. 17, 2023) (Barnes, J.). The court discussed in that opinion the presumed allowance of the Matthew Claim in the absence of the Objection here, stating that "[b]oth the Fifth Amended Plan and the Amended Schedules each have the hallmarks of blatant attempts of the Debtor to confer standing on his son." *Id.*

The Prehearing Order required the parties to file a joint prehearing statement that included a list of witnesses and a list of exhibits that the parties planned to offer into evidence at the evidentiary hearing. Prehearing Order, at ¶ 5. The Prehearing Order also allowed each party to include in the prehearing statement objections to an opposing party's witnesses and exhibits in lieu of any motion *in limine* that the party wished to bring. *Id.* at ¶ 7. Under the express terms of the Prehearing Order, all exhibits to which no objections were raised in the prehearing statements would be admitted into evidence, *id.*, stating that the failure to assert an objection results in the waiver of any prehearing or evidentiary objections that could have been raised by such deadline. *Id.* Despite this default admission exhibits, the Prehearing Order instructed the parties that if they failed to use an exhibit at the hearing or make other meaningful use of the exhibit in relation to the hearing, the exhibit will be assigned little or no weight by the court. *Id.*

As required by the Prehearing Order, on August 31, 2023, the parties filed a joint prehearing statement. Amended Prehearing Statement [Dkt. No. 1003] (the "Prehearing Statement"). Among other things, the Prehearing Statement contained stipulated facts. In part, those stipulated facts form the basis of this background section and the court's findings of fact below.

The Prehearing Statement also set out a number of objections to each party's proposed exhibits. Prehearing Stmt, at § II. Initially, the objections raised to the parties' exhibits were taken up a prehearing conference on Wednesday, September 6, 2023 (the "Prehearing Conference"). At the Prehearing Conference, the court confirmed that any exhibit without an objection noted in the Prehearing Statement was automatically admitted and sustained one objection on relevance grounds.[6] All other objections that were raised were preserved for handling at the evidentiary hearing.

The evidentiary hearing commenced on Monday, September 11, 2023, and concluded on Friday, September 15, 2023 (the "Evidentiary Hearing"). At the Evidentiary Hearing, the Debtor and Matthew were the only witnesses. After the conclusion of the Evidentiary Hearing, the Committee and Matthew each filed proposed findings of fact and conclusions of law in December 2023. Proposed Findings of Fact and Conclusions of Law of the Official Committee of Unsecured Creditors [Dkt. No. 1142]; Matthew Spiegel's Post-Trial Proposed Findings of Fact and Conclusions of Law Related to the Committee's Objection to his Claim (ECF No. 855) [Dkt. No. 1143].

This Memorandum Decision constitutes the court's ruling on the Objection. In considering the matter, the court has considered the Objection itself, the Response and the Reply and all filings and attachments related thereto, as well as the testimony from and evidence admitted at the Evidentiary Hearing. The court has also reviewed the transcript of the Evidentiary Hearing. Volume 1 (Pgs. 1–200); Volume 2 (Pgs. 201–472); Volume 3 (Pgs. 473–576); Volume 4 (Pgs. 577–677); Volume 5 (Pgs. 678–864) [Dkt. Nos. 1065, 1066, 1067, 1068, 1069] (collectively, the "Tr."). Though these items do not constitute an exhaustive list of the filings in the Chapter 11 Case, the court has also taken judicial notice of the contents of the dockets and claims register in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).

---

[6] Matthew's Exh. 68.

FINDINGS OF FACT

From the review and consideration of the procedural background, as well as the evidence presented at the Evidentiary Hearing and the filings in this above-captioned case, the court determines the salient facts to be and so finds as follows:[7]

A.     Debtor's Relation to Matthew

1.   Matthew is the Debtor's only son.  Tr. at p. 46; Prehearing Stmt, at ¶ 31 & 33.

2.   The Debtor and Matthew live together at 1618 Sheridan Road Unit 2 in Wilmette, Illinois.  Tr. at pp. 45–46.  The two have been living together since Matthew was born in 1996.  *Id.* at p. 46; Prehearing Stmt, at ¶ 31 & 33.

3.   As early as April 18, 1997, the Debtor opened a custodial account for Matthew that held approximately $100,000.00.  Committee's Exh. 3; Tr. at p. 593.

4.   Over the years, the Debtor has transferred several hundred thousand dollars to Matthew; in the aggregate, at least, $475,000.00.  Tr. at p. 336.  The Debtor would transfer to Matthew this money by opening bank accounts in which Matthew is named account holder.  Tr. at pp. 709–10.

5.   In some of these accounts, the Debtor served as trustee under the Uniform Transfers to Minors Act as they contained gifts given while Matthew was a minor. Matthew's Exhs. 62 & 63.

6.   Once Matthew became of age, the Debtor and Matthew held many joint accounts. Committee's Exhs. 18, 19, 30 & 31.

7.   In March 2018, the Debtor gave Matthew a majority interest in Greenleaf.  Tr. at pp. 13–16; 464.  Greenleaf is an Illinois limited liability company that has a 100% beneficial interest in a trust that holds legal title to real property commonly known as 1116-22 Greenleaf Ave., Wilmette, IL 60091 and is the Debtor's primary asset.  Tr. at pp. 81, 84, 105, 107 & 465.

8.   Matthew and the Debtor were the only witnesses at the Evidentiary Hearing.  Much of the opposition to the Objection relies on their testimony.

9.   The Debtor appeared to be what can only be described as an experienced witness. In response to the Committee's questions, the Debtor was often evasive, repeatedly questioning the form of questions and offering narrative explanations to what were simple yes or no questions.  This behavior occurred throughout his testimony,

---

[7]      This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and, individually, "Bankruptcy Rule ___"), made applicable in this contested matter by Bankruptcy Rule 9014. Adjudicative facts may also be found and determined throughout this Memorandum Decision.  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

though to a significantly lesser degree when the Debtor was questioned by Matthew's counsel. The Debtor frequently claimed no knowledge or recollection of the events in question, including whether he had read or signed various documents.

10. Matthew's testimony, while much more straightforward and responsive, was contradictory at many points.

   a. For example, Matthew first testified that funds in Wintrust Account 3598 belonged to both him and to the Debtor but days later answered a substantially similar question by stating that the funds belonged to him because his name appeared first on the account. Tr. at pp. 440, 762.

   b. Matthew also testified that he moved his funds from US Bank Account 4978 and into Wintrust Account 6091 to get a better interest rate when in fact it resulted in a lower interest rate. Tr. at pp. 434–35.

   c. Matthew's testimony also conflicted in large parts with his prehearing deposition testimony. Committee's Exh. 3 (Transcript of the Deposition of Matthew Spiegel on January 6, 2022) (the "2004 Deposition").

   d. For example, at the 2004 Deposition, Matthew testified that joint accounts held money that belonged to the Debtor and Matthew. *Id.* Further, Matthew testified that he did not consider himself a creditor of the bankruptcy estate. *Id.* Each of these directly contradict the positions he took in the Evidentiary Hearing.

B.   The Committee

   1. The Committee consists of William Hall, James Waite and William Fausone. Prehearing Stmt, at ¶¶ 8 & 9. Each are officers of the condominium association that oversees the property at 1618 Sheridan Road, Wilmette, Illinois. *Id.*

C.   The Accounts Between Matthew and the Debtor

   1. Wintrust CD 3598 is a yearly renewing certificate of deposit that was opened on March 6, 2017, with an initial deposit of $245,480.71. Committee's Exh. 19; Matthew's Exh. 54.

   a. This account was in the name of Matthew and the Debtor. *Id.* The names are set forth in that order. *Id.*

   b. Matthew listed the interest earned from Wintrust CD 3598 on his tax return for the years 2017 to and including 2019. Matthew's Exhs. 75, 76 & 77.

   c. On March 6, 2019, $46,627.54 was withdrawn from Wintrust CD 3598 and was deposited in US Bank Account 4978. Committee's Exh. 19.

d. On March 6, 2019, $205,039.00 was withdrawn from Wintrust CD 3598 and were deposited in Wintrust Account 3410. *Id.*

2. International Account 5251 is a money market account that was opened in 2012, which held $183,850.03 on October 1, 2018. Matthew's Exh. 52.

   a. This account was in the name of Matthew and the Debtor. *Id.* The names are set forth in that order. *Id.*

   b. Matthew listed the interest earned from International Account 5251 on his tax return for the years 2015 to and including 2018. Matthew's Exhs. 74, 75 & 76; Committee's Exh. 38.

   c. On October 30, 2018, $183,000.00 from this account was withdrawn and was deposited into Chase Account 2058. *Id.*; Tr. at pp. 504–07.

