UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Marshall Spiegel,<br><br>      Debtor. | Case No. 20bk21625<br><br>Chapter 11<br><br>Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION[1]

The matters before the court consist of four interconnected, but independent, contested matters of law.

The first arises out of the Debtor's Motion for Entry of an Order (A) Retroactively Authorizing Transfer for Value of the Debtor's 0.015% Interest in 1116-22 Greenleaf Building LLC Pursuant to 11 U.S.C. §§ 105 and 363, and (B) Granting Related Relief [Dkt. No. 993] (the "Motion to Authorize"), filed by the Marshall Spiegel, the debtor and debtor-in-possession in the above-captioned case (the "Debtor"). The Motion to Authorize has been opposed by the United States Trustee (the "United States Trustee") and the Official Committee of Unsecured Creditors (the "Committee").

The second arises out of the Seventh Amended Plan of Reorganization [Dkt. No. 1038] (the "Plan"), also filed by the Debtor. The Debtor seeks confirmation of the Plan, but that Plan is opposed by the United States Trustee, the Committee and the 1618 Sheridan Road Condominium Association (the "Condo Association").

As to the third, the Committee has filed the Motion of the Official Committee of Unsecured Creditors to Convert Case to Chapter 7 [Dkt. No. 705] (the "Motion to Convert"). The Debtor, the Debtor's son, Matthew Spiegel ("Matthew") and HeplerBroom, LLC ("Hepler"), all objected to the Motion to Convert.

Last, the United States Trustee has filed U.S. Trustee's Motion to Appoint Trustee [Dkt. No. 1010] (the "Motion to Appoint"). In the Motion to Appoint, the United States Trustee asks the court to appoint a chapter 11 trustee to investigate the Debtor in light of allegations that the Debtor participated in actual fraud, dishonesty, or criminal conduct in management of the bankruptcy estate. The Condo Association and the Committee filed joinders to the Motion to Appoint.

---

[1] This Memorandum Decision constitutes both the court's findings of fact and conclusions of law with respect to the matters before it. Though some sections clearly denote findings and other conclusions, to the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

After careful consideration of the evidence provided and the arguments of the parties and for the reasons more fully stated herein, the Motion to Approve will be DENIED and confirmation of the Plan is also DENIED. The Motion to Appoint is GRANTED and, as a result, the court will deny without prejudice the Motion to Convert. A separate order to that effect will be entered concurrently with this Memorandum Decision.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy courts for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy court judge to whom a case has been referred has statutory authority to enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy court judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy court judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the judge may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1) & (c). Absent consent, the judge of the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy court judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a judge of the bankruptcy court must also have constitutional authority to hear and determine a matter. *Stern v. Marshall,* 564 U.S. 462 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court judge hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court judge's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The Motion to Authorize seeks court approval of transfers made by the Debtor without court approval. Such a matter arises in light of the requirements of sections 363 and 549(a)(2)(B) of the Bankruptcy Code and may only arise in a bankruptcy case. *Bush v. United States*, 100 F.4th 807, 811 (7th Cir. 2024) (citing *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990) (holding that abuse of the bankruptcy process grants the court "arising in" jurisdiction)). "A dispute 'arises under' the Bankruptcy Code when it presents a substantive question of bankruptcy law." *Bush*, 100 F.4th at 811 (citing *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990)). As such, the statutory authority and jurisdiction over the matter pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (M), (N) & (O). Moreover, bankruptcy courts have core jurisdiction to interpret and enforce their orders. The Motion to

2

Authorize is, therefore, a core proceeding and the court has jurisdiction, statutory authority and constitutional authority to hear and determine such the Motion to Authorize.

Determining the adequacy of disclosure and confirming a plan are each core proceedings under 28 U.S.C. § 157(b)(2)(L). These arise only in the context of a bankruptcy case, are governed by the Bankruptcy Code and may only be taken up in the bankruptcy courts. *Bush*, 100 F.4th at 811. The court therefore unquestionably has authority over such matters. *Stern*, 564 U.S. at 464. They are, therefore, core proceedings and the court has jurisdiction, statutory authority and constitutional authority to hear and determine such matters.

The Motion to Appoint seeks appointment of a trustee under section 1104 of the Bankruptcy Code. The appointment of a trustee is a core matter because it arises under title 11, concerns administration of the bankruptcy estate, and would not exist outside of the bankruptcy. 28 U.S.C. § 157(b)(2)(A); *In re Brown's Chicken & Pasta, Inc.*, 503 B.R. 86, 88 (Bankr. N.D. Ill. 2013) (Cox, J.) (citing 11 U.S.C. § 1104; *In re Wood*, 825 F.2d 90, 96–97 (5th Cir. 1987); *In re Gander Partners LLC*, 432 B.R. 781, 784 (Bankr. N.D. Ill. 2010) (Cox, J.), *aff'd sub nom. Harris N.A. v. Gander Partners LLC*, 442 B.R. 883 (N.D. Ill. 2011), vacated (Feb. 9, 2011) (citing 11 U.S.C. § 1104)). As such, the dispute in relation thereto "arises under" the Bankruptcy Code. *Bush*, 100 F.4th at 811.

Converting a bankruptcy case from one under chapter 11 to one under chapter 7 is a core proceeding as it is a matter that concerns the administration of the estate and exists solely in bankruptcy. 28 U.S.C. §§ 157(b)(2)(A) and (O). *In re Hall*, No. BR 20-81572, 2022 WL 2499001, at *1 (Bankr. N.D. Ill. July 6, 2022) (Lynch, J.). The authority to convert a case exists only with the bankruptcy judge. As such, a dispute concerning conversion is exclusive to bankruptcy law and practice and thus "arises in" such case. *Bush*, 100 F.4th at 811 (citing *In re Repository Technologies, Inc.*, 601 F.3d 710, 719 (7th Cir. 2010)). The decision to convert a bankruptcy case falls within the discretion of the bankruptcy judge, except where, under the Bankruptcy Code, the judge is required to dismiss the case. *In re Hall*, 2022 WL 2499001, at *4 (citing *In re 5431-33 S. Wabash LLC*, No. 18 B 12463, 2020 WL 7214147 at *4, (Bankr. N.D. Ill. Nov. 16, 2020) (Baer, J.)).

Accordingly, the court has the jurisdiction, statutory authority and constitutional authority to hear and determine each of the matters before the court.

SUMMARY OF ISSUES PRESENTED

The matters before the court present a unique set of circumstances. The Debtor is an individual who has little income other than from assets he has made very hard to reach by third parties. At the same time, the Debtor has incurred and looks to continue to incur extraordinary debts, mostly arising out of ill-fated litigation brought in multiple courts. The Debtor has proposed a series of plans under which he purported to pay his creditors in full. The current Plan no longer makes that claim but, as the Plan is contingent on access to assets that may not be reachable by his creditors (or, perhaps, a trustee), he adopts a "take it or leave it" attitude toward his creditors. His is, or so he believes, the only game in town.

The Debtor's Plan has the support of the Debtor's son, Matthew—whose standing to be heard in these proceedings has been challenged and, given that his standing as a creditor appears to have been contrived by the Debtor to create that standing, whose support is not unproblematic.

The Debtor also has support from the entity from whom the funds to implement the Plan must come and, again, whose role in these proceedings is not unproblematic.

The Plan is opposed by the Committee, which seeks conversion of the Debtor's case. The Committee is made up entirely of those parties against who the Debtor has litigated and no love is lost between the Committee and the Debtor. This case has been fraught with disputes between the two, including multiple attempts by the Debtor to circumvent the issues raised by the Committee by *ad hominem* attacks on it and its members. Shooting the messenger is a logical fallacy that simply does not work, it does nothing other than reveal the attacking party's belief that he or she cannot win on the merits of the dispute. The Committee has been zealous, to be sure, but it remains to be seen if that has amounted to overzealousness. The Committee's cause is seconded by the Condo Association, which, given the overlap between the two, not surprisingly adds little to the Committee's already articulated arguments.

Last to this is the United States Trustee. The United States Trustee opposes the Debtor's Plan and seeks appointment of a trustee. The latter is based on the Debtor's conduct in the above-captioned case, most specifically that of altering postpetition, without court authority the ownership and management documents regarding his most significant asset. That alteration reduced the Debtor's interest in the asset and was done in a manner that sheds the Debtor in a particularly bad light. In return, the Debtor argues that the alteration was done to obtain financing for the case, making another classic misstep of arguing that the ends justify the means. He has asked for retroactive approval of the changes and that has been heard alongside all of the foregoing disputes.

For the reasons more fully stated below, the court is unconvinced that the Debtor has acted in good faith in the above-captioned case. The Debtor's Plan is unconfirmable for that reason alone and the United States Trustee's request to appoint a chapter 11 trustee is warranted under the circumstances.

## PROCEDURAL HISTORY

In taking up the matters before the court, the court has reviewed and considered the Motion to Approve, the Plan and Disclosure Statement, the Motion to Appoint and the Motion to Convert. It has also reviewed and considered:

Motion to Authorize

(1)     U.S. Trustee's Response to Debtor's Motion for Entry of an Order (A) Retroactively Authorizing Transfer of Interest Pursuant to 11 U.S.C. §§ 105 and 363, and (B) Granting Related Relief [Dkt. No. 1048] (the "UST Response to Motion to Authorize");

(2)     Response to Debtor's Motion for Entry of an Order (A) Retroactively Authorizing Transfer for Value of the Debtor's 0.015% Interest in 1116-22 Greenleaf Building LLC Pursuant to 11 U.S.C. §§ 105 and 363, and (B) Granting Related Relief [Dkt. No. 1049] (the "Committee Response to Motion to Authorize");

(3)     Reply in Support of Debtor's Motion for Entry of an Order (A) Retroactively Authorizing Transfer for Value of the Debtor's 0.015% Interest in 1116-22

4

Greenleaf Building LLC Pursuant to 11 U.S.C. §§ 105 and 363, and (B) Granting Related Relief [Dkt. No. 1078] (the "Reply Supporting Authorization");

Plan and Disclosure Statement

(4)     Debtor's Sixth Amended Disclosure Statement for His Seventh Amended Plan of Reorganization [Dkt. No. 1039] (the "Disclosure Statement");

(5)     United States Trustee's Combined Objection to the Approval of the 6th Amended Disclosure Statement and Objection to the Confirmation of Debtor's 7th Amended Plan of Reorganization [Dkt. No. 1074] (the "United States Trustee Objection to Confirmation");

(6)     Objection of 1618 Sheridan Road Condominium Association to (I) Debtor's Seventh Amended Chapter 11 Plan of Reorganization [Dkt. No. 1038], and (II) Debtor's Sixth Amended Disclosure Statement for His Seventh Amended Plan of Reorganization [Dkt. No. 1039] [Dkt. No. 1075] (the "Condo Association Objection to Confirmation");

(7)     Objection of the Official Committee of Unsecured Creditors to the Adequacy of the Debtor's Sixth Amended Disclosure Statement and Confirmation of Debtor's Seventh Amended Plan of Reorganization [Dkt. No. 1077] (the "Committee Objection to Confirmation");

(8)     Reply in Support of Debtor's Seventh Amended Plan of Reorganization [Dkt. No. 1092] (the "Reply in Support of Confirmation");

Motion to Convert

(9)     Objection to Motion to Convert Case to Chapter 7 [Dkt. No. 837] (the "Debtor's Objection to Conversion");

(10)    Objection to Motion of the Official Committee of Unsecured Creditors to Convert Case to Chapter 7 and Response in Support of the Debtor's Fifth Amended Plan of Reorganization [Dkt. No. 840] (the "Hepler Objection Supporting Reorganization");

(11)    Response and Objection of Matthew Spiegel to Motion of the Official Committee of Unsecured Creditors to Convert Case to Chapter 7 [Dkt. No. 841] (the "Matthew's Objection to Conversion");

(12)    Reply in Support of Motion of the Official Committee of Unsecured Creditors to Convert Case to Chapter 7 [Dkt. No. 854] (the "Reply Supporting Conversion");

Motion to Appoint

(13)    Joinder of the Committee to U.S. Trustee's Motion to Appoint Trustee [Dkt. No. 1017];

5

(14)     Joinder of 1618 Sheridan Road Condominium Association to U.S. Trustee's Motion
         to Appoint Trustee [Dkt. No. 1019];

(15)     Debtor's Response in Opposition to Motion of The UST to Appoint a Chapter 11
         Trustee [Dkt. No. 1050] (the "Debtor's Response to Motion to Appoint");

(16)     Joinder of 1116-1122 Greenleaf Building, LLC in Support of the Debtor's Response
         in Opposition to Motion of the United States Trustee to Appoint a Chapter 11
         Trustee [Dkt. No. 1052]; and

(17)     Matthew Spiegel's Joinder in Support of Debtor's Response in Opposition to
         Motion of the United States Trustee to Appoint a Chapter 11 Trustee [Dkt. No.
         1054].