3. Chase Account 2058 is a savings account that held $229,341.02 as of February 28, 2019. Matthew's Exh. 79.

   a. This account was in the name of Matthew and the Debtor. *Id.* The names were set forth in that order until the Debtor removed himself from this account (explained below). Committee's Exh. 16.

   b. Matthew listed the interest earned from Chase Account 2058 on his tax return for the years 2018 to and including 2020. Matthew's Exhs. 76, 77 & 78.

   c. On March 4, 2019, $184,380.02 was withdrawn from Chase Account 2058 and was deposited in US Bank Account 4978. Committee's Exhs. 17 & 22.

4. Chase Account 2206 is a checking account that was described as Matthew and the Debtor's household account. Committee's Exh. 18; Tr. at pp. 157, 608.

   a. This account was in the name of Matthew and the Debtor. Committee's Exh. 18. The names were set forth in that order. *Id.*

   b. No evidence was presented as to who, if anyone, listed the interest earned from Chase Account 2206 on their tax return.

   c. Matthew's name was removed from the account, and it now serves as the primary debtor in possession checking account. Order Excusing Banking Requirement [Dkt. No. 69].

5. Johnson Account 3704 is a money market account that held $500,075.53 as of April 30, 2019. Committee's Exh. 30.

   a. This account was in the name of Matthew and the Debtor. The names were set forth in that order. Committee's Exh. 30.

   b. No evidence was presented as to who, if anyone, listed the interest earned from Johnson Account 3704 on their tax return.

   c. On May 17, 2019, the funds in Johnson Account 3704 were withdrawn and deposited into Johnson Account 1412.  Committee's Exhs. 30 & 31.

6. Johnson Account 1412 is a checking account that held $500,505.00 as of May 17, 2019.  Committee's Exh. 31.

   a. This account was in the name of Matthew and the Debtor.  *Id.*  The names were set forth in that order.  *Id.*

   b. No evidence was presented as to who, if anyone, listed the interest earned from Johnson Account 1412 on their tax return.

   c. On May 17, 2019, the funds in Johnson Account 1412 were withdrawn and deposited into Wintrust Account 3274.  Committee's Exhs. 28 & 31.

7. Wintrust Account 3724 received the $500,480.00 then used the funds to purchase Wintrust CD 2520, a certificate of deposit with Wintrust.  Committee's Exhs. 28 & 29.

   a. This account was in the name of Matthew and the Debtor.  Committee's Exh. 28.  The names were set forth in that order.  *Id.*

   b. No evidence was presented as to who, if anyone, listed the interest earned from Wintrust Account 3724 on their tax return.

   c. Matthew does not claim ownership of the funds held in Wintrust Account 3724 nor Wintrust CD 2520.

D.    <u>Tracing the Funds Used to Purchase the Matthew CDs</u>

1. On May 22, 2019, the Debtor obtained the Letter of Credit from Wintrust Bank.  Matthew's Exh. 46.  Four certificates of deposit were pledged as collateral to secure the Letter of Credit:

   a. $250,000.00 from Wintrust CD 8763 was pledged by Matthew;

   b. $225,000.00 from Wintrust CD 4178 was pledged by Matthew;

   c. $500,000.00 from Wintrust CD 2520 was pledged by the Debtor; and

   d. $250,000.00 from Wintrust CD 0642 was pledged by the Debtor.  *Id.*  Prehearing Stmt, at ¶ 36.

2. Only the first two certificates of deposit, the so-called Matthew CDs, form the basis of the Matthew Claim.

a. <u>Wintrust CD 8763</u>

    i. Wintrust CD 8763 was in Matthew's name only. Prehearing Stmt, at ¶ 36.

    ii. No evidence was presented as to who, if anyone, listed the interest earned from Wintrust CD 8763 on their tax return.

    iii. On May 20, 2019, $250,000.00 was withdrawn from Wintrust Account 6091 and used to purchase Wintrust CD 8763. Committee's Exh. 26. Wintrust Account 6091 was in Matthew's name only. *Id.*

    iv. On May 18, 2019, $20,807.09 was withdrawn from Wintrust Account 7584 and was deposited in Wintrust Account 6091. *Id.* Wintrust Account 7584 was in the Debtor's name only. Committee's Exh. 21.

    v. On May 17, 2019, $231,692.91 was withdrawn from US Bank Account 4978 and was deposited in Wintrust Account 6091. Committee's Exh. 23. US Bank Account 4978 was in Matthew's name only. Committee's Exh. 22.

    vi. On March 6, 2019, $46,627.54 was withdrawn from Wintrust CD 3598 and was deposited in US Bank Account 4978. Committee's Exhs. 20 & 22. Again, Wintrust CD 3598 was in the Debtor and Matthew's name. Committee's Exh. 19.

    vii. On March 4, 2019, $184,380.02 was withdrawn from Chase Account 2058 and was deposited in US Bank Account 4978. Committee's Exhs. 17 & 22.

    viii. Chase Account 2058 was in Matthew's name only as of March 1, 2019, when the Debtor was removed. Committee's Exhs. 16 & 18; Tr. at pp. 327–28.

    ix. The Debtor testified that he removed his name from Chase Account 2058 so as to not contaminate Matthew if a sanctions judgment was issued in the State Court Litigation. Tr. at pp. 328–29. Matthew was unsure why the Debtor's name was removed from Chase Account 2058. Tr. at pp. 423–24.

b. <u>Wintrust CD 4178</u>

    i. Wintrust CD 4178 was in Matthew Spiegel name and payable on death to the Debtor. Committee's Exh. 24.

    ii. No evidence was presented as to who, if anyone, listed the interest earned from Wintrust CD 4178 on their tax return.

iii.  On May 20, 2019, $225,000.00 was withdrawn from Wintrust Account 3410 and used to purchase Wintrust CD 4178.  Committee's Exh. 25. Wintrust Account 3410 was in Matthew's name only and payable on death to the Debtor.  Committee's Exh. 24.

iv.  On March 6, 2019, $205,039.00 was withdrawn from Wintrust CD 3598 and was deposited in Wintrust Account 3410.  Committee's Exh. 19.  Wintrust CD 3598 was in the Debtor and Matthew's name. *Id.*

v.  On May 18, 2019, $21,837.04 was withdrawn from Wintrust Account 7584 and was deposited in Wintrust Account 3410.  Committee's Exh. 21.  Wintrust Account 7584 was in the Debtor's name only.  *Id.*

## LEGAL STANDARD

Because of the complex nature of the claim's litigation process, it is worth explaining the process as it normally proceeds and the approach this court takes.

There exist multiple ways to approach proceedings arising in, arising under or related to a case under the Bankruptcy Code.

For example, for most matters in bankruptcy a party in interest may proceed by motion and such motion may be handled in a summary fashion.  Such matters rarely require evidentiary hearings, the use of which is in the court's discretion.  As the Supreme Court has stated, "[t]he guarantees of due process call for a 'hearing appropriate to the nature of the case.'" *United States v. Raddatz,* 447 U.S. 667, 677 (1980) (*quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).  As the Seventh Circuit stated with respect to a bankruptcy court's determination on a question of good faith, another summary matter, that "[t]he bankruptcy court, exercising its sound discretion, is in the best position to determine when an evidentiary hearing on the issue of good faith is necessary." *Marshall v. Blake*, 885 F.3d 1065, 1083 (7th Cir. 2018), *overruled on other grounds by In re Wade*, 926 F.3d 447 (7th Cir. 2019).  The Bankruptcy Code itself recognizes that there exist circumstances when even a hearing is not necessary, even where the Code states that the court's authority occurs after notice and a hearing.  11 U.S.C. § 102(1)(B).

A party may also commence an adversary proceeding by filing a complaint, which is governed in the most part by the general rules governing federal litigation.  *See* Part VII of the Bankruptcy Rules.  Those rules will define whether and how evidence is put before the court.  *See, e.g.*, Fed. R. Bankr. P. 7012 (incorporating by reference Rule 12 of the Federal Rules of Civil Procedure (the "Civil Rules" and, individually, "Civil Rule ___")); Fed. R. Bankr. P. 7056 (incorporating by reference Civil Rule 56).  If a material fact is in dispute, adversary proceedings go to trial.

In between are contested matters.  These are matters handled more formally than summary matters, but not with as much formality as an adversary proceeding.  *See* Fed. R. Bankr. P. 9014.  The intent remains for contested matters to be handled in a less formal manner, but with the option of proceeding to a full-blown evidentiary hearing.  This is clear in the Bankruptcy Rules themselves.