The court has also taken into consideration any and all exhibits submitted in conjunction with the matters discussed below. Though these items do not constitute an exhaustive list of the filings in the above-captioned bankruptcy case, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same). The court has also considered the procedural history and previous court filings in this case, as is discussed below in detail.

HISTORY

The Debtor filed for chapter 11 bankruptcy on December 16, 2020. [Dkt. No. 1].

A.     The Prepetition History

Before filing for bankruptcy, the Debtor filed a lawsuit against individual members of the condominium association governing his personal residence, and those members' spouses. Litigation of the lawsuit was contentious and drawn out. The litigation, beginning on October 26, 2015, saw the Debtor file five amended complaints and motions for substitution of a judge. The case is still on appeal and is known as *Spiegel v. Hall*, Case No. 15 L 10817 (the "State Court Litigation")[2] in the Circuit Court of Cook County (the "Illinois Circuit Court").

The most momentous occurrence in that State Court Litigation is the issuance of substantial sanctions against the Debtor. On March 29, 2019, the Illinois Circuit Court issued an order sanctioning the Debtor and the Debtor's state court counsel ("Xydakis") in an amount exceeding one million dollars (the "Sanction Award"). The Illinois Circuit Court found that the Debtor had engaged in "abusive litigation tactics of filing complaints filed with baseless accusations, misrepresenting case law by reversing or altering holdings, filing lawsuits for the sole purpose of

---

[2]     As this court has observed, the actual caption of the State Court Litigation is difficult to determine, as it involved multiple lawsuits including some ostensibly commenced by the Debtor on behalf of the condominium association. *See* Committee's Ex. 39; *see also Spiegel I*, 638 B.R. at 610 n.3 (defined below)

6

harassment, increasing costs and delay, and filing objectively unreasonable motions to disqualify counsel and judges." Committee's Ex. 39.

A more fulsome history of the Debtor's actions in the State Court Litigation and the various legal proceedings that resulted is set forth by this court in previous opinions. *See, e.g.*, *In re Spiegel*, 638 B.R. 606, 610 (Bankr. N.D. Ill. 2022) (Barnes, J.) ("Spiegel I"); *In re Spiegel*, Case No. 20BK21625, 2023 WL 2564028 (Bankr. N.D. Ill. Mar. 17, 2023) (Barnes, J.) ("Spiegel II"); *In re Spiegel*, 657 B.R. 34 (Bankr. N.D. Ill. 2024) (Barnes, J.) ("Spiegel III"). Because that prepetition conduct is of only passing relevance to the issues before the court today, the court will delve no further into that here except as may be required later to contextualize various disputes.

B.      The Postpetition History

What is, of course, more relevant is what has transpired in this case.

On December 16, 2020 (the "Petition Date"), the Debtor commenced the above-captioned individual chapter 11 case. At that time, the Debtor was represented before this court by attorney David P. Lloyd (the "Original Counsel").[3] Within fourteen days of the Petition Date, the Debtor filed his Schedule A/B. Official Form 106A/B [Dkt. No. 16]. In the original Schedule A/B, the Debtor disclosed his ownership interest in the residential condo located at 1618D Sheridan Road, Wilmette, IL 60091 (the "Condo"). *Id.* at § 1.1. He also disclosed his interest in 1116-22 Greenleaf Building LLC ("Greenleaf"), *id.* at § 19, the entity that owns the commercial rental units and property located at 1116-22 Greenleaf Ave., Wilmette, IL 60091. *Spiegel III*, 657 B.R. at 47.

On March 3, 2021, the United States Trustee appointed the Committee to act as the official committee of unsecured creditors in the case. Appointment of Unsecure Creditors' Committee [Dkt. No. 81]. The Committee members consist of parties who were also involved in the State Court case against the Debtor. As in the State Court Litigation, litigation in the Chapter 11 case has been heavily contentious. Also as in the State Court Litigation, most primary disputes have been between the Debtor and the Committee.

On May 6, 2021, the Debtor filed the first of his proposed plans of reorganization. Plan of Reorganization [Dkt. No. 158] (the "Original Plan"). The Original Plan was fairly simple, proposing to pay all of the Debtor's creditors in full, though without explanation affording only some of them interest on their claims. *Id.* Though no objections were filed to the Original Plan, due to opposition expressed in hearings on the same, the Original Plan was superseded by later, amended versions and no confirmation hearing on the Original Plan ever occurred.

---

[3]      As has been noted by the court on several previous occasions, the Debtor also engaged Xydakis as "voluntary" counsel in these matters. *See, e.g., Spiegel I*, 638 B.R. at 611 n.4; *Spiegel II*, 2023 WL 2564028 at *6-7 (where the court found that Xydakis had "substantially impeded and delayed the examination of Matthew through his conduct"); *Spiegel III*, 657 B.R. at 57 (where the court noted that "Xydakis turned what can only be described as a routine 2004 Examination into a contentious, inefficient proceeding," resulting in "court-ordered sanctions against the Matthew, Greenleaf and Xydakis."). In *Spiegel III*, the court noted that "Xydakis' actions in the [case] fell away after the District Court disqualified him under section 327, irrespective of the foregoing precedent. *See In re Spiegel*, Case No. 21cv05087 (N.D. Ill. March 10, 2022)." *Id.* at 57 n.11.

To address the need to fund his ostensibly 100% plans considering the mounting costs of this highly litigious case, the Debtor sought postpetition financing. He did this through two steps: First, having Greenleaf obtain financing from an external source; and second, seeking court authority to borrow from Greenleaf. *See* Motion to Obtain Credit [Dkt. No. 494] (the "Motion to Obtain Credit"). The Motion to Obtain Credit was later amended and superseded, Amended Motion to Obtain Credit [Dkt. No. 575] (the "Amended Motion to Obtain Credit"). The Debtor did not disclose to the court in either the Motion to Obtain Credit or the Amended Motion to Obtain Credit that, in seeking the financing for Greenleaf, he had without court authority altered his relationship with and ownership of Greenleaf.

On that point, on October 27, 2021, the Debtor on behalf of Greenleaf engaged the assistance of Dean Giannakopoulos at Marcus & Millichap (together, "M&M"), a loan broker in Chicago. With the assistance of M&M, the Debtor on behalf of Greenleaf negotiated and obtained from ReadyCap Commercial, LLC ("ReadyCap") $1,800,000.00 in financing (the "ReadyCap Financing").

In the course of obtaining the ReadyCap Financing, M&M informed the Debtor that, due to the Debtor's bankruptcy, the Debtor would have to alter the leadership structure at Greenleaf so that Matthew was the key principle and sole manager. M&M also recommended making changes to the ownership structure of Greenleaf and to Greenleaf's operating agreement (the "Original Operating Agreement"). Committee Ex. 35. As to the ownership structure, the Debtor transferred more than one-half of the Debtor's interest in Greenleaf to his son Matthew. This had the net effect of transferring to Matthew an additional .015% interest and resulted in the Debtor having only a .01% ownership in Greenleaf and Matthew owning 99.99%. In addition, the amended operating agreement (the "Amended Operating Agreement"), Committee Ex. 35, removed from the Debtor any management authority, making Matthew the sole managing member of Greenleaf. *Id.* As discussed in more detail below, the Amended Operating Agreement was also structured to look like the Original Operating Agreement and was backdated to March 30, 2018. *Id.*

On June 15, 2022, the court denied without prejudice the Amended Motion to Obtain Credit. Shortly thereafter, the Debtor's Original Counsel withdrew and was replaced by the counsel now representing him in these matters.

Thereafter the parties continued in discovery on the Debtor's then current plan and a contested claims objection regarding Matthew's claim (*Spiegel III*). This discovery was protracted and contentious.[4] This resulted in the Committee filing the Motion to Convert on November 8, 2022, the Debtor filing the Motion to Authorize on August 24, 2023, the United States Trustee filing the Motion to Appoint on September 13, 2023, and the Debtor filing his Plan and Disclosure Statement on October 2, 2023.

---

[4]      Though the Debtor, Matthew and Greenleaf each opposed the Committee's discovery efforts, all objections thereto were overruled. As noted above, at the depositions, the Debtor's attorney was so disruptive that the Committee was compelled to file a motion to reconvene, which was granted, and the court later awarded the Committee sanctions with respect thereto.

8

C.        The Trial

The court conducted trial on all four matters simultaneously (the "Trial").  The Trial took place on three separate occasions.  The first began on September 11, 2023, and concluded on September 15, 2023.  The second ran from January 16, 2024, to January 19, 2024.  The third and final started on January 22, 2024, and finished on January 26, 2024.  During the Trial the court heard testimony from the Debtor, Matthew, Nickolas Dallas, Mr. Giannakopolous, Curtis Novy and William Hall.[5]

Mr. Dallas in his role as title officer and registered agent for Greenleaf, answered questions regarding filing business documents, the transfer of Debtor's interest in Greenleaf and preparing tax returns.  *See generally* Tr., vol. 9.  Mr. Giannakopolous spoke to his role as the mortgage broker in assisting the Debtor become eligible to receive a loan from ReadyCap.  *See generally* Tr., vols. 10, 11.  Mr. Novy, a financial investigator serving as an expert witness, explained his analysis of the loan application process after reviewing all the relevant documents.  *See generally* Tr., vol. 11.  Mr. Hall, testified as to his role and actions as chairman of the Committee, discussing the consequences of appointing a chapter 7 trustee and answered questions about the claim that his wife filed.  *See generally* Tr., vol. 12.

Regarding Mr. Dallas, his testimony was of limited insight.  When asked about why and how Marshall Spiegel was named in the Original Operating Agreement, Dallas testified that he did not recall.  Tr., vol. 9, p. 1514.  Similarly, he did not recall when asked if he had seen the Amended Operating Agreement before his deposition.  *Id.* at p. 1552.  He also did not recall whether he had spoken with Mr. Giannakopolous with respect to the ReadyCap Financing.  *Id.* at p. 1567.  Mr. Dallas failed to recall so many of the events germane to the matter that the court was left questioning the value of his testimony.  At the very least, his testimony was lacking in credibility.

As to Mr. Giannakopolous, he did testify that the lender they initially consulted had advised him that it would only provide the loan to Greenleaf if Matthew was the only manager.  Tr., vol. 10, p. 2012.  Yet, he testified that that lender understood Marshall would continue to run the property, despite what the documentation might provide.  *Id.* at p. 2014.  As to his testimony regarding Matthew being the primary decisionmaker for Greenleaf, *id.* at p. 2022, it was frankly unbelievable given thereafter that he testified that Matthew was only sometimes part of the negotiations.  *Id.* at p. 2023.  While he did testify that he had suggested that a new operating agreement, as opposed to an amended one was preferable, that testimony did not appear to explain why the Amended Operating Agreement was backdated, only why it was not titled as "amended."  *Id.* at pp. 2056-69.  He also explained that the lender requested that the Debtor have no management authority over Greenleaf.  Tr., vol. 11, pp. 2091-92.  Interestingly, though he minimized it in his testimony, Mr. Giannakopolous testified that the lender questioned the basis for the ownership alteration, even going so far as to ask if money had changed hands with respect to the alteration and whether

---

[5]        The transcript of the Trial consists of multiple volumes on the docket.  Transcript of Proceedings Before the Honorable Timothy A. Barnes, vol. 1 (Sept. 11, 2023) [Dkt. No. 1065], vol. 2 (Sept. 12, 2023) [Dkt. No. 1066], vol. 3 (Sept. 13, 2023) [Dkt. No. 1067], vol. 4 [(Sept. 14, 2023) Dkt. No. 1068], vol. 5 (Sept. 15, 2023) [Dkt. No. 1069], vol. 6 (Jan. 16, 2024) [Dkt. No. 1224], vol. 7 (Jan. 17, 2024) [Dkt. No. 1225], vol. 8 (Jan. 18, 2024) [Dkt. No. 1226], vol. 9 (Jan. 19, 2024) [Dkt. No. 1227], vol. 10 (Jan. 22, 2024) [Dkt. No. 1228], vol. 11 (Jan. 23, 2024) [Dkt. No. 1229], vol. 12 (Jan. 24, 2024) [Dkt. No. 1230], vol. 13 (Jan. 25, 2024) [Dkt. No. 1231], vol. 14 (Jan. 26, 2024) [Dkt. No. 1232] (collectively, the "Transcript").  Citations to the Transcript herein are in format of "Tr., vol. [X], pp. [Y-Z]".