11

For example, Bankruptcy Rule 9014(c) provides that Bankruptcy Rule 7026, which incorporates in large part Civil Rule 26, does not apply in a contested matter unless the court directs otherwise and therefore, doing away what otherwise would be mandatory discovery disclosures.

An objection to a claim is a contested matter. Advisory Committee Notes for Fed. R. Bankr. P. 3007. As such, the judge hearing a claim objection has the discretion and authority to determine whether many of the rules governing adversary proceedings should apply and how evidence, if any, should be presented. Fed. R. Bankr. P. 9014(c); *see also* Fed. R. Evid. 611; *Raddatz*, 447 U.S. at 677; *Marshall*, 885 F.3d at 1083. Claims objections are first and foremost determinations as to whether and to what extent a claimant is entitled to share in a bankruptcy estate (the claimant's piece of the pie). They are not necessarily determinations on the merits of the nonbankruptcy issues and are treated as such by the Bankruptcy Code and Bankruptcy Rules. *See, e.g.*, 11 U.S.C. § 502(j); Fed. R. Bankr. P. 3008. Together section 502(j) and Bankruptcy Rule 3008 allow a claim determination to be reconsidered for cause. Such a claim on reconsideration may be allowed or disallowed according to the equities of the case. 11 U.S.C. § 502(j); Fed. R. Bankr. P. 3008. This circumvents the limitations of Civil Rules 59 and 60, made otherwise applicable in bankruptcy matters by Bankruptcy Rules 9023 and 9024, respectively, and varies greatly from the parties' nonbankruptcy rights.

How this bears out in the hearing of claims objections is ill-defined. It is no wonder that that District Courts appear to misunderstand this process as many bankruptcy courts themselves seem to confuse it. If, for example, a claims objection were to track the rules of litigation, what is the complaint? The claim? The objection? As Civil Rule 56 applies, *see* Bankruptcy Rules 9014(c) & 7056, must a party file a separate motion for summary judgment or is this subsumed in the original objection and response?

As a result, this court has made a habit of clarifying at the outset of claims objections (and has done so here) that the claims litigation process, as a contested matter, should be viewed in multiple stages. An evidentiary hearing is only warranted if all the previous stages are satisfied.

A claim or interest, proof of which is properly filed under section 501 of the Bankruptcy Code, is deemed allowed, unless a party in interest objects. 11 U.S.C. § 502(a). This gives rise to a rebuttable presumption in favor of the validity and the amount of the claim with the claim existing *prima facie* evidence in support thereof. *Ebner v. Kaiser* (*In re Kaiser*), 525 B.R. 697, 704 (Bankr. N.D. Ill. 2014) (Barnes, J.) (*citing* Fed. R. Bankr. P. 3001(f)).

Unless a filed claim is invalid on its face (*e.g.*, late, incomplete, unsigned or failing to attach required support for a claim asserted as secured), "[c]laim objectors carry the initial burden to produce some evidence to overcome this rebuttable presumption." *In re McCoy*, 355 B.R. 69, 72 (Bankr. N.D. Ill. 2006) (Squires, J.) (*citing In re O'Malley*, 252 B.R. 451, 455–56 (Bankr. N.D. Ill. 1999) (Schmetterer, J.)); *In re Kham & Nate's Shoes No. 2, Inc.*, 97 B.R. 420, 424 (Bankr. N.D. Ill. 1989) (Coar, J.). Such "[o]bjectors to claims are required to produce evidence of a probative force equal to the allegations of the creditor's proof of claim." *Heritage Bank Tinley Park v. Steinberg* (*In re Grabill Corp*)., 121 B.R. 983, 992 (Bankr. N.D. Ill. 1990) (Squires, J.). "Once the objector has produced some basis for calling into question allowability of a claim, the burden then shifts back to the claimant to produce evidence to meet the objection and establish that the claim in fact is allowable." *O'Malley*, 252 B.R. at 456.

The first stage is therefore a determination of whether a claim is validly submitted, thus giving rise to the rebuttable presumption in the claim's favor noted above. A proof of claim may be invalid on its face. It may be late, unsigned or incomplete. It may be asserted as secured but without the attached support required by the claim form. *See* Official Form 410 (instructing the claimant to "[a]ttach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements."); *see also* Fed. R. Bankr. P. 3001(c)(1) (requiring claims based on writings to attach copies such writings). When a proof of claim is not filed in accordance with the rules, it is not entitled to the *prima facie* allowance. *In re Plourde*, 418 B.R. 495, 508–09 (B.A.P. 1st Cir. 2009). If a claim fails to satisfy the requirements of the Official Form or the Bankruptcy Rules in a material way, the objection goes no further and the claim is disallowed. This is in some ways comparable to a motion to dismiss under Rule 12(b)(6) or a "no evidence" motion for summary judgment under Rule 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986).

If a claim is valid on its face (or the failures are not material), the court proceeds to the second stage.[8] At this stage, the party objecting to a claim bears the initial burden to introduce evidence or legal authority of probative force equal to or greater to presumption of allowance. *McCoy*, 355 B.R. at 72; *Grabill Corp.*, 121 B.R. at 900. If the objection is sufficient (and many are not), then and only then does the court proceed to the third stage.

As to the first two stages, the evidence considered is that which the parties were required to adduce in order to make their respective filings. The claimant has the up-front evidentiary burdens on his or her claim discussed above. Official Form 410; Fed. R. Bankr. P. 3001(c)(1). The objecting party, unless the claim is invalid on its face or is legally deficient for some other reason, must file with its objection evidence of sufficient probative force to overcome the presumptive allowance of the claim *with his or her objection*. *Grabill Corp.*, 121 B.R. at 900; *O'Malley*, 252 B.R. at 456; *cf.* Rule 3007-1(c)(1) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("An objection to claim must be supported by admissible evidence sufficient to overcome the evidentiary effect of a properly documented proof of claim executed and filed in accordance with FRBP 3001. The evidence must demonstrate that the proof of claim should be disallowed, reduced, subordinated, re-classified, or otherwise modified."). Discovery is not needed or appropriate for these first two stages.

The third stage, on the other hand, is akin to summary judgment. It allows the court to weigh whether there exists an evidentiary dispute sufficient to require an evidentiary hearing. It may be that the facts, if presumed to be true, fail to support the allowance or disallowance of a claim. For example, a creditor in a chapter 13 matter recently asserted a secured claim in a vehicle but attached to that claim evidence of a security in a completely unrelated vehicle. Such a determination

---

[8]    Bankruptcy Rule 3001 presents a gating issue for the claim and satisfying that gating issue alone is not enough to allow the claim when met with evidence supporting the disallowance of the claim pursuant to the grounds set forth in section 502(b) of the Bankruptcy Code. 11 U.S.C. § 502(b). For example, section 502(b)(1) provides a claim may be disallowed when it would be unenforceable under applicable law. 11 U.S.C. § 502(b)(1). Thus, this court disagrees with a recent Ninth Circuit decision finding that Nevada law is not "applicable law" that can render a claim unenforceable because the claim in that case met the gating requirements of Bankruptcy Rule 3001. *LVNV Funding LLC v. Myers* (*In re Myers*), Case Nos. 22-16615, 22-60037, 2023 WL 8047842, at *2 (9th Cir. November 21, 2023). That conclusion, for lack of a better term, is nonsense.

would certainly never require an evidentiary hearing, but would in the normal course of litigation occur only after discovery has taken place. While a party might request discovery for this stage, it is not automatic and is generally not afforded unless specifically requested and justified. In addressing this stage, the burden is on the claimant as the proponent of the claim. *O'Malley*, 252 B.R. at 456.

The court customarily hears all three initial stages at a hearing on the objection and any responses thereto, and that hearing is not an evidentiary hearing. Its purpose is not to adduce additional evidence, but to consider the totality evidence at that stage. Witness testimony isn't taken. Fed. R. Bankr. P. 9014(e). Only if the proof of claim survives these challenges and a material fact is in dispute, must the parties proceed to an evidentiary hearing. The burden in such an evidentiary hearing remains on the claimant. *Id.*; Fed. R. Bankr. P. 9014(d). Prior to the final, evidentiary hearing, the parties may engage in additional discovery as made applicable to contested matters. Fed. R. Bankr. P. 9014(c).

Recall that while a proof of claim executed and filed in accordance with the rules is entitled to be *prima facie* allowance, Fed. R. Bankr. P. 3001(f), the same holds true for the scheduling of claims. A proof of claim or interest is deemed filed under section 501 of the Bankruptcy Code for any claim or interest that appears in properly completed schedules in a chapter 11 case filed under section 521(a)(1) or 1106(a)(2) of the Bankruptcy Code, except a claim or interest that is scheduled as disputed, contingent, or unliquidated. 11 U.S.C. § 1111(a).