Matthew had in fact contributed value commensurate with his ownership percentage. *Id.* All in, his testimony was credible at points and not at others. While it did serve to confirm that most of the changes in the Amended Operating Agreement were not the Debtor's idea, it was not helpful in determining whether the Debtor understood the propriety of those change in light of his bankruptcy.

The testimony of Mr. Novy as an expert on behalf of Matthew was helpful,[6] but only to a limited extent. He testified that the ReadyCap Financing did not, in his view, have the indicia of fraud in mortgage lending as he was familiar with the trade. Tr., vol. 11, pp. 2329-40. He also testified, however, that he was only familiar with the Bankruptcy Code in a limited sense and not aware of the Debtor's duties as a debtor-in-possession. *Id.* at pp. 2349-50. As Mr. Novy could not testify as to the ultimate legal conclusion before the court, his testimony was of limited relevance and bears little or no weight in this matter.

Mr. Hall, the chairman of the Committee, was called by the Debtor and mostly testified as to his understanding of the Plan and his belief as to what is in the best interests of creditors in this matter. Tr., vol. 12, *infra*. When pressed, Mr. Hall had difficulty quantifying how he had concluded that a chapter 7 was in his constituent's best interest. *Id.* at pp. 2496-2547. While there was a fair amount of questioning that seemed to be an intent to impeach the Committee's motivations in this matter, that issue was not the subject of the Trial except insomuch as it calls into question the Committee's conclusions on best interest. In sum, however, Mr. Hall's testimony stood for the proposition that converting the bankruptcy case was in the best interest of creditors as it would create a better opportunity for the ongoing and protracted state court litigation between the Debtor and multiple parties, not just the Committee, to be settled reasonably. *Id.* at p. 2547.

Most germane, of course, was the testimony of the Debtor and Matthew. Each were credible at points, but their testimony was mostly antagonistic to any line of inquiry other than that which they are advancing. The Debtor, while affable, was conveniently forgetful at times.[7] He repeatedly blamed others for his actions.[8] He claimed ignorance of legal requirements while quibbled with counsel over legal niceties while at the same time sheltering behind his lack of knowledge of the law.[9] All in all, the Debtor engaged in obvious sophistry. As to the latter, for

---

[6]     Underscoring the overlapping and confused roles of the parties before the court, Mr. Novy testified as a witness for the Debtor, though he was retained and paid by counsel for Matthew. Tr., vol. 11, p. 2283.

[7]     See, e.g., Tr., vol.6, p. 970.

[8]     *See infra*, n.14.

[9]     *Compare* Tr., vol. 6, pp. 872-73 (where the Debtor challenged questioning counsel's assertion that a judgment had been entered, rather than simply an adverse resolution) *and* Tr., vol. 14, p. 2777 (same) *and* Tr., vol. 1 p. 115 (inviting questioning counsel to "refresh my recollection") and Tr., vol. 8, p. 1214 (same) *and* Tr., vol. 14, p. 2761 (same) *with* Tr., vol. 7, p. 1109 ("I'm not a lawyer. I'm not a tax lawyer. I'm not an income tax preparer. …. I am sure as hell not an accountant ….") *and* Tr., vol. 1, pp. 113-15 (espousing limited experience in the state and federal court system). The court notes 38 cases where the Debtor has been involved in matters before the federal courts, including this case and the adversaries within it. He has, for example, petitioned to the Seventh Circuit for a writ of mandamus against a judge whose rulings he disliked, not once, but twice. *Spiegel v. G. Michael Halfenger*, 2017op02760 (7th Cir. 7th Cir. Aug. 28, 2017) (denied by summary order); *Spiegel v. G. Michael Halfenger*, 2016op03998 (7th Cir. Nov. 23, 2016) (same). The Debtor's claim to ignorance of the law has been soundly rejected by the state court in the State Court Litigation. *Spiegel*

example, when pressed for details the Debtor would question the question, redirecting the inquiry until it was difficult to regain what was being sought.[10]  Matthew appeared sullen and resentful of his involvement.  While he took responsibility for many of the actions regarding Greenleaf including its interactions with its advisors, when pressed for details, he had little or nothing to offer.  For the most part, Matthew did not convince the court that he has done anything other than what his father has told him to do.  Neither the Debtor nor Matthew was a credible witness on the most salient points to be determined by the court herein.

At the conclusion of the Trial, the court ordered posttrial briefing consisting of written closing statements and proposed findings and conclusions from each party.  As a result, the court has also considered each of the foregoing:

(1)     U.S. Trustee's Findings of Fact and Conclusions of Law for the U.S. Trustee's Motion to Appoint Trustee and for the U.S. Trustee's Objection to Confirmation of Debtor's 7th Amended Plan of Reorganization. [Dkt. No. 1249];

(2)     [United States Trustee's] Closing Argument [Dkt. No. 1250];

(3)     Closing Argument of the Committee [Dkt. No. 1251];

(4)     Debtor's Proposed Findings of Fact and Conclusions of Law [Dkt. No. 1252] (the "Debtor's Proposed Findings and Conclusions"); and

(5)     Post-Trial Brief in Support of Confirmation of Debtor's Seventh Amended Plan of Reorganization (Dkt No. 1038) and Opposition to the Motion of the United States Trustee to Appoint a Trustee (Dkt. No. 1010), and the Motion of the Official Committee of Unsecured Creditors to Convert the Case to Chapter 7 (Dkt. No. 705) [Dkt. No. 1253].

APPLICABLE LAW AND BURDENS

A.     The Motion to Approve

Under section 363(b)(1) of the Bankruptcy Code, after notice and a hearing, a debtor-in-possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Notably, other than the ordinary course of business exception, there appear to be no express provisions in the Bankruptcy Code excusing a debtor's failure to comply with section 363(b)(1).  While the court might order the postpetition transfer undone under section 549 and the court might deem such a failure immaterial enough to not constitute grounds for dismissal under section 1112(b), retroactive excusal is simply not contemplated.

---

*v. 1618 Sheridan Rd. Condo. Assoc.*, Case Nos. 1-22-1427, 1-22-1546, 1-22-1628, 1-23-0215, & 1-23-0221 (cons.), 2024 WL 3549535, 2024 IL App (1st) 221427-U (1st Cir. App. Ct. Ill. July 26, 2024) (ironically citing to earlier case law as controlling, which case law arose from another case in which the Debtor had been sanctioned).

10     *E.g.*, Tr., vol. 1, p. 113 ("Q:  [D]id you authorize your attorney to file documents around the petition date on your behalf? A:  You have to explain authorize or -- what do you mean by that?").

11

While the Seventh Circuit has not spoken directly to this issue, the Eleventh Circuit has set forth three factors for a court to consider when asked to retroactively approve an action. *In re Nilhan Devs., LLC*, No. 21-13820, 2022 WL 3275175, at *4 (11th Cir. Aug. 11, 2022). The three factors are "(1) the bankruptcy court would have authorized the transaction had a timely request been made; (2) the bankruptcy court was reasonably persuaded that other creditors were not harmed; and (3) the debtor honestly believed that it had authority to enter into the transaction." *Id.*

True, a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out provisions of this title." 11 U.S.C. § 105(a). Such authority, on its face, would appear to be limited to carrying out the provisions of the Bankruptcy Code, not to forgive the failure to do the same.

In *Telesphere*, the court cited numerous cases in concluding that the main factor in approving a disposition of assets is whether the proposed sale is in the best interests of the estate. *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994) (Wedoff, J.). In another case, the court stated:

> The usual effect of a sale or lease of property of the estate, conducted outside of the ordinary course of business but without adherence to the notice and hearing requirements of § 363(b)(1), is that any sale held is rendered null and void . . . . [T]o allow such transactions to stand over objection of creditors who were denied proper notice, even when there has been some benefit to the estate, would subvert the requirements of § 363(b) and encourage transfers to be completed without adherence to the requirements of that section.

*In re Weisser Eyecare, Inc.*, 245 B.R. 844, 850 (Bankr. N.D. Ill. 2000) (Schmetterer, J.).

As the issue raised in the Motion to Authorize is not contemplated in the Bankruptcy Code, it is not surprising that the court can find no direct authority on point. At best, there is Bankruptcy Rule 9005. Bankruptcy Rule 9005 states that "Rule 61 F.R.Civ.P. applies in cases under the Code. When appropriate, the court may order the correction of any error or defect or the cure of any omission which does not affect substantial rights." Fed. R. Bankr. P. 9005. Civil Rule 61, in turn, states that "[n]o error … or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground … for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." Fed. R. Civ. P. 61. This doctrine will be discussed more below.

The burden would appear to be the default one, that the movant bears the burden of proof on her request. *See Simmons v. Kmart Corp.* (*In re KMart Corp.*), 381 F.3d 709, 714 (7th Cir. 2004); *In re Suburban W. Properties, LLC*, 504 B.R. 477, 483 (Bankr. N.D. Ill. 2013) (Barnes, J.) ("the Debtor—as the movant—bears the burden of proof").

B.      Plan and Disclosure Statement

"For a chapter 11 plan to be confirmed, the plan must meet each requirement of section 1129(a) of the Code, 11 U.S.C. § 1129(a)." *In re S. Beach Sec., Inc.*, 376 B.R. 881, 887 (Bankr. N.D. Ill. 2007) (Goldgar, J.), *aff'd* 421 B.R. 456 (N.D. Ill. 2009), *aff'd* 606 F.3d 366 (7th Cir. 2010). Under the Bankruptcy Code, the court is responsible for determining whether the requirements of section

1129(a) have been met. *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990) (Schmetterer, J.).

"The proponent of the plan bears the burden of establishing that each requirement set forth in § 1129(a) has been met." *In re Draiman*, 450 B.R. 777, 789 (Bankr. N.D. Ill. 2011) (Barnes, J.) (quoting *In re Sentinel Mgmt. Group, Inc.,* 398 B.R. 281, 292 (Bankr N.D. Ill. 2008) (Squires, J.)); *S. Beach Sec.*, 376 B.R. at 887. It is the debtor's obligation to provide clear and convincing evidence, based on a preponderance of the evidence, that the plan satisfies the requirements of section 1129(a). *Rusty Jones*, 110 B.R. at 373. A "proponent of the plan must affirmatively demonstrate that a plan is confirmable." *Id.* The burden then shifts to any objector who must provide proof and any affirmative defenses to confirmation. *Id.*

C.       Motion to Convert

Conversion is a "drastic measure" that must be shown to be "warranted and not premature." *In re Bovino*, 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013) (Barnes, J.) (citing *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989)).

A party in interest may seek conversion or dismissal of a bankruptcy case under section 1112(b) of the Bankruptcy Code.[11] Section 1112(b)(1) states, in pertinent part, that:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

Section 1112(b) provides a nonexhaustive of list of causes, including failure to comply with an order of the court; unexcused failure to timely file or reporting requirement; failure to attend the meeting of creditors under 341(a); and material default by the debtor with respect to the confirmed plan. 11 U.S.C. § 1112(b)(4); *In re Aurora Memory Care, LLC*, 589 B.R. 631, 638 (Bankr. N.D. Ill. 2018) (Goldgar, J.) (citing *In re Waterworks, Inc.*, 538 B.R. 445, 457-58 (Bankr. N.D. Ill. 2015) (Lynch, J.) (noting that section 1112(b)(4)'s list is nonexhaustive)).

"The initial burden lies with the movant to demonstrate cause." *Aurora Memory Care,* 589 B.R. at 638 (citing *Draiman*, 450 B.R. at 826). The movant meets its burden by a preponderance of the evidence. *Draiman*, 450 B.R. at 826 (citing *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994); *In re Van Eck,* 425 B.R. 54, 59 (Bankr. D. Conn. 2010)).

Once the movant has met its burden and shown cause exists, the burden shifts to the debtor to demonstrate why the case should not be converted. *Aurora Memory Care*, 589 B.R. at 638 (citing *In re Waterworks, Inc.*, 538 B.R. 445, 457 (Bankr. N.D. Ill. 2015). The debtor

---

[11]      Party in interest is defined in section 1109 of the Bankruptcy Code and expressly includes creditors' committees. 11 U.S.C. § 1109(b).