As this court has stated,

> [b]y adding Matthew as a creditor, the Debtor has created a claim for him. *See* 11 U.S.C. § 1111(a) ("A proof of claim or interest is *deemed filed* under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(a)(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated."); Fed. R. Bankr. P. 3003(b)(1) ("[i]t shall not be necessary for a [chapter 11] creditor … to file a proof of claim"). As a result, Matthew has a claim within the meaning of section 501 … and that claim is presumptively allowed under section 502 unless and until a valid objection to either the schedule or claim has been brought ….

*Spiegel*, 2023 WL 2564028, at *3 (footnote omitted).

Regardless of the source, the same stages set forth above apply. They cannot, however, apply the same way. As there is no requirement that a debtor attach supporting documentation on a scheduled claim, such a claim obtains its presumed allowance on a much lower standard. Compliance with what information is required in the schedules is therefore all the more important as failures are most likely material. The objection to a scheduled claim must still provide evidence of a sufficient probative force to overcome the assumed allowance, but that is an easier burden to meet when the initial claim is as yet unsupported by evidence. As a result, it is incumbent on the claimant of a scheduled claim when responding to an objection to provide with that response the evidence which is required on a proof of claim.

In addressing those stages here, the objecting party—the Committee—bears the initial burden to overcome the *prima facie* presumption should such presumption arise, but the scheduled

14

creditor—Matthew—carries the ultimate burden of persuasion to show his entitlement to the Matthew Claim, including the amount of the Matthew Claim.

DISCUSSION

A.    The Matthew Claim

Matthew did not file a proof of claim in this case. The potential for a claim in favor of Matthew first appeared on the docket in the Fifth Amended Plan. The Debtor then followed that with scheduling the Matthew Claim in the Debtor's Amended Schedule E/F.

In the absence of an objection and solely for the purpose of considering Matthew's standing to be heard on matters in this case, the court previously found the Matthew Claim was entitled to *prima facie* allowance, stating that:

> As amendments to schedules are liberally permitted under Fed. R. Bankr. P. 1009, the Debtor's amendments – though late – are presumptively valid unless a statutory basis for disallowing them exists. *See*, *e.g.*, *Law v. Siegel*, 571 U.S. 415, 416 (2014) ("a court may not refuse to honor a debtor's invocation of an exemption without a valid statutory basis."). The court presumes the Supreme Court means such a principle to apply to all amended schedules.
>
> By adding Matthew as a creditor, the Debtor has created a claim for him. *See* 11 U.S.C. § 1111(a). As a result, Matthew has a claim within the meaning of 11 U.S.C. § 501 and that claim is presumptively allowed under 11 U.S.C. § 502 unless and until a valid objection to either the schedule or claim has been brought.

*Spiegel*, 2023 WL 2564028, at *3 (paragraph numbering omitted). That ruling was made in the context of a challenge to standing only and not in the context of an objection directed at the factors discussed herein. The *prima facie* allowance of the Matthew Claim was not generally determined in that narrow context and is not therefore the law of this case.

Following that ruling, the Committee brought this Objection, among other things, challenging that *prima facie* allowance of the Matthew Claim.

B.    The Objection

The Objection advances the following four theories under which the Matthew Claim might be disallowed. First, as the Amended Schedules do not comply with the Bankruptcy Code and Bankruptcy Rules, the Matthew Claim should be disallowed as it is not entitled to *prima facie* allowance. Second, pursuant to section 502(b)(1) of the Bankruptcy Code, the Matthew Claim should be disallowed as Matthew never loaned any funds to the Debtor and, even if the elements of a loan could otherwise be established, that the Debtor was the actual the source of the funds. Third, pursuant to section 502(d) of the Bankruptcy Code, the Matthew Claim should be disallowed as Matthew is the recipient of multiple avoidable transfers from the Debtor. Fourth and last, on equitable grounds, the Matthew Claim should be disallowed as the claim was developed as a scheme to allow Matthew standing to participate in the proceeding at large.

The court will consider each of these in turn.

15

1.      Prima Facie *Validity*

The Objection asserts that the Matthew Claim is not entitled to *prima facie* allowance as the Amended Schedules do not comply with the Bankruptcy Code and Bankruptcy Rules.

It is unquestionably true, as the Committee argues, that "[t]he burden is on the debtors to use reasonable diligence in completing their schedules and lists," *Lubeck v. Littlefield's Restaurant Corp. (In re Fauchier)*, 71 B.R. 212, 215 (B.A.P. 9th Cir. 2009), and "[d]ebtors may not insulate themselves by asserting that they have failed to read their schedules before signing and filing them." *U.S. Trustee v. Klawitter (In re Klawitter)*, Adv. No. 20ap96026, Case No.19bk82566, 2022 WL 4656207, at *23 (Bankr. N.D. Ill. Sept. 30, 2022) (Lynch, J.).  It is equally true that the Matthew Claim, as scheduled, is incomplete.

The Matthew Claim is scheduled at section 4.7 on the Official Form 106E/F (the "Form").  The Form requires a debtor to list all nonpriority unsecured claims in section 4.  Section 4 of the Form, in turn, requires a number of things and allows for others.  What is clearly required is the name and address of the scheduled creditor, the amount of the claim, the date the debt was incurred, a selection of who incurred the debt, whether the claim is subject to offset and type of the claim.  The Form also requires if applicable the last 4 digits of an account number should one exist and, also if applicable, requires the debtor to indicate whether the claim is contingent, unliquidated and/or disputed.  As to the type of claim, the debtor is given options including the ability to choose "other", but if he or she does, to specify the nature of claim.

Here, the Debtor, under section 4.7 of the Amended Schedules, provided Matthew's name, address and the amount owed as $475,000.00.  He indicates that the debt was incurred by him and that the claim is not subject to offset.  The Debtor does not, however, disclose when the debt is incurred nor did he, despite selecting "other" as the nature of the claim, specify the type of claim.

That such omissions are material is clear.  The Committee was left to speculate, as it did in the Objection, how and when the Matthew Claim arose.  It was not until the Response was filed that the Committee learned of its provenance.  The Amended Schedules quite simply did not provide sufficient description of the Matthew Claim for an objecting party to begin to analyze their or the estate's rights vis-à-vis the claim.  In this, the Debtor has failed to use reasonable diligence in completing his schedules and lists.

This is especially true considering the timing of and circumstances surrounding the filing of the Amended Schedules.  The Debtor only filed the Amended Schedules after the Committee challenged Matthew's standing to participate in the Chapter 11 Case and the standing issue had been set on briefing.  Only then did the Debtor file the Fifth Amended Plan and the Amended Schedules setting forth a debt owed to Matthew, his son.  The Debtor's own testimony confirmed that the Amended Schedules were filed in response to the Committee's challenge to Matthew's standing and the Committee's Motion to Convert.  Tr. at pp. 371–72.

The Debtor is entitled to liberally amend his schedules pursuant to Bankruptcy Rule 1009 and is not required to seek leave to do so.  *Spiegel*, 2023 WL 2564028, at *3 (*citing to Siegel*, 571 U.S. at 416).  The Debtor, in fact, amended his schedules on three different instances in the Chapter 11 Case.  *See* [Dkt. Nos. 17, 160, 805].  The Matthew Claim, as we subsequently discovered, appears to

16

have been incurred May 23, 2019.[9]  Of the foregoing amendments, two occurred after that date and before the amendment in question.  The Debtor's plan of reorganization was amended four times after that date before the Matthew Claim was included in his plan of reorganization, *see* [Dkt. Nos. 264, 406, 635, 728], and it was not until after the Debtor amended the plan to add treatment of a claim by Matthew that the schedules were amended to add the Matthew Claim.

The Debtor did not further amend his schedules to reflect the debt until his son's standing to be heard in the Chapter 11 Case was questioned.  That standing was reasonably questioned by the Committee, as Matthew's actions in the case had all the hallmarks of him being used by the Debtor to raise issues through him.  Matthew's involvement in the Chapter 11 Case began early when the Committee sought the 2004 Examination of the Debtor, Matthew and Greenleaf.  [Dkt. Nos. 134, 161].  In turn, Matthew sought in part to disband the Committee.  [Dkt. No. 166].  Matthew and Greenleaf were represented at that time by the Debtor's state court counsel Xydakis, [Dkt. No. 161],[10] at the same time he appeared in the Chapter 11 Case as volunteer counsel for the Debtor.[11]

Xydakis turned what can only be described as a routine 2004 Examination into a contentious, inefficient proceeding.  Those actions resulted in court-ordered sanctions against the Matthew, Greenleaf and Xydakis.  Order Granting in part, Denying in part, and Continuing in part

---

[9]  The court could find nothing in evidentiary record of this matter conclusively establishing the date the Matthew Claim is deemed to have arisen.  It might be on the date the CDs were pledged, but, as discussed below, it is an agreement to repay the Matthew Claim which is integral to any such claim having arisen.  This is a clear failing of the Debtor's scheduling of the Matthew Claim, as the date the debt was incurred is a required element of that scheduling.  The court therefor infers that the date of alleged claim arose is sometime around May 2019.