13

must show, and the court must specifically identify, "unusual circumstances" that make conversion inappropriate. *In re LG Motors, Inc.*, 422 B.R. 110, 115 (Bankr. N.D. Ill. 2009) (Barbosa, J.) (citing 11 U.S.C. § 1112(b)(1)); *see also In re Hall*, Case No. 20-81572, 2022 WL 2499001 (Bankr. N.D. Ill. July 6, 2022) (Lynch, J.).

In addition, the debtor must show that the "plan is reasonably likely to be confirmed within the statutory time." *Aurora Memory Care*, 589 B.R. at 638 (citing 11 U.S.C. § 1112(b)(2)(A)). Second, the debtor must show they had a "reasonable justification" for the event that created the "cause" for conversion or dismissal and that the issue will be resolved within a "reasonable time." *Id.* (citing 11 U.S.C. §§ 1121(b)(2)(B)(i) & (ii)).

D.      Motion to Appoint

The appointment of a trustee in a chapter 11 matter is governed by section 1104 of the Bankruptcy Code. It provides that, "[a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall* order the appointment of a trustee." 11 U.S.C. § 1104(a) (emphasis added).

Section 1104(a) gives several triggering conditions including, "(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause …" and "(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. §§ 1104(a)(1) & (2).

While section (a)(1) "mandates the appointment of a trustee when the bankruptcy court finds cause," *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir.1989), section (a)(2) creates a more "flexible standard." *Id.*; *see also In re LHC, LLC*, 497 B.R. 281, 292 (Bankr. N.D. Ill. 2013) (Cassling, J.). Both the determination of whether cause exists under section (a)(1) and whether the more flexible standard under (a)(2) has been met are left to the distention of the court. *Sharon Steel*, 871 F.2d at 1226 (citing to *Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 242 (4th Cir. 1987)); *LHC, LLC*, 497 B.R. at 292. That discretion has been described as "broad." *In re Woodlawn Comm. Dev. Corp.*, 613 B.R. 671, 684 (N.D. Ill. 2020) (citing to *In re G-I Holdings, Inc.*, 385 F.3d 313, 321 (3rd Cir. 2004)).[12]

Section 1104 states further that:

> The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief

---

[12]      Though not a factor here, several judges in this court have also found that the factors set forth in section (a) are nonexhaustive. *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (Schmetterer, J.), *aff'd* Case No. 99B9876, 2000 WL 329574, at *3 (N.D. Ill. Dec. 8, 1994); *In re Madison Mgmt. Grp., Inc.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992) (Sonderby, J.).

14

financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting.

11 U.S.C. § 1104(e).

Section 1104(e) does not provide a metric for the court to use in making its section 1104(a) determination, but rather creates a standard applicable only the United States Trustee as to when to seek such a determination. As the movant under section 1104(a), the United States Trustee bears the burden of supplying "proof by clear and convincing evidence" to justify the "extraordinary remedy" of appointing a trustee. *LHC*, 497 B.R. at 291 (noting that some courts in from outside of this jurisdiction have applied the lesser preponderance of the evidence standard); *Bellevue Place*, 171 B.R. at 623 (Bankr. N.D. Ill. 1994); *Madison Mgmt.*, 137 B.R. at 280. "[A] full evidentiary hearing is not required in every case regarding the appointment of a trustee." *Woodlawn*, 613 B.R. at 684.

The flexible standards for whether the court should use its discretion to appoint a trustee are "(1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for rehabilitation; (3) whether the business community and creditors of the estate have confidence in the debtor; and (4) whether the benefits outweigh the costs." *LHC*, 497 B.R. at 293.

While appointment of a trustee is an extraordinary remedy, "section 1104 represents a protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *Bellevue Place*, 171 B.R. at 623.

DISCUSSION

In taking up the multiple issues before the court, the court will first consider the Debtor's requests, the Motion to Authorize and the request to confirm the Plan. Having done so, the court will take up the Committee's Motion to Convert, followed by the United States Trustee's Motion to Appoint.

A.    Motion to Authorize

The Motion to Authorize seeks retroactive approval of what transpired around the ReadyCap Financing. The facts underling the Motion to Authorize are essentially the same facts underlying the Motion to Appoint. Should the court grant the Motion to Authorize, it would make the Motion to Appoint mostly moot. However, for the reasons more fully discussed below, the court will not grant the Motion to Authorize.

1.    *The Arguments*

a.    *The Motion to Authorize and Reply Supporting Authorization*

In the Motion to Authorize, the Debtor requests retroactive approval of the actions he has taken in relation to the ReadyCap Financing.

It is what the Debtor did with respect to his own bankruptcy estate in conjunction with the ReadyCap Financing that the parties question and which the Debtor now seeks retroactive approval for. Specifically, and as noted above, on or about December 16, 2022, without court authority, the Debtor altered both his ownership interest in Greenleaf and Matthew's. As to the former, the

15

Debtor reduced by more than one-half his ownership interest in Greenleaf, transferring the balance to his son, Matthew.  As to the latter, the Debtor also eliminated his rights to manage Greenleaf by executing the Amended Operating Agreement.  *See generally* Original Operating Agreement; Motion to Authorize, Ex. B at 10 (showing changes between the Original Operating Agreement and the Amended Operating Agreement).

The Debtor's stated purpose for this transfer was to facilitate a commercial loan that would fund the bankruptcy case and pay administrative fees.  Tr., vol. 10, pp. 1827–28.  No one challenges the fact that Greenleaf was able to obtain the ReadyCap Financing, though whether such changes were necessary for it do so remains unresolved.  The Debtor argues that he had limited options for keeping the bankruptcy case alive, and in fact, that as he needed additional funds to pay the Committee's counsel, it was Committee's counsel that recommended he obtain a loan to pay outstanding fees.[13]

The Debtor stated that the Original Counsel failed to tell the Debtor that amendments to the Original Operating Agreement that made the loan possible needed court approval and testified that he therefore never sought court approval.  Tr., vol. 10, pp. 1824.  The Debtor stated in his filings that had he been aware that court approval was necessary, he would have sought approval.  He further argues that the only reason to oppose the Motion to Authorize is to cause pain and suffering to him.

The Debtor argued in his filings that the transfer in question was *de minimis* and not prejudicial to creditors of the estate.  According to the Debtor, the court should defer to his business judgment.  He reduced his ownership interest by only a nominal amount in exchange for a substantial benefit.  The substantial benefit is paying for the fees and funding the Plan.  As a result, the Debtor argues that the court should condone the violation of his duties as a debtor-in-possession given that little, if any, harm resulted.

        b.        *The United States Trustee Response to Motion to Authorize*

The United States Trustee makes the obvious point that in seeking court authorization now, the Debtor has admitted that he failed to make such a request and obtain court authorization prior to making the transfer.  The United States Trustee also points out that despite the Debtor's stance that Greenleaf is independent from him and that Matthew makes the decisions with respect to it, the Debtor admits that he himself negotiated the loan and not Matthew or counsel.

The United States Trustee argues that the justification the Debtor gives for the transaction is a fabrication—a result of "revisionist history."  For example, the United States Trustee argues that the Debtor fails to disclose of post-petition negotiations with the loan broker M&M.  The United States Trustee notes that the Debtor was conducting negotiations for the loan with M&M before the Committee sought to have the court compel payment of its allowed fees.[14]  As such, that motion could not have been the deciding factor in the Debtor obtaining the loan.

---

[13]     At Trial, the Debtor contradicted this assertion and testified that it was his Original Counsel that recommended the loan.  Tr., vol. 10, pp. 1824.

[14]     *See* Motion of the Official Committee of Unsecured Creditors and its Counsel to Compel Payment of Interim Compensation or in the Alternative Convert to Chapter 7 [Dkt. No. 430] [December 6, 2021].

As to the authority for the Motion to Authorize, the United States Trustee argues that the cases cited by the Debtor are either not on point or in fact support denial.  The United States Trustee also argues that that the Debtor could not have reasonably believed he had the authority to complete the transaction, that the loan would not have been approved by the court had the Debtor sought approval in advance and that the Debtor did not truly believe there was value to the estate or creditors.

c.       *The Committee Response to Motion to Authorize*

The Committee echoes the United States Trustee's argument that the Debtor only filed the Motion to Authorize because he was caught.  The Committee claims that there is no legal support for the Debtor's request and that if the court were to grant the Motion to Authorize it would be sanctioning fraud.

According to the Committee, the first party that the Debtor allegedly defrauded was ReadyCap because the Debtor hid the bankruptcy and his control of Greenleaf.  The Debtor also backdated the Amended Operating Agreement used in the transaction in order to induce ReadyCap to make the loan.  The Committee argues that the business judgment rule is inapplicable in the face of fraud.

As dud the United States Trustee, the Committee cites to cases from outside this jurisdiction addressing how and when a court might grant retroactive authorization.  It reaches the same conclusion that the court would not have approved the transaction had prior approval been sought, that creditors are harmed by the transaction and that the Debtor could not honestly believe he had authorization to do what he did to effectuate the ReadyCap Financing.

2.       *Analysis*

No one claims, nor could they, that Greenleaf needed court approval to borrow money from ReadyCap.  Greenleaf, while owned in part by the Debtor, is not a debtor itself and thus the direct requirements of sections 363 and 364 do not apply.  It is what the Debtor did with respect to his own bankruptcy estate that the parties challenge and the Debtor, through the Motion to Authorize, essentially admits was in error.

Section 363 of the Bankruptcy Code requires a debtor-in-possession to provide notice and conduct a hearing to use, sell or lease property outside the normal course of business.  11 U.S.C. § 363(b)(1).  The language of the section is unambiguous.  This transaction is unquestionably out of the normal course of business for the Debtor.  The need for authority from the court was clear.  *Cf. In re Breitling*, 133 F. 146, 150 (7th Cir. 1904) ("We are indisposed to give countenance in the slightest degree to any act which shall withhold from creditors any part of the estate of a bankrupt which lawfully he should devote to the payment of his debts.").

There can be no doubt, therefore, that the Debtor needed court authority for both actions taken in conjunction with the ReadyCap Financing.  There is, however, quite simply, no statutory authority directly addressing the question of retroactive approval of actions taken by a debtor.

True, section 105 states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The courts have been clear that such authority is best limited to statutory "gap filling."  *Cordova v. City of Chicago*

17

(*In re Cordova*), 635 B.R. 321, 341 (Bankr. N.D. Ill. 2021) (Barnes, J.) (*citing Kovacs v. United States*, 614 F.3d 666, 674 (7th Cir. 2010)).

In reliance on section 105 and other nonbinding court precedent, the Eleventh Circuit has discussed when so-called *nunc pro tunc* approval should be given. *Norcross Hosp., LLC v. Jones* (*In re Nilhan Devs., LLC*), Case No. 21-13820, 2022 WL 3275175, at *4 (11th Cir. Aug. 11, 2022). As it stated, "[s]uch approval is warranted if: (1) the bankruptcy court would have authorized the transaction had a timely request been made; (2) the bankruptcy court was reasonably persuaded that other creditors were not harmed; and (3) the debtor honestly believed that it had authority to enter into the transaction." *Id.*; *see also In re Lage*, No. DL 18-02766, 2019 WL 4267730, at *2 (Bankr. W.D. Mich. Aug. 1, 2019).

None of the *Nilhan* factors, however, are satisfied here.

The court is not convinced that it would have approved this transaction had it been presented to the court beforehand. The transfer results in funds to Greenleaf, but such funds must still be loaned by Greenleaf to the Debtor. The court would have been very hesitant to approve any reduction of estate assets in return for the mere possibility of funds to the estate. The court is equally unconvinced that the ReadyCap Financing was not possible without these acts. The court is aware of no authority that permits a debtor to fail to comply with section 363 simply because the assets in question are of little value. The Debtor relies on *Telesphere*, which is not helpful in this instance. *Telesphere*, 179 B.R. at 552. *Telesphere* stands only for the proposition of what the court might allow in the absence of an objection. *Id.* To the contrary, the court is aware of multiple times courts have been asked to authorize and have in fact then authorized the sale *de minimis* assets. *See, e.g.*, *In re Green Field Energy Services, Inc.*, Case No. 13-12783 (KG), 2013 WL 6908773 (Bankr. D. Del. Nov. 26, 2013).