[10]  Although Xydakis never filed an appearance on behalf of Greenleaf, he represented himself as such in hearings before the court.

[11]  Xydakis' involvement in the Chapter 11 Case has been problematic from the start.  He attempted to wear multiple hats in the Chapter 11 Case, all the while not being retained to act on behalf the bankruptcy estate.  Unfortunately, the Seventh Circuit has stated that attorneys that do not seek employment under 327 are akin to "officious intermeddlers" who are merely prevented from seeking compensation.  *In re Grabill Corp.*, 983 F.2d 773, 776 (7th Cir. 1993) (suggesting that "[a] lawyer who was concerned that he might be disapproved if he applied under 327(a) might take a chance on not applying ... ."); *see also* 3 COLLIER ON BANKRUPTCY ¶ 327.03[2][c] (16th ed. 2015) (calling such attorneys officious intermeddlers or "gratuitous volunteers").  This is not helpful to the administration of bankruptcy estates as it views section 327 as a gateway to compensation only, rather than its more broadly understood purpose to safeguard and oversee the actions of debtors with respect to counsel during the pendency of their cases.  *Accord Interwest Bus. Equip., Inc. v. U.S. Trustee (In re Interwest Bus. Equip., Inc.)*, 23 F.3d 311, 318 (10th Cir. 1994) ("The Bankruptcy Code and Rules do not provide authority for the court to prohibit a professional from working for any client it chooses.").  Courts routinely use this broader purpose to ensure that bankruptcy estates are represented by competent counsel.  *In re Vettori*, 217 B.R. 242, 245 (Bankr. N.D. Ill. 1998) (Schmetterer, J.) ("[A]n attorney hoping to represent a Chapter 11 debtor must have more than just integrity; that counsel must also have a strong knowledge of technical requirements under the Bankruptcy Code").  Reading section 327 narrowly permits parties such as Xydakis to unnecessarily complicate proceedings.

Xydakis' actions in the Chapter 11 Case fell away after the District Court disqualified him under section 327, irrespective of the foregoing precedent.  *See In re Spiegel*, Case No. 21cv05087 (N.D. Ill. March 10, 2022).

the Second Motion of the Official Committee of Unsecured Creditors to Compel Matthew Spiegel and 116-22 Greenleaf Building, LLC to Comply with Rule 2004 Subpoenas [Dkt. No. 403]. What followed was a series of disputes between the Committee, Matthew and Greenleaf involving requests for discovery, compelling discovery and opposition to the Committee's Counsel's fee applications, culminating for these purposes in the Committee's challenge to Matthew's standing, the Debtor's filing of a revised plan and revised schedules, and the Objection.

In light of all of this and as this court has noted, these circumstances have all "the hallmarks of blatant attempts of the Debtor to confer standing on his son." *Spiegel*, 2023 WL 2564028, at *3. Considering the foregoing, the court cannot simply overlook the Debtor's material omissions in the Amended Schedules in relation to the Matthew Claim. As Matthew has never filed a claim of his own and the Matthew Claim as scheduled is insufficient, the Matthew Claim is not therefore entitled to a rebuttable presumption of allowance in its favor.[12]

That is not, however, the end of the inquiry. Had Matthew not supplemented the Matthew Claim in his Response, it would be. But in light of the additional information provided by Matthew and as noted above about how the claims objection stages shift when a claim originates in a debtor's schedules, the court must look further. Keeping in mind that the burden remains on Matthew, the court will therefore take up the remaining arguments raised by the Committee.

2.    *Section 502(b)(1)*

The Objection also asserts that the Matthew Claim should be disallowed pursuant to section 502(b)(1) of the Bankruptcy Code as Matthew never loaned any funds to the Debtor. Section 502(b)(1) results in the disallowance of a claim where any agreement or applicable law would find a claim unenforceable against the debtor. 11 U.S.C. § 502(b)(1). As this court has previously stated,

> Section 502(b) is understood to stand for the proposition that "creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provision of the Bankruptcy Code." *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 20 (2000); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443, 452 (2007) (recognizing that "claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed"); *In re Caesars Entm't Operating Co., Inc.*, 588 B.R. 32, 41 (Bankr. N.D. Ill. 2018) (Goldgar, J.) (*quoting Raleigh*).

---

[12]    The Committee also argues that informal claims are not entitled to *prima facie* allowance unless such informal claims contain the information required by the Official Form. *See In re Houston Bluebonnet, L.L.C.*, 579 B.R. 772, 778 (Bankr. S.D. Tex. 2017), *aff'd*, 586 B.R. 837 (S.D. Tex. 2018), *vacated and remanded on other grounds,* 770 F. App'x 222 (5th Cir. 2019) ("A creditor's proof of claim is *prima facie* valid if the creditor completes all required portions of the Official Bankruptcy Proof of Claim Form, attaches all supporting documents available for that claim … These informal proofs of claim are thus incomplete, do not substantially conform to the appropriate Official Form, and are not *prima facie* valid."). While the court does not disagree with this assertion, it is of no bearing here. What is at issue here is a claim arising from scheduling in the manner dictated by the Bankruptcy Code and Bankruptcy Rules, not an informal claim.

18

*Spiegel*, 638 B.R. at 615–16.

Recall that the essence of the Matthew Claim is that the Debtor owes him reimbursement for funds committed to collateralize the Letter of Credit and subsequently taken by Wintrust Bank in satisfaction of a draw on the same. The Committee's theory challenges the validity of that debt and does so in two essential parts. First, the Committee argues that the debt the Debtor claims to owe Matthew is illusory as the funds committed by Matthew were in fact the Debtor's. Second, the Committee argues that, even if the funds belonged to Matthew, there is no evidence that the Debtor is obligated to repay Matthew for the use of such funds.

The court will take up each of those parts in turn.

a.      Do the Funds Belong to Matthew, the Debtor, or Both?

It is undisputed that some of the collateral pledged in support of the Letter of Credit included the Matthew CDs. The Committee claims, however, that the Matthew CDs were in fact funds of the Debtor. In response, Matthew argues that the funds used to purchase the Matthew CDs were gifted to Matthew by the Debtor.

To be clear, the Matthew CDs totaled $475,000.00, as set forth above and were purchased on May 20, 2019, just two days prior to their being used as collateral for the Letter of Credit. The source of the funds in the Matthew CDs was varied. Working backwards, the funds flowed in the following way:

- <u>Wintrust CD 4178</u>. Matthew purchased Wintrust CD 4178 with a deposit of $225,000.00 on May 20, 2019, from Wintrust Account 3410.

  o   Wintrust Account 3410, which was in Matthew's name only, was created on March 6, 2019, with two deposits: (1) $205,039.00 from Wintrust CD 3598; and (2) $21,837.04 from Wintrust Account 7584.

  o   Wintrust CD 3598, which was held by Matthew and the Debtor, was purchased on March 6, 2017, with an initial deposit of $245,480.71, the source of which is unclear.

  o   Wintrust Account 7584, in turn, was the Debtor's account.

- <u>Wintrust CD 8763</u>. Matthew purchased Wintrust CD 8763 with a deposit of $250,000.00 on May 20, 2019, from Wintrust Account 6091.

  o   Wintrust Account 6091, which was in Matthews's name only, was created on May 17, 2019, with two deposits: (1) $231,692.91 from U.S. Bank Account 4978; and (2) $20,807.09 that from Wintrust Account 7584.

  o   U.S. Bank Account 4978, which was in Matthew's name only, was created on March 4, 2019, with two initial deposits: (1) $46,627.54 from Wintrust CD 3598; and (2) $184,380.02 from Chase Account 2058.

o   Wintrust CD 3598, which was in the name of Matthew and the Debtor, was purchased on March 6, 2017, with an initial deposit of $245,480.71, the source of which is unclear.

o   Chase Account 2058 was initially in Matthew and the Debtor's name, but the Debtor's name was removed approximately five days before the transfer.  It is unclear when this account was opened.

o   Again, Wintrust Account 7584 was the Debtor's account.

As noted above, two sources of funds in the Matthew CDs were transferred from the Debtor's accounts immediately preceding the purchase of the CDs.  Wintrust 4178 was funded with $21,837.04 and Wintrust 8763 was funded with $20,807.09, each just two days before the purchase of the CDs and just two days before the CDs were pledged in support of the Letter of Credit.  In instance, the source of the funds was solely from an account of the Debtor.