There is also Bankruptcy Rule 9005, which applies a "harmless error" rubric to cases under the Bankruptcy Code. *See* Fed. R. Bankr. P. 9005 (applying Fed. R. Civ. P. 61 to bankruptcy cases); *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648 (2d Cir. 1988) (applying Bankruptcy Rule 9005 to "salutary harmless errors"). Bankruptcy Rule 9005, however, is predicated on the omission not affecting substantive rights, *id.*, and the court cannot conclude here that either the error was a salutary harmless error or that no substantive rights have been affected. The court is not convinced that the creditors are not harmed by the transaction. Were creditors being paid in full and were the Plan otherwise confirmable, it might—as the Debtor suggests—be seen as a reason to overlook the express requirements of the Bankruptcy Code. *Cf. In re Bartle*, 560 F.3d 724, 730 (7th Cir. 2009) (looking to evidence of the harm under Bankruptcy Rule 9005). As discussed below, however, the Plan no longer purports to be a 100% plan. Even if it were, the Plan must be confirmable, and the Plan is not. By reducing the Debtor's ownership stake in one of the only assets potentially available for creditor recoveries outside of the Plan by more than 50%, the transaction has harmed creditors.

Other than in the instances directly governed by Bankruptcy Rule 9005, the court is disinclined to sanction a "no harm, no foul" approach to Bankruptcy Code compliance. Not only does this strike the court as an after-the-fact justification of the Debtor's noncompliance, but the documents in question evidence an attempt to cover up the fact that the transaction occurred postpetition and thus was subject to the requirements of the Bankruptcy Code. By backdating the Amended Operating Agreement, the Debtor actively concealed the timing of the transaction. Were the court to condone that through the harmless error standard, it would encourage debtors to not

just be more cavalier with their duties, but to actively avoid those duties with no repercussions.  The court declines to exercise its discretion here to retroactively approve the transaction as a harmless error.  *Cf. Breitling*, 133 F. at 150.

Finally, the Debtor has not convincingly argued that he reasonably believed he did not need court authority.  Section 363 is clear on its face.  The advice of counsel explanation advanced by the Debtor is simply unconvincing.  The case law is clear that when a debtor is faced with duties, the debtor may not rely on an advice of counsel defense for failure to perform the same.  As the Seventh Circuit stated in *Breitling*,

> *advice of counsel cannot excuse violation of law.*  It may mitigate the act, according to the character of the advice and circumstances under which it is given.  If the omission here were in the exercise of a supposed right under advice taken and given in good faith, the bankrupt might be absolved of the charge of making a false oath or of designedly concealing his estate from his creditors.  To work such result, however, the facts must be fully in good faith stated to counsel, and the act charged done innocently, and believing that he had been correctly advised.  Whether the bankrupt here stands in such plight, depends upon the facts of the case, judged in the light of all the surrounding circumstances.

*Breitling*, 133 F. 148-49 (emphasis added); *In re Rosenzweig*, 237 B.R. 453, 458 (Bankr. N.D. Ill. 1999) (Squires, J.).  So, at best, the advice of counsel would mitigate the results, but not excuse the act.

To be clear, while the Debtor testified that the changes to the Original Operating Agreement were done by Xydakis, Xydakis never explained to him why they were done and none of the advisors advised him to report the changes to the bankruptcy court, Tr., vol. 10, p. 1974, that testimony is not reliable.  The Debtor has a history of hiding behind counsel when his actions are question.  But his actions speak louder than his words.[15]  Further, the testimony of Mr. Giannakopoulos and Mr. Dallas provided no additional clarity this.  Neither Mr. Giannakopoulos nor Mr. Dallas was willing to admit to being the source of these requested changes and each were evasive when questioned regarding the same or passed on responsibility to another party.  Tr., vol. 9, pp. 1602-23; Tr., vol. 10, pp. 2057-69.  At best, if taken at face value, Mr. Giannakopoulos's testimony stands for the proposition that some of the changes may have been requested by the lender.  Tr., vol. 10, pp. 2056-69.

Thus, even assuming such counsel was given, the court does not find the third factor of *Nilhan* to be met.  As a result, none of the factors of *Nilhan* have been met when all are required.  The Motion for Approval will be denied.

---

[15]    In addition to blaming his Original Counsel in these matters for various strategic decisions in the bankruptcy, as noted above, the Debtor blamed Xydakis for the Sanctions Award yet continued to avail himself of Xydakis's assistance in this case.  *Spiegel v. 1618 Sheridan Rd. Condo. Assoc.*, Case Nos. 1-22-1427, 1-22-1546, 1-22-1628, 1-23-0215, & 1-23-0221 (cons.), 2024 WL 3549535, 2024 IL App (1st) 221427-U, ¶ 72 (1st Cir. App. Ct. Ill. July 26, 2024) (noting that such a claim before it has already been considered and rejected by the circuit court, as follows: "Mr. Spiegel's characterization that his attorney was the sole driver of this abusive litigation is not borne out by the pleadings, motions, appearance of Mr. Spiegel personally in this Court's courtroom as well as others.").  That assistance resulted in further sanctions from this court.

B.        Plan and Disclosure Statement

The Plan is the seventh proposed by the Debtor in the hopes of being confirmed and was filed in conjunction with the sixth Disclosure Statement.  Like previous plans, the Plan is contested by various creditors for its sufficiency and transparency.

1.        *The Arguments*

a.        *The Plan*

In the Plan, the Debtor creates seven classes, six of which are impaired.  Plan, at § 4.01.  The only unimpaired class consists solely of U.S. Bank, who has a secured interest in the Condo.  *Id.*

Payments and disbursements under the Plan are voluntary distributed to the Debtor by Greenleaf.  *Id.* at § 3.02.  Greenleaf will make an initial payment before the initial disbursement date to cover the estimated Administrative Expense and Class 2 Claims, with an extra $20,000 to go to the Disbursement Agent.  *Id.* at § 7.01.  Greenleaf's payments will go into a segregated disbursement account, from which the Disbursement Agent will make disbursements.  *Id.*  Each quarter after the initial disbursement, the Debtor will pay $16,000 into the account and the Disbursement Agent will disburse the same, until the allowed claims are paid in full.  *Id.*

In addition to the foregoing, the Debtor will be vested with his assets upon confirmation of the Plan.  *Id.* at § 7.02.  Those assets include his various causes of action.  *Id.* at § 1.4.  At the same time, the Debtor will be discharged from all claims and causes of action upon completion of the payments to the holders of allowed claims.  *Id.* at § 7.06.

In addition to the Plan, the Disclosure Statement contains:  The Identity of Fair Market Value of Non-Exempt Assets [Exhibit B], the Projection of Cash flow for First Year After Confirmation [Exhibit C], the Liquidation Analysis [Exhibit D] (the "Liquidation Analysis"), the Financial Statements of Greenleaf [Exhibit E], the Summary of Operations During Chapter 11 Case [Exhibit F] and the Personal Tax Returns of the Debtor for 2019, 2020, 2021 and 2022 [Exhibit G].

b.        *The United States Trustee Objection to Confirmation*

The United States Trustee objects both to the Disclosure Statement and to the Plan.

As to the Disclosure Statement, the United States Trustee argues that it does not comply with Local Rule 3016-1 or section 1125 in the Bankruptcy Code as it "lacks critical information for a creditor to determine the value of its claim and whether to accept the proposed plan."  According to the United States Trustee, the Disclosure Statement's list of assets is incomplete and the Liquidation Analysis is inaccurate and incomplete.

Under the Local Rules,[16] among other things, a disclosure statement must include:

> (a) An introductory narrative summarizing the nature of the plan and
> including a clear description of the exact proposed treatment of each class

---

[16]      Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (effective April 19, 2022) (the "Local Rules" and as to each, "LBR ___").

showing total dollar amounts and timing of payments to be made under the plan, and all sources and amounts of funding thereof. The narrative should plainly identify all classes, the composition of each class (as to number and type of creditors), the amount of claims (specifying any that are known to be disputed and how they will be treated under the plan), and the amount (dollar and/or percentages) to go to each class. The distinction between pre- and post-petition creditors must be clear.

(b) A summary exhibit setting forth a liquidation analysis as if assets of the debtor were liquidated under Chapter 7.

LBR 3016-1.

As noted above, the Liquidation Analysis can be found in Exhibit D to the Disclosure Statement. The United States Trustee disagrees with the Debtor's estimated value of the fraudulent transfer claim in the Liquidation Analysis. The Debtor values the fraudulent transfer claim at zero dollars and judgments are listed at 10% of face value with no explanation.

The United States Trustee also argues that the Disclosure Statement is incomplete and thus inadequate. Specifically, the United States Trustee takes issue with the solicitation procedure (the "Solicitation Procedure") found in the Disclosure Statement because it differs from court-approved solicitation procedures. Plan, pp. 4-5. The Solicitation Procedure states that a ballot that does not accept or reject the Plan will be considered acceptance of the Plan. *Id.* The United States Trustee observes that this does not comply with the requirements set forth in Bankruptcy Rule 3018.

Addressing the Plan, among other things, the United States Trustee argues that, in light of the issues with the Debtor's valuation of Liquidation Analysis noted above, cannot be concluded that the Plan meets the best interests test, and thus fails to comply with section 1129(a)(7) of the Bankruptcy Code.

In addition, the United States Trustee argues that the Plan is not feasible because it relies on voluntary distributions from Greenleaf to the Debtor. As Greenleaf allegedly has no obligations to pay the Debtor, if Greenleaf chose not to pay the Debtor, there is no legal basis to force Greenleaf to pay funds to the Debtor. According to the United States Trustee, voluntary payments make it impossible for the Plan to be feasible under section 1129(a)(11).

c.       *The Condo Association Objection to Confirmation*

The Condo Association also objects to both the Disclosure Statement and the Plan.

As to the Disclosure Statement, the Condo Association requests that it be deemed inadequate. It argues that the Disclosure Statement may not be approved because the Plan itself is not confirmable due to it containing "insufficient and misleading information about critical aspects of the Plan." The Condo Association therefore asserts that the Disclosure Statement "does not adequately address creditors' voting rights and is inconsistent with other filings concerning voting on the plan."

The Condo Association argues that the Plan fails to satisfy the good faith requirement of section 1129. 11 U.S.C. § 1129(a)(3). Given the allegations against the Debtor in the Motion to

21

Appoint and the Motion to Convert, the Committee believes that good faith is lacking. Even if the Plan is confirmable, the Condo Association argues it should be afforded the benefits of appointing a trustee or converting the case so it may deal with a neutral, third-party fiduciary.

The Condo Association also argues that the Plan simply furthers the Debtor's attempt to frustrate his creditors' rights; that in making his interest in Greenleaf impossible to reach except by his consent, the Debtor is manipulating the bankruptcy system in a way unintended by Congress when it enacted the Bankruptcy Code. It argues that the Plan purports to compensate the value of creditors' prepetition claims (without interest), but the Plan does so without a sure way of doing so. This too, the Condo Association argues, is an *indicium* of a lack of good faith.

According to the Condo Association, there is no way of the court to measure the feasibility of such a plan or the likelihood that such a plan would not be followed by a liquidation. *See, e.g.*, 11 U.S.C. § 1129(a)(11). Given that the Debtor arbitrarily values his interest in Greenleaf at $400.00 in the Liquidation Analysis, there is no way for the Debtor, at the same time, to rely on the more than a million dollars needed to be contributed by Greenleaf for the Plan to succeed.

The Plan, it argues, also violates the absolute priority rule as the Debtor retains non-exempt property of the estate, including equity interest in Greenleaf and the condo unit, but doesn't pay the Condo Association's Class 5 claim in full. The Debtor's future promises of funding are insufficient to prove the new value required for such an exception to apply.

Last, the Condo Association also takes issue with the discharge provisions of the Plan, stating they are overly broad because they do not carve out or address the effect of a discharge on claims the court has abstained from ruling on, on claims objected to post-confirmation, on the litigation claims for supplemental sanctions awarded post-confirmation, or on claims entitled to post petition interest. The Condo Association asks for its rights to be preserved and that the Plan and Confirmation Order "state that any post-confirmation claim amendment, liquidation, or allowance process must be completed by the Debtor prior to the Debtor receiving any discharge under section 1141 of the Bankruptcy Code."

### d.        *The Committee Objection to Confirmation*

The Committee also objects to both the Disclosure Statement and to the Plan.

As to the Disclosure Statement, the Committee argues that that the document lacks explanations of what creditors will be paid and when and what contingencies for payments exist, contains an inaccurate and inadequately supported liquidation analysis, has inadequate information, fails the best interest test, and is not feasible due to a lack of instrument requiring Greenleaf to fund the Plan.