These transfers, which total $42,644.13, were never adequately explained by Matthew.  Given the nearly contemporaneous transfer of these funds from the Debtor to Matthew and from Matthew in return to Wintrust on behalf of the Debtor, the court must conclude that these were the Debtors' own funds being used for the Debtor's purposes.  As a result, the Matthew Claim cannot properly reflect these amounts and must be reduced accordingly.

As to the remainder of the funds used to fund the CDs, the source of the funds was in some occasions accounts held solely by Matthew and in some occasions accounts held jointly by Matthew and the Debtor.

It is clear that Matthew and the Debtor contend these funds are gifts, made as early as 2012, from the Debtor to Matthew.  Tr. at pp. 507, 610.  They contend that the ownership of joint accounts, for example, is best determined by whose name is first on the accounts and, in addition, whose social security number is associated with the account.  Tr. at pp. 498, 704 & 712.  This testimony directly contradicts earlier testimony by Matthew at the 2004 Deposition.  Committee's Exh. 3.

The Committee attempts in turn to trace the funds through several decades of Matthew's and the Debtor's financial history.  It is not necessary to trace the funds to their source, however.  There appears to be no legitimate question that the original source of the funds was the Debtor.  The Committee, however, contends that at all relevant times, the funds in the Matthew CDs were the actual and equitable property of the Debtor.  It claims that Matthew only enjoyed bare legal title at best.

It is perplexing that neither Matthew nor the Committee sought to introduce and put at issue the terms and conditions for the CDs and accounts in question.  Despite the Debtor's contentions, there was further little attempt to show whose social security number was associated with the accounts, though the tax treatment of the accounts was given a fair amount of attention.  Still, the result of these failures is to leave it to the court to make determinations of ownership in the absence of what might be the most salient evidence as to ownership.

In that regard, Illinois law provides generally that "[w]hen a deposit in any bank … transacting business in this State has been made or shall hereafter be made in the names of 2 or

more persons payable to them when the account is opened or thereafter, the deposit or any part thereof or any interest or dividend thereon may be paid to any one of those persons whether the other or others be living or not". 765 ILCS 1005/2(a). Further, under Illinois law, that funds are held in a joint account is *prima facie* evidence that the funds belong to the account holders jointly. *See Society of Lloyd's v. Collins*, 284 F.3d 727, 731 (7th Cir. 2002) (*citing Leaf v. McGowan*, 141 N.E.2d 67, 71 (Ill. App. Ct. 1957)).

The net effect of the accounts being joint is that both Matthew and Marshall were entitled to exercise control over the funds therein. "Neither party to a joint bank account is liable to the other joint depositor for the withdrawn funds." *Oberg v. Chrispin (In re Chrispin)*, Adv. No. 11ap00443, Case No. 10bk47833, 2012 WL 3126807, at *9 (Bankr. N.D. Ill. July 31, 2012) (Cassling, J.) (*citing In re Vogel*, 684 N.E.2d 1035, 1038 (Ill. App. Ct. 1997)); *see also Smith v. Marcet (In re Marcet)*, 352 B.R. 462, 470 (Bankr. N.D. Ill. 2006) (Squires, J.) ("Pursuant to common law, in a joint tenancy each party independently owns the entirety, and therefore, either party is entitled to withdraw the funds unilaterally.") (*citing Wood v. Jack Carl Assocs., Inc.*, Case No. 85c499, 1985 WL 1140, at *1 (N.D. Ill. April 29, 1985)).

When something other than joint ownership of the funds is contended as to such accounts, the burden then shifts to the party challenging ownership of the funds. *See Society of Lloyd's*, 284 F.3d at 731. In the event of such a challenge, "[f]actors used in determining the ownership of funds in a joint account include: (1) control over the funds in the account; (2) contribution of funds to the account by each party; (3) whether any contribution by one party constituted a gift to the other; (4) who paid taxes on the earnings from the account; and (5) the purpose for which the account was established." *Chrispin*, 2012 WL 3126807, at *9 (*citing Highsmith v. Dep't of Public Aid*, 803 N.E.2d 652, 657 (Ill. App. Ct. 2004)). While the burden to prove his claim remains on Matthew, the form of ownership is, under Illinois law, sufficient to meet that burden. It falls on the Committee to prove the *Chrispin* factors and negate the presumptions regarding the ownership of the funds in the joint accounts.

The court will therefore consider each of these factors in turn.

### i.   Control over the Funds in the Account

The Debtor testified that the funds in the Joint Accounts belonged to Matthew and he would need Matthew's approval to transfer those funds. Tr. at p. 683. The Debtor further testified Matthew often withholds consent regarding the funds. Tr. at pp. 683–84, 721. He also testified that he considered the ownership of the funds was best defined by whose name was first on the account and whose social security number was associated with the account. Tr. at pp. 498, 704 & 712. The best evidence would begin, of course, the terms governing the Joint Accounts, but those were not provided.

In response, the Committee argues that the Debtor maintained control of the funds in the Joint Accounts and the evidence of that fact is that the funds held ultimately were used for the benefit of the Debtor, notwithstanding later transactions being conducted solely by Matthew.

Despite the Committee's creative *res ipsa loquitor* argument, this factor is neutral at best. The evidence provides that until the transfers in question, the funds remained mostly untouched and served as a vehicle to earn interest. While it did appear that the Debtor exercised some control over

21

how the accounts were formed, that is not inconsistent with joint accounts and there is nothing that compels the court to conclude these funds were solely controlled by the Debtor. Some control over joint funds is consistent with the nature of the accounts. The Debtor's subjective, self-serving statements regarding ownership of the accounts are of little use in the determination.

As such, there is no compelling evidence of control to overcome the presumption that funds in the Joint Accounts belonged to both accountholders in accordance with Illinois law and this factor weighs in favor of Matthew.

ii.      Contribution of Funds to the Account by Each Party

This factor overwhelming favors the Committee's arguments. While the court heard evidence that Matthew's paychecks were regularly deposited into Chase Account 2058, Tr. at p. 414, neither Matthew nor the Debtor asserted that Matthew through his earned income could have been the source of the funds of the magnitude held in Chase Account 2058 or any of the other Joint Accounts. While Matthew and the Debtor asserted the funds belonged to Matthew as they were gifted to Matthew by the Debtor at some undetermined point in the past, that is discussed in more detail below. Absent such a determination, the contribution of the funds favors a determination that the funds in the accounts belonged to the Debtor.

This factor weighs against Matthew.

iii.      Whether Any Contribution by One Party Constituted a Gift to the Other

Both Matthew and the Debtor testified the funds used to purchase the Matthew's CDs were a gift from the Debtor to Matthew. Committee's Exh. 3; Tr. at pp. 333–37, 521–22, 530–31, 796–97.

Under Illinois law, "a transfer from a parent to a child is presumed to be a gift." *In re Marriage of Hagshenas*, 600 N.E.2d 437, 443 (Ill. App. Ct. 1992). This is true even if the child is an adult. *Moore v. Moore*, 138 N.E.2d 562, 558 (1956) ("The presumption has been applied in many cases involving adult sons or married daughters.") (listing cases); *Tummelson v. White*, 47 N.E.3d 579, 581 (Ill. App. Ct. 2015); *In re Marriage of Kendra*, 815 N.E.2d 22, 24 (Ill. App. Ct. 2004). "Normally, this presumption can only be overcome with clear and convincing evidence." *In re Marriage of Heinze*, 631 N.E.2d 728, 734 (Ill. App. Ct. 1994). The existence of a claimed gift thus, under Illinois law, shifts the burden to the party opposing such a claim.

No such clear and convincing evidence exists. The Debtor's testimony demonstrated a regular practice of opening accounts with Matthew, including when Matthew was a minor. Matthew's Exh. 63; Tr. at p. 21. The Debtor also contended that some of the funds might have constituted gifts from third parties. Tr. at p 347. Though the Debtor could not pinpoint when specific funds were gifted to Matthew from those other than the Debtor, he speculated that some of the funds may have come as a gift from his ex-wife to Matthew and from wedding gifts that the Debtor did not intend to keep, instead, regifting those to Matthew. *Id.*; Committee's Exh. 3.

True, it is unclear from the testimony why the Debtor and Matthew decided the Debtor's name should remain on the accounts if the funds, as they both contend, belonged to Matthew. One

22

suggestion is that both names remained on the accounts so the accounts would receive greater protection from the deposit insurance of the Federal Deposit Insurance Corporation. The Debtor's testimony, though self-serving, did seem to support that contention. Tr. at pp. 177–78.