According to the Committee, the Plan artificially impairs and categorizes classes, is not supported by creditors who are not insiders, is not feasible and has not been proposed in good faith. The Committee further argues that the cramdown requirements set out in the Plan are not met and the Plan is proposed in bad faith. Last, the Committee states that the Plan cannot be confirmed because it "is premised on a fraud."

As to the first, the Committee states a cramdown is impossible because all the impaired classes are artificially impaired. The Committee alleges that the Debtor has the money to pay all the

creditors in full but is choosing not to, instead is choosing to impair all the classes. In addition, Class 6 of the Plan, which is substantially similar to Class 5 but whose votes would be outweighed by the other creditors in Class 5, was created according to the Committee for the sole purpose of gerrymandering an impaired, accepting class. Class 6 is made up of Hepler and Langone, who according to the Committee are both insiders and unable to vote.

The Committee also challenge's the Plan's good faith. It argues that the Debtor has no fact-based way of maximizing value to satisfy creditors and there is no going concern to preserve. As the Debtor is unemployed and has no business, the only asset in the estate that has value is the Debtor's residence and his interest in Greenleaf. Despite these limited sources of repayment, the Debtor is making no modifications to his lifestyle toto fund the Plan.

The Committee mirrors the Condo Association's argument that the Plan is premised on a fraud, a fraud which secured a loan for the Debtor that is now supposed to fund the Plan. The Debtor's alterations to his ownership and control of Greenleaf (as discussed above) also constitute bad faith actions by the Debtor.

In sum, the Committee asserts that this bankruptcy serves only the Debtor, allowing him to exit chapter 11 and continue litigation against his neighbors.

e.       *The Reply in Support of Confirmation*

Not surprisingly, the Debtor disagrees with every objection discussed above.

The Debtor claims that, having resolved all objections regarding the Plan's compliance with the provisions of the Bankruptcy Code, the Plan satisfies section 1129(a)(1).

According to the Debtor, altering the Original Operating Agreement does not violate section 1129(a)(2) as that section is concerned with disclosure and Debtor did not hide the transaction. The Debtor, relying on the case *Urgent Care Physicians*, argues that the transaction was a "harmless error" and he thus committed no wrongdoing. *In re Urgent Care Physicians, Ltd.*, Case No. 21-24000-beh, 2021 WL 6090985, at *3 (Bankr. E.D. Wisc. Dec. 20, 2021).

The Debtor further claims the Plan was proposed in good faith as required by section 1129(a)(3).

As to good faith, while the objecting parties did not raise the omission of Matthew's claim on the schedules, the Debtor nevertheless addresses it. As noted above, the addition of Matthew's claim occurred under circumstances that make the addition appear to have been done to manufacture standing for Matthew. The Debtor argues, however, that adding a claim to schedules cannot be a sign of acting in bad faith, especially when the late filed claim's class is subordinated to the other creditors. The Debtor asserts that the Committee cannot say that the Debtor has frustrated creditors' abilities to be paid when the Debtor has proposed multiple 100% plans.

Further, the Debtor argues that having Greenleaf fund the Plan is not a basis for a bad faith determination. According to the Debtor, Greenleaf's ability to fund the Plan is a question of fact to be addressed by voting and not something to be the basis of a bad faith argument. Greenleaf is allegedly creating income for the Debtor and the Debtor does work and is not unemployed.

23

On the issue of good faith, the Debtor takes issue with the Committee's argument that the Debtor's residence is not being liquidated to maximize value for the creditors. According to the Debtor, even if that were true, the Committee has waived the argument by failing to raise it in previous objections. Similarly, the Debtor believes that whether the Plan is predicated on fraud is not a concern as the Committee has also waived that argument. Further, the Debtor argues that fraud is a matter to be determined by voters and is not a factor in determining whether a plan was filed in bad faith.

According to the Debtor, the United States Trustee's objection that the Plan violates section 1129(a)(4) is unfounded as the Plan clearly outlines how the disbursement agent will be paid.

The Debtor further argues that the United States Trustee's objections as to classification and voting are moot because the classes are no longer impaired. The Debtor argues that all classes are able to vote, thus satisfying section 1129(a)(10), that the stay of actions have been removed, that the Plan treats creditors fundamentally fairly and that the Plan will pay all allowed claims.

As to feasibility, the Debtor argues he is maximizing value to the estate by obtaining a binding commitment via written agreement for Greenleaf to fund the plan. That written agreement also ensures the Plan is feasible, satisfying section 1129(a)(11).

Regarding classification, the Debtor argues that the Plan meets the cramdown requirements of section 1129(b) as Class 6 is impaired, has voted to accept the Plan and does not contain any insiders. The Debtor refutes the claim that Hepler is an insider, stating that no nexus exists other than the time Debtor's counsel assisted Hepler with a filing because Hepler was without counsel at the time of filing. As to Langone, the Debtor argues that though retained by the Debtor, Langone is not controlled by the Debtor and the Committee has no legal support for the claim that Langone is an insider. The Debtor also argues that Class 6 is properly classified because Class 5 creditors obtained an order from the court "to abstain from adjudicating their claims in favor of the Illinois state court venue."

Last, the Debtor addresses the Committee's argument that the Plan artificially impairs all creditors, stating that the Debtor would have been able to pay all the claims on the estimated effective date if not for the Committee's counsel accruing an "excessive amount of fees" that then required the Committee's counsel to be paid instead of creditors upon confirmation. The Committee's belief that the Plan's discharge is overly broad is without merit, according to the Debtor, because the Plan is clear that there is no discharge until the court grants discharge "on completion of all payments under the [P]lan." In rejecting the Committee's complaint that the plan does not adequately carve out three groupings of claims from discharge upon completion of payments, the Debtor argues that there is no Bankruptcy Code section that requires a plan to make a carve out for discharge claims and, in this case, no discharge is granted until the court grants a discharge upon completion of all payments under the plan. The Debtor again argues that the Committee's failure to object to these same concerns in earlier iterations of the Plan constitutes a waiver.

2.        *Analysis*

The Debtor's Disclosure Statement is inadequate.  The Debtor has further failed to meet his burden of establishing that every requirement in section 1129(a) of the Bankruptcy Code has been met.

In considering the various arguments, the court gives no weight to the Debtor's many waiver claims.  The court finds nothing that the Committee has done (or not done) here amounts to a waiver of its rights to seek affirmative relief from the court or object to the relief sought by other parties.  As the Seventh Circuit has stated, "[w]aiver is the intentional relinquishment of a known right." *Yang v. United States*, Case23-2777, 2024 WL 3841099, at *8 (7th Cir. Aug. 16, 2024).  There is no evidence that the Committee has intentionally relinquished any rights here.

Further, the court can find nothing that would give rise to either judicial or equitable estoppel or a laches defense.  True, the Debtor has presented multiple plans.  The time for objecting to the one before the court, the Plan, was set by the court and the Committee complied with that order.  The time for making its arguments against the Plan were then.  That the Committee may have not objected to an earlier version of the Plan which was not confirmed and for which no confirmation hearing was held is of no import.  The Committee acted timely and in accordance with the applicable Bankruptcy Rules.  The Debtor's arguments here are simply misplaced.

With respect to disclosure, on the other hand, the court does not consider those objections regarding the Plan, whether they be by the Committee or another party, to be valid Disclosure Statement objections.  Defects in plans are ordinarily not considered to be germane when considering the sufficiency of a disclosure statement.  As the Third Circuit has stated,

> "Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage." *In re Larsen,* No. Case No. 09–02630, 2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011).  Courts have recognized that "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing." *Id.*

*In re Am. Capital Equip., LLC*, 688 F.3d 145, 153–54 (3d Cir. 2012).

Thus, issues with the Disclosure Statement which are in fact issues with the Plan will be taken up in that latter context only.  There is nothing about this Plan that would make it, in contexts other than that before the court today and without correcting changes, confirmable.

There is, however, inadequate information in the Plan and the Disclosure Statement to enable a hypothetical investor to make an informed judgment regarding the Plan.  11 U.S.C. § 1129(a)(1); 11 U.S.C. § 1125(a)(1).  The Disclosure Statement violates Local Rule 3016-1 and section 1125 as the Liquidation Analysis is incomplete and the Solicitation Procedure is not permissible.  The Debtor's treatment of the entirety of his assets, including his interest in Greenleaf, his litigation recoveries and financial information relevant to creditors' decisions to object or accept the plan, such as evidentiary support for his liquidation analysis, is either incomplete or missing entirely.

In keeping with that issue, section 1129(a)(3) has not been satisfied.  The Debtor is required to propose his Plan in good faith.  Bankruptcy is reserved for the "honest but unfortunate debtor." *Grogan v. Garner,* 498 U.S. 279, 287 (1991); *In re Draiman*, 450 B.R. 777, 807 (Bankr. N.D. Ill. 2011) (Squires, J.) (finding that a debtor who "manipulate[s] the system to the detriment of his creditors" does not satisfy the good faith requirements of section 1129(a)(3)).  Here, it is clear that the Plan was not proposed in good faith and the Debtor, while unfortunate, does not otherwise meet the qualifications and requirements for the relief he seeks.

As has been noted, the Plan is not a 100% Plan.  It affords some, but not all, claims with interest without sufficient explanation of the difference in treatment.  There are few facts to support the claims and assertions the Debtor makes.  The Plan reads as more of an aspiration than anything that is grounded in fact.  With the many inconsistencies and missing pieces of information for this Plan, the Plan begins from a point of questionable good faith, because without the missing information it is difficult, if not impossible, to determine whether there is a reasonable likelihood that the plan will result in a manner consistent with the objectives and purposes of the Bankruptcy Code.  *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).  In addition, given the totality of circumstances, the court finds little to support a conclusion that the plan is both accurate and evidences "a fundamental fairness in dealing with [the Debtor's] creditors."  *In re Rimgale*, 669 F.2d 426, 432 (7th Cir. 1982).

Further, the court finds that the discharge provision is overly broad.  This is particularly telling in this case.  The dichotomy between the discharge of the Debtor's liability in his various disputes and, at the same time, the Debtor's retention of his rights in those causes of actions is more than troubling.  Were this a 100% plan, there would be little need for the bankruptcy case at all.  But it is not.  The Debtor seeks to impair his creditors' rights to litigate with him while he retains all rights to litigate against them.

The Debtor testified that he would not propose a plan that would receive approval from the Committee that required him to abandon his right to appeal the sanctions award.  This underscores both the Debtor's unrealistic views toward litigation and his motivations in seeking approval of the Plan.  As to the former, the Debtor quite simply does not know when to quit doubling down on losing actions.  He will not take no for an answer.  The Debtor, for example, testified that he believed he might be entitled to United States Supreme Court review of his Sanctions Awards.  Tr., vol. 10, pp. 1918-20.  He scheduled a judgment in a robo-caller telemarketing suit against entities he has been unable to locate as worth its face value of $268,615.50, Official Form 106A/B, § 33 [Dkt. No. 16], though that judgment was obtained by default and the case was closed in 2019 with no recovery to be had on it.[17]  There is no realistic chance of recovery on the matter yet the scheduling shows that the Debtor believes otherwise.

He has all the appearance of having been taken advantage of by unscrupulous advisors who have profited from his inability to admit fault or futility.

The Debtor's decision-making as a debtor as a debtor-in-possession is equally flawed.  As has been noted, his obstructionist tactics have already resulted in his sanction from this court.  Rather than admit that the Committee has both a right and a duty to investigate the propriety of his conduct and his Plan, the Debtor goes on the offensive, challenging the Committee's existence,

---

[17]     *Spiegel v. Engagetel*, Case No. 15cv01809 (N.D. Ill. June 18, 2019).

26

composition and fees and thus engaging in the worst kind of *ad hominem. Ad hominem* is a logical fallacy intended to distract parties from the issues at bar by attacking the messenger instead of the message. *In re Maurice*, 167 B.R. 114, 131–32 (Bankr. N.D. Ill. 1994) (Squires, J.), *as amended* (Mar. 31, 1994), *subsequently aff'd*, 69 F.3d 830 (7th Cir. 1995); *see also SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555, 560 (N.D. Ill. 1984). As Judge Squires succinctly, stated "these attacks are illogical and material fallacies raised to distract attention from the real issues in this case, and thus are not worthy of further discussion." *Maurice*, 167 B.R. at 312.

True, some of the Committee's fees seem over the top. But a large portion have been in response to the Debtor's own actions or inactions in the case. The issue of each party's fees has been expressly reserved by the court in the interim fee rulings made thusfar in the case and will be taken up when final compensation is sought.