The net result does not change. The burden is on the Committee as to demonstrate by clear and convincing evidence that the funds given to Matthew were not intended as gifts, and that burden has not been met.

This factor weighs in favor of Matthew.

iv.      Who Paid Taxes on the Earnings from the Account

The evidence is clear that Matthew paid taxes on the interest on the earnings from the Joint Accounts. Matthew's Exhs. 74, 75, 76, 77 & 78. The Committee does not dispute this but argues that this was merely a tax saving scheme by the Debtor to avoid paying what would be a higher interest income had it been reported on the Debtor's tax returns.

As no evidence was presented by the Committee to support this allegation, at best, this argument is speculative and is insufficient to satisfy *Chrispin*.

This factor weight in favor of Matthew.

v.      The Purpose for which the Account Was Established

The evidence demonstrated the purpose of the accounts in question was to serve as an investment, primarily to earn interest. Tr. at p. 79–80. Nothing presented by either party advanced this issue in either way. As a result, the court has no evidence that would allow this factor to negate Matthew's presumed joint ownership of the funds in the accounts.

After considering the *Chrispin* factors, the court cannot conclude that the Committee has presented sufficient evidence to overcome the presumption of joint ownership regarding the funds in the Joint Accounts. As such, both the Debtor and Matthew were free to use the funds in the accounts. The evidence appears to indicate that it was Matthew who moved the funds in question. Tr. at pp. 427–28, 433–34, 445–47. As such, the court must conclude that, other than the $42,644.13 discussed above and excluded from the Matthew Claim, the funds as used to fund the Matthew CDs were Matthew's through that exercise of ownership of moving the funds and subsequently pledging them.

This is not, however the end of the court's analysis under section 502(b)(1) of the Bankruptcy Code. In addition to the funds being those of Matthew, Matthew as the defender of the Matthew Claim must demonstrate that the pledging of the Matthew CDs in favor of the Letter of Credit and the resulting liquidation of the Matthew CDs by Wintrust in satisfaction of the draw on the Letter of Credit gave rise to an allowable claim.

b.      Do the Funds Exchanged Reflect Entitlement Through a Contractual Right or Any Other Legal Means

The second part of the Objection under section 502(b) asserts that, even if the funds underlying the Matthew Claim belonged to Matthew, there is no evidence that the Debtor is obligated to repay Matthew for the use of such funds.

Neither party presents a written contract under which Matthew might assert that the extension of funds constituted a loan to the Debtor, though Matthew has shown that he can and will enter into contracts governing his relationship with his father. *See, e.g.*, Reply in Support of Debtor's Sixth Amended Disclosure Statement for His Seventh Amended Plan of Reorganization [Dt. No. 1093], Ex. 1 ("Agreement to Be Bound").

Instead, in the Response, Matthew asserts that he and the Debtor entered into a valid and enforceable *oral* contract pursuant to which Matthew pledged the Matthew CDs to secure the Letter of Credit. Matthew argues in that alternative that if the court were to find no oral contract can be established, then an implied-in-fact contract can be inferred. Last, Matthew argues that the Matthew Claim can be upheld on a theory of restitution and unjust enrichment, or, in other words, that there exists a contract implied in law.

The court will consider each argument in turn.

i.      Oral Contract

Under Illinois law, the elements of a contract are an offer, acceptance and consideration. *BMO Harris Bank, N.A. v. Porter*, 106 N.E.3d 411, 421 (Ill. App. Ct. 2018). "Oral contracts are subject to the same requirements of contract formation as written ones—there must be an offer, an acceptance, and consideration." *Tindall Corp. v. Mondelez Int'l, Inc.*, 248 F. Supp. 3d 895, 904 (N.D. Ill. 2017) (*citing Sheth v. SAB Tool Supply Co.*, 900 N.E.2d 738, 566–67 (Ill. App. Ct. 2013)).

In terms of an agreement between Matthew and the Debtor, the Debtor testified that he did not have an explicit understanding with Matthew, but it was his view that he would owe the money to Matthew at some point. Tr. at p. 515. Matthew testified that it was his understanding the Debtor owed him $475,000.00 and Matthew expected and still expects to be repaid that amount from the Debtor. Tr. at p. 723.

The testimony of both the Debtor and Matthew was both self-serving and unreliable. Matthew's testimony conflicts with that from the 2004 Deposition. At the 2004 Deposition, Matthew testified that he was owed $500,000.00 to upward of $1 million. Committee's Exh. 3. The Debtor, in turn, never acted to memorialize a debt to Matthew until forced to do so to ensure that Matthew could still voice his unconditional support for the Debtor's actions in the Chapter 11 Case.

Even if the court were to accept the basic precepts of their assertions, neither witness testified as to any plan of repayment, terms exchanged or any agreed understanding on the alleged loan … all required elements for the formation of an oral contract under Illinois law. *BMO Harris Bank*, 106 N.E.3d at 421; *Tindall Corp.*, 248 F. Supp. 3d at 904.

Under these circumstances, the court cannot find that an oral contract exists.

ii.        Contract Implied in Fact

The existence of a contract implied in fact depends on the facts, circumstances and expressions by the parties demonstrating intent to be bound.  *BMO Harris Bank*, 106 N.E.3d at 421.

As Judge Hunt of this court has written,

> "Even in the absence of an express contract, an implied contract can be created as a result of the parties' actions." *Trapani Constr. Co. v. Elliot Grp., Inc.*, 2016 IL App (1st) 143734, ¶ 41, 407 Ill. Dec. 754, 64 N.E.3d 132 (*citing Kohlenbrener v. North Suburban Clinic, Ltd.*, 356 Ill. App. 3d 414, 419, 292 Ill. Dec. 422, 826 N.E.2d 563 (1st Dist. 2005)).  A contract implied in fact arises from a promissory expression inferred from facts and circumstances that demonstrate the parties' intent to be bound. *Id.* (*citing Heavey v. Ehret*, 166 Ill. App. 3d 347, 354, 116 Ill. Dec. 781, 519 N.E.2d 996 (1st Dist. 1988)).  "Thus, '[t]he only difference between an express contract and an implied contract in the proper sense is, that in the former the parties arrive at an agreement by words, either verbal or written, while in the latter the agreement is arrived at by a consideration of their acts and conduct.'" *Id.* (*quoting Litow v. Aurora Beacon News*, 61 Ill. App. 2d 127, 133, 209 N.E.2d 668 (2d Dist. 1965) (internal quotation marks omitted)).

*Johnson v. Amerbank, LLC* (*In re Miles*), 652 B.R. 512, 526 (Bankr. N.D. Ill. 2023) (Hunt, J.)

As Judge Hunt continues, "[a] contract implied in fact is a true contract, which contains all the elements of an express contract, including offer, acceptance, consideration, and a meeting of the minds." *Id.*  These elements must be shown, not by the parties' written or oral agreement, but instead by conduct. *Id.*

Here the court has little to go on relating to the parties' conduct other than their conduct within the Chapter 11 Case.  As noted, though the obligation to Matthew would presumably have arisen at the time the Matthew CDs were pledged, despite numerous opportunities (through filed schedules and numerous plans, testimony at the meeting of creditors and depositions), the Debtor never took a position that he owed Matthew anything until he did for the obviously self-serving reason of defeating a challenge to Matthew's standing to appear in support of the Debtor's actions in the case.  As to Matthew, to this day he has never asserted a claim in the bankruptcy case in his own right, despite not being treated in the Debtor's bankruptcy schedules and not being addressed in the early versions of the Debtor's plans.  These actions do not speak to parties who believe a legitimate contract exists.

Under these circumstances, the court cannot find that a contract implied in fact exists.

iii.        Contract Implied in Law

"Under Illinois law, unjust enrichment is an equitable remedy that lies where a defendant has unjustly retained a benefit to the plaintiff's detriment and … the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *In re Rowell*, 606 B.R. 329, 345 (Bankr. N.D. Ill. 2019) (Lynch, J.) (*citing Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) (internal quotations omitted)).  "The theory of unjust enrichment is an equitable remedy

25

based upon a contract implied in law." *Nesby v. Country Mutual Insurance Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004).