The litigation posture of the matters before the court demonstrates the Debtors' tactics quite clearly. As noted earlier, the Debtor amended his schedules to include a claim for his son, Matthew, in response to challenges to his son's right to be heard in these proceedings. While the following litigation did result in a partial win for the Debtor given the presumptions in favor of debtors and scheduled claims, the court noted then that the Debtor's inclusion of Matthew in his fifth amended plan, Fifth Amended Plan of Reorganization [Dkt. No. 776] (the "Fifth Plan"), amendment of his schedules to include Matthew "each have the hallmarks of blatant attempts of the Debtor to confer standing on his son." *Spiegel II*, 2023 WL 2564028 at 3. In the Trial, the court heard from the Debtor, Matthew and Greenleaf—all making essentially the same arguments and all represented by competent and presumably expensive counsel. All of those attorneys are presumptively being paid, directly or indirectly, from the same source, Greenleaf. Yet the Debtor rails against the Committee's expense.

Despite all this expense, the Debtor may be capable of proposing a 100% plan with the assistance of Greenleaf. The Debtor has never, however, convincingly explained why Greenleaf, an entity that the Debtor owns only .01% of and in which the Debtor, especially after the Amended Operating Agreement, has no ability to control, would do so. Greenleaf is an asset made remote by the Debtor prior to commencement of this case under circumstances that have never been adequately explained. Especially after the Amended Operating Agreement, but to some extent before, the Debtor has treated Greenleaf as his own private, unreachable piggy bank. It is there to fund what he wants but is otherwise inaccessible to the Debtor's creditors. When pressed, the Debtor falls back on the formalities, Tr., vol. 14, pp. 2739-41, never convincingly explaining why such an entity would or should fund his Plan. At best the court has the testimony of Matthew who stated that he did not take income from Greenleaf when he could have used it to support himself, and if he had taken proceeds, he would have used them to support his father by paying for medicine and letting him live at the condo. Tr., vol. 8, pp. 1466-80.

While this is believable after a fashion, there are less expensive ways for Matthew to achieve these results. The Plan is not needed to achieve that result. It is, however, necessary to achieve the disparity in litigation rights that it would create. A better exercise in judgment for a debtor-in-possession would be to propose a plan that sought closure on the parties' protracted and vexatious litigation.

The court finds that the Plan is not confirmable because the Plan has not been proposed in good faith. 11 U.S.C. § 1129(a)(3); *Madison Hotel*, 749 F.2d at 425. It further fails to satisfy the

requirements of section 1129(a)(1).  As a result, the court need not look further into the factors of section 1129 and the Plan.  Therefore, the Debtor's Seventh Amended Plan of Reorganization is denied.

C.       Motion to Convert

While the Motion to Convert was filed before the Motion to Appoint, the two motions share the premise that the Debtor has acted in bad faith and has a history of actions that show the Debtor is not trustworthy.  These claims are, of course, opposed by the Debtor and by parties aligned with the Debtor.  Considering this, the court must determine whether cause exists to convert or dismiss and, if it does, whether it is in the best interests of the estate and the creditors to convert the case to chapter 7, dismiss the case, appoint a trustee or continue to let the Debtor operate as a debtor-in-possession.

1.       *The Arguments*

a.       *The Motion to Convert*

The Motion to Convert to Chapter 7 is lengthy and chronicles an alleged pattern of behavior that indicates, in the Committee's view, that the Debtor has not filed or conducted this bankruptcy in good faith and that the Debtor's conduct constitutes cause for this court to order conversion.

The Committee's list of grievances begins with the Debtor's actions in litigation prior to filing for bankruptcy and ends with the Debtor's conduct leading to the absence of a confirmed plan four years after the bankruptcy was commenced

As to the Debtor's postpetition conduct, first, the Committee argues that the Debtor's schedules were insufficiently prepared.  The schedules omitted the most valuable assets from his schedule and failed to list his largest creditors.  These omissions created unconfirmable plans, and as a result, the Debtor was not able to confirm a plan in a reasonable amount of time.  The multiple unconfirmable plans' real purpose served as an appeal bonds.

Second, the Committee states the Debtor has mismanaged the estate by "refusing to prosecute valuable estate claims, purposefully diminish[ing] the estate, [and] us[ing] property estate outside the ordinary course of business without authority."

Third, the Committee asserts that the Debtor's post-petition actions are meant to hinder the progress of the case and any investigation into his unethical and possibly fraudulent actions.  For example, the Debtor failed to timely or accurately file his monthly reports.  According to the Committee, the Debtor's objections are without basis, unfounded, and only serve to lengthen the progress of the case.  While the Committee has tried to perform discovery, the Debtor attempted to obstruct progress by disrupting the depositions.  That required the court to order the Debtor to participate in additional hours of depositions.  The Debtor has refused to compromise with the creditors in any way.  Last, the Debtor has been unwilling to pay any expenses of the estate that have been allowed.

b.   *The Debtor's Objection to Conversion*

The Debtor's Objection to Conversion begins with arguments in favor of the Fifth Plan, a plan that is only of passing relevance at this point. Those arguments are not considered here.

In keeping with his demeanor throughout the case, the Debtor characterizes the Motion to Convert as a selfish action, meant to add additional litigation and bring the case to a close for the Committee's own benefit at the expense of the creditors. A primary reason for the Motion to Convert, according to the Debtor, is for the Committee to force the Debtor to waive his right to appeal the Sanctions Award that prompted the Debtor to file for bankruptcy.[18] The Debtor argues that the only reason he has not agreed to the Committee's offer of compromise is because it requires him to waive his right to appeal.

Finally, the Debtor states it is not efficient to convert the case to chapter 7 and is not in the best interests of the creditors, as Greenleaf is willing to fund the Plan and Greenleaf will not fund a chapter 7 case. The Debtor believes there is no cause to dismiss or convert the plan because there is a reasonable likelihood a plan will be confirmed, the monthly reports have been filed and are accurate, and the omissions on the schedules are insufficient to justify dismissal.

c.   *Matthew's Objection to Conversion*

Matthew's Objection to Conversion begins by repeating the Debtor's *ad hominem* attacks, arguing that the Committee is effectively serving as a vehicle for the Condo Association to abuse the chapter 11 process to "exact revenge." Matthew argues that it is not the Debtor that has been unwilling to compromise, but the Committee.

Matthew raises many of the allegations of misconduct made by the Committee, pointing to specific examples for each. This objection, unlike the Debtor's, is detailed.

Matthew first contests whether the Committee has standing to bring this case. Matthew argues that the Committee is not a party in interest because it does not have a pecuniary interest in the outcome of this case. By the same token, Matthew argues that the Committee should not be afforded standing as the situation the Committee finds itself in is the consequence of the Committee's own actions. Such actions, Matthew argues, were entirely avoidable. An example this is, according to Matthew, that the Condo Association only recently amended its allegedly inflated proof of claim to comply with the sanctions handed down by the Circuit Court of Cook County. According to Matthew, the Condo Association has refused to accept these payments from Xydakis or alter their proof of claim to reflect those payments. Matthew believes that this refusal was intended to preserve the Committee's standing to bring the Motion to Convert. Matthew argues the Committee only serves to advance the interest of the Condo Association, the only creditor the Committee represents, which seeks to eliminate the Debtor's ability to appeal the Sanctions Award.

---

[18]   Despite this, the court notes that the Debtor has vigorously pursued those very same appeal rights during the pendency of this case, to no avail. On July 26, 2024, the First District Appellate Court of Illinois issued a ruling on his appeal of the Sanctions Award, affirming the lower court rulings in all respects. *Spiegel v. 1618 Sheridan Rd. Condo. Assoc.*, Case Nos. 1-22-1427, 1-22-1546, 1-22-1628, 1-23-0215, & 1-23-0221 (cons.), 2024 WL 3549535, 2024 IL App (1st) 221427-U (1st Cir. App. Ct. Ill. July 26, 2024).

Were the Court to deny confirmation of the Plan, Matthew argues that dismissal is the most appropriate course of action.  If the court were to dismiss the case, the Debtor would be required to pay unpaid litigation and other unsecured claims.  Matthew argues against conversion, stating a chapter 7 trustee would be under the control of the Condo Association, would pursue "frivolous and unnecessary avoidance actions" and the result would be that it would take years to pay creditors.[19]  Matthew believes that a chapter 7 trustee would ultimately evict the Debtor from his condominium, which Matthew states is the real goal of the Committee.

Matthew argues that there is no evidence of bad faith or obstruction by his father.  Rather, Matthew argues that it is the Committee that is acting in bad faith.  Mathew believes that the multiple attempts to confirm plans and now timely and complete monthly operating reports by the Debtor show that the Debtor is making a good faith effort to confirm a plan while the Committee is unwilling to compromise and allow such plans to be confirmed.

d.       *The Hepler Objection Supporting Reorganization*

Hepler argues that it is not well represented by the Committee as the Committee members' interests all arise from the same pre-petition litigation.  In contrast, Hepler is owed legal fees.  As the largest unsecured creditor not represented by the Committee, Hepler believes its voice should be given great weight.  However, Hepler believes that the Committee is attempting to have the case converted so that the Committee may pursue a larger litigation strategy at the expense of creditors like Hepler, who would be paid 100% under the plan.  According to Hepler, with Greenleaf being able to pay for the Plan, it is nonsensical to have a chapter 7 trustee sue Greenleaf.  Hepler asserts that confirmation of the Plan, not dismissal or conversion, is in its best interests as it will be paid in full under the Plan.  Granting the Committee's motion, according to Hepler, is advancing the Committee's interests at the expense of his own.

e.       *The Committee's Reply Supporting Conversion*

In the Reply Supporting Conversion, the Committee reminds the court that the Motion outlined many actions by the Debtor that constitute cause to convert the case to chapter 7.  The Committee points to the faulty schedules and the insufficient operating reports.  The Committee also believes that the multiple, unsuccessful plans and disclosure statements are indicative of the Debtor's inability to confirm a plan.  Such do not indicate a genuine interest in moving the case forward.  Further the Committee inexplicably argues that Xydakis's attempt to pay claims on which he is legally liable but which the Debtor is also liable for constitutes cause.

The Committee disagrees with the assertion that a chapter 7 trustee would slow the bankruptcy process.  The Committee says a disinterested trustee would be able to quickly liquidate tangible assets of the estate, address valuable causes of action held by the estate against Debtor's insiders, dispose of all pending litigation brought by the Debtor and make distributions to creditors.

---

[19]      Matthew argues that a trustee would be time-barred in bringing any such action and blames the Committee for allowing the time to pass.  This argument ignores the fact that it is, first and foremost, a debtor's obligation as a debtor-in-possession to bring such actions if viable.  True, this would be a much different case had that such an action been brought by the deadline.  But it was not and blaming the Committee for such a failure is disingenuous.

The Debtor has been unable to accomplish any of these actions in the last 27 months, and if the case is dismissed, the Committee says the inaction will continue.

As to the Debtor's argument that there exist unusual circumstances which merit ignoring any cause for conversion, the Committee believes that such circumstances do not exist. The Committee argues that the examples of unusual circumstances offered by the Debtor show instead that the Debtor is not interested in his creditors or confirming a plan within in a reasonable period of time, as required by section 1112(b)(2). An example of unusual circumstances given by the Debtor is his inability to pay administrative fees, which the Committee points out actually supports conversion.

Ultimately, the Committee argues that the Plan is not confirmable and there is no track record indicating that a confirmable plan is imminent. The Committee points to language of a Plan that impairs most classes and only promises to pay the impaired claims if the Debtor fails in continued litigation post-confirmation. The Committee argues that this is detrimental to showing that the Plan is in the best interests of the creditors. As, at the time it filed Reply Supporting Conversion, no creditor had accepted the Plan, the Committee believes this supports a finding of bad faith. As argued in other filings, the Committee argues that the plan is not confirmable because payments in the Plan, which are insufficient to begin with, are dependent on a party to make regular payments that it has no obligation to make.

The Committee further attempts to rebut the argument that the Committee is trying to "torpedo" the Plan. According to the Committee, it is the Debtor who has clearly made attempts to "torpedo" the Plan by continually proposing unconfirmable plans.

Last, the Committee states that the Debtor's laches defense fails because it ignored the Debtor's own actions that constitute cause. The delay in filing the Motion to Convert was not intentional delayed as the Debtor argues, but the only action the Committee could take after repeated efforts to negotiate with the Debtor failed to make any progress. Furthermore, the Debtor's failure to pay administrative expenses supports conversion and does not constitute an unusual circumstance excusing the many examples of cause for conversion.