As Judge Hunt writes,

[i]n addition to contracts implied in fact, Illinois recognizes contracts implied in law. *Trapani*, 2016 IL App (1st) 143734, ¶ 41, 407 Ill. Dec. 754, 64 N.E.3d 132 (*citing Brody*, 298 Ill. App. 3d at 154, 232 Ill. Dec. 419, 698 N.E.2d 257). "A contract implied in law is equitable in nature, predicated on the fundamental principle that no one should unjustly enrich himself at another's expense." *Milborn*, 122 Ill. App. 3d at 690, 78 Ill. Dec. 241, 461 N.E.2d 1075. "Contracts implied in law (quasi-contracts) arise notwithstanding the parties' intentions, result from a duty imposed by law, and are contracts merely in the sense that they are created and governed by principles of equity." *Zadrozny*, 220 Ill. App. 3d at 295, 163 Ill. Dec. 93, 581 N.E.2d 44 (*citing Steinberg v. Chi. Med. School*, 69 Ill. 2d 320, 334, 13 Ill. Dec. 699, 371 N.E.2d 634 (1977)). "No claim on a contract implied in law can be asserted if an express contract or a contract implied in fact exists between the parties and concerns the same subject matter." *Zadrozny*, 220 Ill. App. 3d at 295, 163 Ill. Dec. 93, 581 N.E.2d 44 (*citing Heavey*, 166 Ill. App. 3d 347, 116 Ill. Dec. 781, 519 N.E.2d 996 (*quoting Bd. of Dir. of Carriage Way Prop. Owners Ass'n v. W. Nat'l Bank*, 139 Ill. App. 3d 542, 547, 94 Ill.Dec. 97, 487 N.E.2d 974 (1st Dist. 1985))). Claims based on the theory of a contract implied in law are sometimes referred to as claims for *quantum meruit*, quasi-contract, or unjust enrichment. *Marcatante v. City of Chi.*, 657 F.3d 433, 442 (7th Cir. 2011) (*citing Yugoslav-Am. Cultural Ctr., Inc. v. Parkway Bank & Trust Co.*, 327 Ill. App. 3d 143, 261 Ill.Dec. 390, 763 N.E.2d 360 (1st Dist. 2001)).

*Miles*, 652 B.R. at 528–29. "To recover, a plaintiff must show that a defendant voluntarily accepted a benefit that would be inequitable to retain without payment." *Pepper Constr. Co. v. Palmolive Tower Condominiums, L.L.C.*, 194 N.E.3d 991, 1017 (Ill. App. Ct. 2021).

The evidence demonstrates that the Debtor did receive a benefit. The Debtor was able to obtain the Letter of Credit with the funds provided by Matthew as collateral. This permitted the Debtor to appeal the Sanction Award. Matthew, as guarantor, lost the Matthew CDs once they were liquidated by Wintrust. This lessened the burden on the Debtor on the amount of funds the Debtor needed to pay by at least $431,319.87 (reflecting the amount after having reduced the $43,680.13, the court found did not belong to Matthew).

But the retention of the benefit must be unjust. *See Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1995) (stating "(t)he term unjust enrichment is not descriptive of conduct that, standing alone, will justify an action for recovery. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct.") (internal quotations omitted).

The parties' actions here demonstrate that Matthew conveyed this benefit upon the Debtor voluntarily and was not obligated to pledge the Matthew CDs by any undue influence. In much the same way that the court is asked to accept that the multitude of transfers from the Debtor to Matthew over the years were gifts, the court has trouble seeing the pledge of the Matthew CDs in

26

favor of the Letter of Credit as anything other than similar gift.  The parties re clearly capable and experienced with entering into written contracts, including with respect to each other.  *See, e.g.,* Agreement to Be Bound.

Absent that, the evidence also makes clear that Matthew benefited from the pledge. Matthew has, as testified by the Debtor, no real ability to support himself in the manner he and the Debtor presently do.  Tr. at p. 633–34.

Matthew resides with the Debtor and has done so for the entirety of his adult life.  Their residence is owned by the Debtor.  Rather than incur further debt on that residence, the Debtor sought alternative sources to fund the Letter of Credit.  Matthew had every reason to support that effort as it lessened the risk on their home and their other shared asset, Greenleaf.

As previously noted, Matthew's actions call into question whether he truly believed he was owed money from his father.  Until the Matthew Claim was scheduled by the Debtor in an attempt to confer standing on his son, Matthew took no steps to memorialize a claim against the estate.  He neither filed nor, after the deadline for filing such claims passed, requested permission to file a proof of claim in the Chapter 11 Case.  Even in light of the clear deficiency in the scheduling of the Matthew Claim made evident in the Objection, he never acted affirmatively to secure his rights.  He only responded to the Committee's actions.

The court cannot conclude under the circumstances that Matthew's pledge was something that the Debtor (and therefore his estate) was required to repay or that Matthew would be unjustly treated as a result of that lack of repayment.  There was therefore no contract implied in law supporting these theories.

As Matthew is unable to demonstrate that an express contract, a contract implied in fact or a contract implied in law exists and the court cannot conclude that the elements of unjust enrichment or some other equitable doctrine would require the creation of a debt in favor of Matthew, the Matthew Claim must be disallowed in its entirety under section 502(b).

3.      *Section 502(d)*

The Objection also asserts that the Matthew Claim should be disallowed pursuant to section 502(d) of the Bankruptcy Code because Matthew is the recipient of multiple avoidable transfers from the Debtor.  Section 502(d) of the Bankruptcy Code provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 552(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of this title, unless such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

In making this request, the Committee asks this court to consider several of the allegations set forth in a previously denied motion.  Motion of the Official Committee of Unsecured Creditors

27

for an Order Granting Derivative Standing to Assert, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtor's Estate [Dkt. No. 804] (the "Derivative Standing Motion"). The Derivative Standing Motion alleged numerous potential actions against Matthew pursuant to sections 544 and 548 of the Bankruptcy Code for the avoidance of prepetition transfers from the Debtor of cash, real property and membership interests in Greenleaf.

The Derivative Standing Motion was denied because the Committee failed to demonstrate that the Debtor had unjustifiably refused a demand to pursue a cause of action. As the statute of limitations on avoidance actions had passed, the court could not find any unjustifiable refusal.[13] That does not mean, however, that no avoidable actions existed.

While sections 544 and 548 of the Bankruptcy Code do allow a trustee to avoid a transfer of property of the debtor for the benefit of creditors and the Derivative Standing Motion does set forth a number of transfers that, in the absence of arguments to the contrary, do appear avoidable, section 502(d) of the Bankruptcy Code requires the court to first find a claim is avoidable. *In re Odom Antennas, Inc.*, 340 F.3d 705, 708 (8th Cir. 2003) ("the purpose of section 502(d) is to ensure compliance with judicial orders"); *Parker N. Am. Corp. v. Resolution Trust Corp. (In re Parker N. Am. Corp.)*, 24 F.3d 1145, 1155 (9th Cir. 1994) ("Section 502(d) operates to disallow claims of transferees who do not surrender their avoidable transfers. It does not compel the surrender, nor permit affirmative relief of any kind."); *Campbell v. U.S. (In re Davis)*, 889 F.2d 658, 662 (5th Cir. 1989) ("This section [502(d)] is designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate.").

Here there has been no avoidance action commenced against Matthew and the court cannot impute the success of such a nonexistent action for the purpose of satisfying section 502(d). Whether a claim is avoidable and recoverable for the estate is a determination that must be made through an adversary proceeding, Fed. R. Bankr. P. 7001(1), and a claim objection under section 502(d) in the absence of or in advance of the same is premature. As a result, section 502(d) does not support disallowance of the Matthew Claim.

4.      Equitable Grounds

The Objection makes as a final argument that the Matthew Claim should be disallowed as it is a sham to confer standing on Matthew so that Matthew may participate in the Debtor's bankruptcy proceedings. The Committee asks the court to consider Matthew as an insider of the Debtor. *See* 11 U.S.C. § 101(31)(A)(i) ("The term 'insider' includes –if the debtor is an individual— relative of the debtor…"). Although the court is cognizant it must add additional scrutiny to the Matthew Claim because as the Debtor's son, Matthew, is an insider of the Debtor, scrutiny alone is insufficient reason to disallow a claim. Further, the circumstances surrounding the scheduling of the Matthew Claim have already been taken into account in the foregoing analysis.

As a result, the Matthew Claim will not be independently disallowed under this theory alone.

---

[13]      An individual creditor or creditor's committee may prosecute an action originally vested in the trustee when: (1) the trustee unjustifiably refuses a demand to pursue the action; (2) the creditor establishes a colorable claim or cause of action; and (3) the creditor seeks and obtains leave from the bankruptcy court to prosecute the action for and in the name of the trustee. *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990).

28

CONCLUSION

Accordingly, the Committee has met its burden on the Objection and Matthew has failed to meet his burden on the Matthew Claim.  For the reasons set forth in this Memorandum Decision and by separate order entered concurrently herewith, the Objection will be SUSTAINED and the Matthew Claim will be disallowed.

Dated: January 26, 2024

ENTERED:

_____

Timothy A. Barnes
Judge, United States Bankruptcy Court