2.      *Analysis*

In the Debtor's Proposed Findings and Conclusions, the Debtor argues that unusual circumstances exist that would make converting or dismissing the case not in the best interests of the creditors. The Debtor says the Committee's attempts to torpedo the plan of reorganization, excessive fees, the Committee's failure to prove the transfer was fraudulent and the Committee's failure to prove the Debtor's use of a housekeeper and masseuse were excessive constitute unusual circumstances. The court does not find this argument compelling. This is more of an argument against finding cause than it is an argument in favor of special circumstances warranting ignoring that cause. But that cause has been established, as is discussed below.

With that said, as to the Committee's reliance in part on the Debtor's prepetition conduct, even if those allegations are unchallenged, the Seventh Circuit has made clear that conversion on those grounds would be improvident. *In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992). As the Seventh Circuit stated:

31

If we were to create a presumption when a debtor's debt arose from egregious prepetition conduct, then a debtor with egregious prepetition conduct would be foreclosed from bankruptcy unless the debtor could come forward with evidence that her later activities demonstrate good faith. Some debtors with sincere intentions in filing for Chapter 13 relief might have difficulty meeting this burden. Accordingly, such a presumption has the possibility of unjustifiably foreclosing certain debtors from Chapter 13 relief.

Furthermore, such a presumption would lessen the benefits of the case-by-case, totality of circumstances test applicable to good faith determinations. The purpose of a case-by-case, totality of circumstances test is to allow the bankruptcy judge, who is in the best position to evaluate the witnesses' credibility against the other evidence, to weigh the evidence in making the good faith determinations.

*Id.* (citations omitted). As a result, the court need not take up the impropriety in the Debtor's prepetition actions.

Looking to the postpetition ones, however, still paints a picture of a Debtor who is using his bankruptcy as both a sword and a shield. Notably, as the Committee points out, the Committee's lengthy allegations of misconduct are unchallenged by the Debtor and only Matthew addresses only some of the alleged misconduct. The insufficient schedules and faulty monthly operating reports, for example, are virtually ignored by the Debtor.

Rather than argue the points, the Debtor seems content to cast aspersions at the Committee and rest on the claim that his is, as was said earlier, the only game in town. The Debtor in fact admits many of the allegations that the Committee makes. For example, the Debtor seems to admit that he filed documents late, that filings were incomplete and needed amendments, that tax returns were incorrectly filed and that he gave the court bad information that the court relied on. When he does address the issues, the Debtor has an excuse for every misstep. He says he is allowed to amend documents, that late filings weren't significantly late, that he didn't know he was giving incorrect information to the court and that it is the fault of previous counsel that these missteps occurred.

The Debtor seems to believe that if he eventually complies with his obligations of full disclosure, there will be no detrimental consequences. There might even be something to that, considering the application of Bankruptcy Rule 9005. But this case has been prolonged and made more expensive by the Debtor's cavalier attitude toward his duties as a debtor-in-possession. His defense, for example, for his failure to disclose the change in ownership structure he made to one of his most significant assets is that he wasn't asked by anyone about it. All parties have been harmed as a result. The number of missteps is also telling and is indicative of carelessness or recklessness at a minimum or, as in this case here, bad faith. The Debtor's inability to follow his obligations in a complete and timely manner raise serious doubts as to whether the Debtor is capable of proposing a confirmable plan in the future or whether he could execute on a plan, if confirmed.

In keeping with the only game mentality, the Debtor argued with respect to the Fifth Plan that if it is not confirmed, then no plan is confirmable. Notwithstanding that, the Debtor has now filed two further plans. The treatment of the unsecured creditors in the Plan is markedly different than that Fifth Plan. It is difficult to see how the Debtor would be able to propose a plan that would be successful under these circumstances.

It is also worth noting that the payment of creditors upon dismissal is unclear. The Debtor argues that there is no funding for creditors to be paid back if the case is dismissed. Matthew, the arguable source of any payments through his control of Greenleaf, argues instead that the Debtor can pay every creditor in full upon dismissal. If this were true, the Debtor's need for a continuing bankruptcy case would certainly be in question.

As discussed above, the Plan is not confirmable for a variety of reasons, chief amongst these being lack of good faith. The Plan has been fatally flawed since its inception due to the fault disclosures, deficient plans and incomplete schedules. But that pales in comparison to the Debtor's apparent use of the Plan to further his nonbankruptcy litigation agenda. The assertion that the Debtor has been operating in bad faith is well supported. Cause exists for dismissal or conversion.

As for the choice between the two, while the parties may differ in what they think the outcome of the Motion to Convert should be, both the Debtor and Committee seem to agree that dismissal will lead to more litigation. Any solution that will cause more litigation is not ideal. As dismissal would effectively return all parties back to square one and the court has good reason to believe the Debtor's abusive litigation will continue as a result, such a result is certainly not in the best interest of the creditors.

It is important to not forget that Hepler, a creditor in the case, opposes this result. It fears that it will receive nothing in a chapter 7. That is a real possibility, to be sure. But the creditor recoveries should not trump the need to protect the sanctity of the system. To do so would allow debtors to buy their way out of countless misdeeds. Further, while Hepler's recoveries may be diminished, the outcome for the multitude of parties against whom the Debtor is litigating (or intends to litigate against) may be significantly better.

Mr. Hall's testimony in this regard was telling. Conversion to chapter 7 and handing the case to a disinterested trustee would lead to a better result for creditors and a quicker resolution to the case than if the case were to be dismissed or continue as a chapter 11 with the Debtor remaining in possession. Such a chapter 7 trustee, using independent judgment and good management, could dispassionately analyze whether the Debtor's claims against his creditors and his ongoing litigation on appeal would be worthwhile. Such a trustee might choose to abandon those claims to the Debtor, but he or she might also choose to bring the actions or settle them. As there has been no indication that the Debtor would be willing to do the latter, the view of a dispassionate trustee would be in the best interests of all concerned.

Such a conversion would be premature, however, considering the United States Trustee's Motion to Appoint. The Motion to Appoint presents another option worth considering.

D.      Motion to Appoint

The final motion before the court is the Motion to Appoint. The court takes up the Motion in the context of denying the Motion to Authorize and Plan confirmation. It also takes this up on light of its conclusion that, absent another form of relief, converting the case to chapter 7 is in the best interests of the estate and creditors. It should also be noted that the Committee and the movant behind the Motion to Convert support the Motion to Appoint, while Greenleaf and Matthew support the Debtor's Response to the Motion to Appoint. The decision nonetheless lies with the court.

33

1.      *The Arguments*

     a.      *The Trustee's Position*

The Motion to Appoint has been joined by the Committee and Condo Association.  The United States Trustee begins by noting that he is required under section 1104(e) to bring the Motion to Appoint when it is reasonably suspected "that the Debtor participated in actual fraud, dishonesty, or criminal conduct in the management of the Debtor."

The United States Trustee explains the basis of his conclusions, noting that when the Debtor, in the context of seeking a post-petition loan, without notice to any party in the above-captioned bankruptcy cases and without authority from the court, modified the Original Operating Agreement governing Greenleaf.  That modification both reduced the Debtor's effective share of Greenleaf by 60%, but also was done in manner that demonstrated questionable intent.  The latter, the United States Trustee points out, is evident by the Debtor's backdating of the Amended Operating Agreement.

The United States Trustee also alleges that the Debtor evaded discovery attempts by the parties in relation to the transaction, changed the managing member of Greenleaf, failed to disclose the existence of his bankruptcy case to the lender in the transaction, removed the Debtor from the Greenleaf's Articles of Organization and made changes to his funding of accounts without court approval so as to make the transaction more likely to occur.

The United States Trustee alleges that these actions constitute cause under section 1104(a)(1).  They evidence the Debtor's conflict of interest between the Debtor's duties as a debtor-in-possession and his own personal self-dealing.  Finally, the United States Trustee also argues that appointment of a trustee is warranted as the Debtor's actions evidence a lack of trustworthiness.

     b.      *The Debtor's Response to the Motion to Appoint*

In the Response to the Motion to Appoint, the Debtor first spends an inordinate amount of time and energy arguing that section 1104(e) does not apply to this case because that section is "limited to corporations or similar entities" where there is a "governing body of the debtor chief officers."  The Debtor further argues that the United States Trustee has not shown that the appointment of a trustee will benefit the creditors and is only acting in the best interests of the Committee and the Condo Association.

According to the Debtor, the United States Trustee's allegations about dishonest acts are qualified with phrases like "may have" or "appears to have" that indicate the United States Trustee's extreme requests are based on unsupported ideas.

Also, according to the Debtor, the United States Trustee has failed to show that "actual fraud" has occurred, to show whether the alleged fraud is material and that the United States Trustee does not have "reasonable grounds to suspect" that fraud occurred.  The United States Trustee has not, therefore, pled facts with particularity and has not shown that Freddie Mac would not have given the loan if the Original Operating Agreement remained in effect.

The Debtor denies that there was ever concealment of his involvement in the transfer of his .015% interest in Greenleaf.  The claim that the Debtor attempted to conceal the changes made to

the operating agreement are without merit, according to the Debtor, as the United States Trustee failed to show any specific request made during discovery that would require turnover of the changes and the Debtor later voluntarily disclosed the changes to the court.

The Debtor argues that the ReadyCap Financing has created an agreement with Greenleaf that would create a 100% plan. Thus, while the United States Trustee argues that the appointment of trustee is in the best interests of the creditors, the Debtor asserts that he has proposed a 100% plan in good faith and any alternative would be costly in both money and time.

2.      *Analysis*

The United State Trustee's proposal to appoint a chapter 11 trustee is favored by both the Committee and the Condo Association. It is opposed by the Debtor, Matthew and Greenleaf.

To begin, none of the parties are well served by the internecine disputes over the operation of section 1104(e). Whether the Trustee was required to bring the Motion to Appoint is not the issue before the court, and the parties do their other arguments a disservice by quibbling over an irrelevant point. Whether the Trustee has or should have made a determination under section 1104(e) has no bearing on the court's determination under section 1104(a).

Having found cause under section 1112, the court is required to dismiss or convert a chapter 11 case to chapter 7 unless the court finds "that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b); 5 Collier Bankruptcy Practice Guide P 85.02 (2024).

The United States Trustee's Motion to Appoint serves to underscore that the Debtor's actions in this case constitute cause for conversion or dismissal and that the bankruptcy filing was done in bad faith. These factors have been discussed above and will not be worth setting forth here again. They clearly establish cause under section 1104(a)(1). 11 U.S.C. § 1104(a)(1).

The United States Trustee has clearly and convincingly shown that that standards under section 1104(a)(2) have also been met. 11 U.S.C. § 1104(a)(2). The standards set forth by Judge Cassling in *LHC* have been met, *LHC* 497 B.R. at 293, it is clear that the Debtor has actively deceived parties, avoided his fiduciary responsibilities as a debtor-in-possession and acted cavalierly toward his statutory obligations. In short, the Debtor is not conducting his reorganization in such a way that would cause the court to be comfortable deferring to his judgment. The Debtor's past and current actions do not demonstrate that future behavior will be different. Only those aligned with the Debtor feel differently, but the lack of confidence in the Debtor is not salvageable at this point.

What is in the best interest of creditors, 11 U.S.C. § 1104(a)(2), is an independent, dispassionate fiduciary. While that can be achieved in a chapter 7, the parties appear better served by affording a chapter 11 trustee an opportunity to independently investigate the Debtors' affairs and consider whether reorganization or liquidation is even possible. Such a trustee could, of course, conclude that conversion or dismissal is the best option. But such a decision should only be made after a chapter 11 trustee has had an opportunity to weigh in.

The court therefore finds that appointment of a chapter 11 trustee is in the best interests of the estate and the creditors. *Id.* A chapter 11 trustee will be able to provide more options to move forward and will be better suited to protect the creditors. With more flexibility, the chapter 11

35

trustee may be able to propose a confirmable plan if appropriate, execute a liquidation plan, and even propose conversion to chapter 7 or dismissal, if necessary.  By so ordering, the Motion to Convert which would otherwise be granted, will be rendered moot.

CONCLUSION

For the reasons set forth in this Memorandum Decision and by separate order entered concurrently herewith, the Motion to Authorize will be denied and the confirmation of the Plan will also be denied.  While the Motion to Convert would otherwise be granted, the Motion to Appoint will be granted, mooting Motion to Convert.

Dated:  September 5, 2024                              ENTERED:

_____
Timothy A. Barnes
Judge, United States Bankruptcy Court

36