## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Converted to Chapter 7 |
| MARSHALL SPIEGEL, | ) | Case No. 20-21625 |
| | ) | Honorable Timothy A. Barnes |
| Debtor. | ) | |
| | ) | Presentment Date:  March 26, 2025 |
| | ) | Hearing Time: 9:00 a.m. |

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on March 26, 2025 at 9:00 a.m., we shall appear before the Honorable Timothy A. Barnes, United States Bankruptcy Judge for the Northern District of Illinois, or any judge sitting in that judge's place, **either** in courtroom 744 in the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, **or** electronically as described below, and present the **SIXTH AND FINAL APPLICATION OF ADELMAN & GETTLEMAN, LTD. FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**, a copy of which is attached.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode**. The meeting ID for this hearing is 161 329 5276, and the passcode is 433658. The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

ADELMAN & GETTLEMAN, LTD.

By: /s/ Nicholas R. Dwayne
     One of its attorneys

Howard L. Adelman, Esq. (ARDC #0015458)

Nicholas R. Dwayne, Esq. (ARDC #6308927)
Adelman & Gettleman, Ltd.
53 West Jackson Boulevard, Suite 1050
Chicago, Illinois 60604
(312) 435-1050
**Counsel for Official Committee of Unsecured Creditors**

## CERTIFICATE OF SERVICE

I, Nicholas R. Dwayne, an attorney, certify that I served a copy of this notice and the attached motion on each entity shown on the attached list at the address shown and by the method shown on March 5, 2025, at 5:00 p.m..

By: /s/ Nicholas R. Dwayne
Nicholas R. Dwayne, Esq.

## SERVICE LIST

**VIA CM/ECF**
- Howard L. Adelman    hla@ag-ltd.com, dbaird@ag-ltd.com
- John Andreasen    JAndreasen@tdrlaw.com
- Jason J Ben    jben@freeborn.com, bkdocketing@freeborn.com
- Alexander F Berk    alexander.berk@bfkn.com, james.tucker@bfkn.com
- Julie A Boynton    jboyntonlaw@gmail.com
- Adam Brief    Ustpregion11.es.ecf@usdoj.gov
- Mark A Carter    mcarter@hinshawlaw.com,
  grodriguez@hinshawlaw.com,courtfiling@hinshawlaw.com
- Francisco Connell    fconnell@fernandezholdings.com, dgeorge@chuhak.com
- Nicholas R Dwayne    ndwayne@ag-ltd.com, dbaird@ag-ltd.com;srodela@ag-ltd.com
- William J Factor    wfactor@wfactorlaw.com,
  wfactorlaw@gmail.com;bsass@wfactorlaw.com;wfactor@ecf.courtdrive.com;wfactormy
  ecfmail@gmail.com;factorwr43923@notify.bestcase.com
- Brandon R Freud    bfreud@chuhak.com, dburns@chuhak.com
- Jeffrey L. Gansberg    jeffrey.l.gansberg@usdoj.gov
- Paulina Garga-Chmiel    pgarga@dykema.com, lball@dykema.com
- E. Philip Groben    pgroben@gcklegal.com, aperez@gcklegal.com
- Harold D. Israel    hisrael@lplegal.com,
  nbailey@lplegal.com;ikropiewnicka@lplegal.com;kpatton@lplegal.com;druiz@lplegal.c
  om
- Gina B Krol    gkrol@cohenandkrol.com,
  gkrol@cohenandkrol.com;ecf.alert+Krol@titlexi.com
- Gina B Krol    gkrol@cohenandkrol.com, gkrol@cohenandkrol.com
- David P Lloyd    courtdocs@davidlloydlaw.com

2

1370145_2

- Joseph A Morris     mdlrusuk@aol.com
- Eugene E Murphy     gmurphy@murphylitigation.com
- David A. Newby     dnewby@momkus.com, cbednarski@momkus.com
- Nathan Q. Rugg     nathan.rugg@bfkn.com, james.tucker@bfkn.com
- M. Gretchen Silver     ustpregion11.es.ecf@usdoj.gov, gretchen.silver@usdoj.gov
- Elizabeth B Vandesteeg     evandesteeg@lplegal.com,
  nbailey@lplegal.com;ikropiewnicka@lplegal.com;druiz@lplegal.com;kpatton@lplegal.c
  om
- John R Weiss     jrweiss@duanemorris.com,
  autodocketchi@duanemorris.com;jjohnson3@duanemorris.com
- David K Welch     dwelch@burkelaw.com,
  gbalderas@burkelaw.com;bwelch@burkelaw.com;welchdr67393@notify.bestcase.com
- Sean P. Williams     swilliams@lplegal.com,
  nbailey@lplegal.com;ikropiewnicka@lplegal.com;kpatton@lplegal.com;druiz@lplegal.c
  om
- John Xydakis     johnxlaw@gmail.com

**VIA FIRST CLASS MAIL**

City of Chicago
Department of Revenue
P.O. Box 88292
Chicago, IL  60680-1292

Hepler Bloom LLC
130 N. Main St. PO Box 510
Edwardsville, IL  62025-0510

Julie A. Boynton
2104 Village View Dr.
Yorkville, IL  60560-9282

US Bank
P.O. Box 5229
Cincinnati, OH  45201-5229

Internal Revenue Service
Mail Stop 5014CHI
230 S. Dearborn Street, room 2600
Chicago, IL  60604-1705

City of Chicago Department of Finance
Chicago Dept. of Law Bankruptcy
121 N. LaSalle St., Suite 400
Chicago, IL  60602-1264

1370145_2

Lagone Batson & Lavery
17 N. Wabash Ave.
Suite 500
Chicago, IL  60602-4818

Department of the Treasury
Internal Revenue Service
P.O. Box 7346
Philadelphia, PA  19101-7346

U.S. Bancorp
Attn:  Bankruptcy
800 Nicollet Mall
Minneapolis, MN  55402-7014

Village of Wilmette
c/o Tressler LLP
233 S. Wacker, Floor 61
Chicago, IL  60606-6359

1370145_2

Form G-8

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In Re  MARSHALL SPIEGEL | ) | |
| | ) | |
| | ) | Bankruptcy No. ___20-21625___ |
| | ) | |
| Debtor. | ) | Chapter ___7___ |

## COVER SHEET FOR APPLICATION FOR PROFESSIONAL COMPENSATION
### (IN CASES UNDER CHAPTERS 7, 11 AND 12)

Name of Applicant: ___Howard L. Adelman, Nicholas R. Dwayne, and the law firm of Adelman & Gettleman, Ltd.___

Authorized to Provide Professional Services to: ___Official Committee of Unsecured Creditors___

Date of Order Authorizing Employment: ___April 26, 2021___

Period for Which Compensation is Sought:
From ___April 1,___, ___2021___ through ___December 19___, ___2024___

Amount of Fees Sought:  $ 1,321,903.95

Amount of Expense Reimbursement Sought:  $ 25,401.09

This is an:    Interim Application _____    Final Application ___✓___

If this is *not* the first application filed herein by this professional, disclose as to all prior fee applications:

| Date Filed | Period Covered | Total Requested (Fees & Expenses) | Total Allowed (Fees & Expenses) | Fees & Expenses Previously Paid |
|---|---|---|---|---|
| 09/03/2021 | 04/01/2021 - 07/31/2021 | $149,453.77 | $137,704.70 | $137,704.70 |
| 02/24/2022 | 08/01/2021 - 12/31/2021 | $167,898.32 | $153,035.65 | $153,035.65 |
| 10/03/2022 | 01/01/2022 - 07/31/2022 | $214,927.08 | $203,345.58 | $203,345.58 |
| 09/29/2023 | 08/01/2022 - 08/31/2023 | $336,251.50 | $327,354.50 | -0- |
| 02/28/2024 | 09/01/2023 - 07/31/2024 | $340,322.60 | $335,680.70 | -0- |

Dated: ___March 5, 2025___          ___/s/ Nicholas R. Dwayne___
                                                              (Counsel)

(Rev 11/19/10)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Converted to Chapter 7 |
| MARSHALL SPIEGEL, | ) | Case No. 20-21625 |
| | ) | Honorable Timothy A. Barnes |
| Debtor. | ) | |
| | ) | |
| | ) | |

### SIXTH AND FINAL APPLICATION OF ADELMAN & GETTLEMAN, LTD.
### FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND
### REIMBURSEMENT OF EXPENSES AS COUNSEL TO
### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

NOW COMES Howard L. Adelman, Nicholas R. Dwayne, and the law firm of Adelman & Gettleman, Ltd. (collectively, "**Movant**"), counsel to the Official Committee of Unsecured Creditors (the "**Committee**") of Marshall Spiegel (the "**Debtor**") and hereby submits Movant's sixth and final application ("**Final Application**") for the final allowance and payment of compensation and reimbursement of ordinary and necessary expenses incurred between and including April 1, 2021, and December 19, 2024 (the "**Application Period**"), pursuant to sections 330 and 331 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002 and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 5082-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "**Local Rules**"). In support of the Final Application, Movant respectfully states as follows:

### I.    <u>INTRODUCTION</u>

After an arduous and vain four-year chapter 11 proceeding, the Debtor's creditors have finally received material relief in the form of conversion of the above-captioned case. Though the case currently pends in chapter 7 and the creditors still await distributions, the materiality of the removal of the Debtor as debtor in possession cannot be overstated. After enduring nothing more

1

than perpetuation of the Debtor's frivolous pre-petition litigation tactics, the creditors can now do business with a dispassionate and honest arbiter in the Trustee (as defined below). The Trustee, moreover, is statutorily bound to swiftly monetize the assets of the estate (inchoate or physical) for the benefit of the creditors and the creditors alone. As a result, the creditors are now relieved of the personal motivations, animosities, and petty grievances which previously guided administration of the estate. This refreshing new state of play is directly attributable to the efforts of the Committee, and further to the Movant's efforts in its representation of the Committee over the past four years. The Movant respectfully submits the regime change effectuated by the efforts of the Committee is a concrete and substantial demonstration of the benefit its services have afforded the estate.

The appropriateness and allowability of compensation, however, is not measured solely by the benefits the Movant has afforded the estate. Rather, the Movant is tasked with demonstrating its work performed was reasonable, necessary, and appropriate. As set forth in more detail below, these elements are easily satisfied, given that nearly all of the Committee's undertakings were in direct response to an action or inaction by the Debtor. Moreover, every action, inaction, and position of the Debtor manifested in triplicate due to the collaboration and coordination of the Debtor, his adult son, Matthew Spiegel ("**Matthew**"), and his company, 1116-22 Greenleaf Building LLC ("**Greenleaf**"). To start, the financial affairs of the Debtor, Matthew, and Greenleaf were inextricably intertwined into a purposeful amalgam intended to hinder, delay, and defraud the Debtor's creditors.

Greenleaf serves two purposes: (a) to generate income and distribute to the Debtor only the exact portion of that income necessary for the Debtor to pay his regular living expenses; and (b) to fraudulently shield the remaining income and the commercial real estate at 1116-22 Greenleaf Building LLC (the "**Building**") from any claim by the Debtor's creditors. Matthew, while himself

2

an individual presumably with interests of his own, seems to serve in all material respects as a cat's paw for the Debtor, going out of his way to: (w) hold bare title to Greenleaf and accordingly the Building as nominee for the Debtor; (x) take tenuous and often sanctionable positions in the case; (y) expend legal fees in doing so; and (z) incur substantial debt for the sole and exclusive benefit of his father. While demonstrated more concretely below, the case is replete with examples of the Debtor exercising near total control over both Greenleaf and Matthew. What flowed from this control was not meaningful participation by Matthew and Greenleaf (and the assets they ostensibly controlled) in the reorganization process for the benefit of creditors, but rather was merely the multiplication of each and every routine matter into a protracted and expansive contested matter.

Instead of producing documents and sitting for depositions in response to validly issued subpoenas, the Debtor, Matthew, and Greenleaf each chose to engage in motion practice, appeals, dilatory conduct, and all manner of obstinance. Instead of negotiating and compromising with creditors and putting forth reasonable and confirmable plans, the Debtor, Matthew, and Greenleaf conspired to preserve all satellite litigation, retain all property of Greenleaf, and escape the jurisdiction of this Court even though it was voluntarily invoked by the Debtor. Instead of exercising full and frank disclosure on the Debtor's initial schedules, the Debtor, Matthew, and Greenleaf concealed the Debtor's true interest in Greenleaf throughout the case and manufactured an alleged claim in favor of Matthew more than two years into the case and only when Matthew's standing was challenged. Instead of addressing the merits of the Committee Motion to Convert (as defined below), the Debtor, Matthew, and Greenleaf twice sought to disband the Committee—to name a few of the hallmark actions of the Debtor, Matthew, and Greenleaf to which Committee response was necessitated.

This case presented the rare, unfortunate scenario of an individual serial litigator, whose creditors are comprised almost exclusively of those against whom he is litigating, taking undue advantage of the protections of the Bankruptcy Code and weaponizing the ***powers*** of a debtor in possession in dereliction of his ***duties*** as a debtor in possession. Under these circumstances, the Committee had no choice but to serve as a check and balance on the Debtor, which inevitably put the Committee itself in the crosshairs of the Debtor. As demonstrated below, the Committee put forth yeoman's efforts in bringing about resolution of all disputes at the core of this case, in the face of persistent opposition, concealment, malfeasance, and general obstinance put forth by the Debtor, Matthew, and Greenleaf. When consensual or other more efficient resolution proved impossible, only then did the Committee proceed with and obtain conversion—which as set forth above is the path most consistent with the interests of the creditors and the estate. For the reasons set forth throughout, the Movant submits all of its efforts in the case were reasonable, necessary, appropriate, and benefited the estate and seeks final allowance of the compensation set forth herein.

This Final Application covers a period of approximately three (3) years and nine (9) months from April 1, 2021, the effective date of the Bankruptcy Court's approval of the Committee's retention of Movant [Dkt. No. 147], through and including December 19, 2024, the day preceding the conversion of the above-captioned case from chapter 11 to chapter 7 [Dkt. No. 1349]. Movant filed five (5) previous fee applications (collectively, the "**Interim Applications**"), covering the period of April 1, 2021, through January 31, 2024 (the "**Interim Period**"). For the Interim Period, the Court allowed Movant's fees in the amount of $1,083,516.75 and reimbursement of Movant's expenses in the amount of $25,356.30, for a total of $1,159,364.75 (the "**Aggregate Interim Award**"). Despite having the means to pay the award in full, Debtor (and Greenleaf)[1] has paid

---

[1] Of the aggregate total $508,530.52 received to date by the Movant, $12,510.50 was paid by Greenleaf in compliance with the Court's issuance of discovery sanctions. *See* Dkt. No. 522.

1370145_2

only $508,530.52 of the Aggregate Interim Award. Moreover, the partial payments of the Aggregate Interim Award generally came only after Movant was forced to move to compel payment, *see* Dkt. Nos. 430 and 461, and upon the Court's entry of orders consistent with such requests. *See, e.g.*, Dkt. Nos. 456, 521, and 522.

During the remainder of the Application Period, from February 1, 2024, through December 19, 2024 (the "**Final Period**"), movant incurred an additional $187,895.50 in fees and $44.79 in expenses, for a total of $187,940.29 (the "**Final Period Amount Sought**"). Movant now additionally seeks final approval and allowance of all fees and expenses incurred during both the Interim and Final Periods, represented by the sum of the Final Period Amount Sought ($187,940.29) and the Aggregate Interim Award ($1,159,364.75), totaling $1,347,304.04 (the "**Total Final Amount Sought**").

## II.    JURISDICTION, VENUE, AND STATUTORY BASIS FOR RELIEF

1.    This Court has jurisdiction over the Final Application pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(A) and (O). Movant consents to this Court entering a final order regarding the Final Application. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicate for the relief requested herein is section 330 of the Bankruptcy Code, and the applicable rules are Bankruptcy Rules 2002 and 2016 and Local Rule 5082-1.

## III.    BACKGROUND

### A.  Overview of the Case

1370145_2

3.      On December 16, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned case, originally as a chapter 11 case (the "**Chapter 11 Case**").[2]

4.      On March 3, 2021, the Office of the United States Trustee (the "**UST**") filed the *Appointment of Unsecured Creditors' Committee* [Dkt. No. 81][3], appointing the Committee as an official committee in the Chapter 11 Case to represent the interests of unsecured creditors of the Debtor, pursuant to section 1102 of the Bankruptcy Code.

5.      On April 26, 2021, the Court approved the Committee's retention of the Movant as counsel effective April 1, 2021. *See* Dkt. No. 147.

6.      On November 8, 2022, the Committee filed that certain *Motion of the Official Committee of Unsecured Creditors to Convert Case to Chapter 7* [Dkt. No. 705] (the "**Committee Motion to Convert**").

7.      On September 13, 2023, the UST filed the *U.S. Trustee's Motion to Appoint Trustee* [Dkt. No. 1010] (the "**Chapter 11 Trustee Motion**").

8.      The Debtor filed several plans throughout the Chapter 11 Case. On October 2, 2023, he filed his final plan, the *Debtor's Seventh Amended Plan of Reorganization* [Dkt. No. 1038] (the "**Plan**").

9.      The Court then set the Committee Motion to Convert, Chapter 11 Trustee Motion, and confirmation of the Plan for a single evidentiary hearing, taking place between September 11, 2023, and March 18, 2024 (the "**Conversion Trial**").

---

[2] While subsequently converted to and currently pending in chapter 7, the Chapter 11 Case proceeded as a chapter 11 during the entirety of the Application Period and accordingly is referred to herein as the "Chapter 11 Case."

[3] On March 30, 2021, the UST filed an *Amended Notice of Appointment of Official Unsecured Creditors' Committee* to correct a scrivener's error. *See* Dkt. No. 111.

1370145_2

10.     On September 5, 2024, the Court issued a detailed opinion and order (a) denying confirmation of the Plan, (b) denying the Committee Motion to Convert, and (c) granting the Chapter 11 Trustee Motion. *See* Dkt. Nos. 1273-74.

11.     On September 18, 2024, the Court entered an order appointing the Trustee as chapter 11 trustee. *See* Dkt. No. 1285.

12.     On October 9, 2024, the Trustee filed the *Motion of Gina B. Krol, Chapter 11 Trustee, to Convert to Chapter 7 and to Shorten Notice* [Dkt. No. 1295] (the "**Trustee Motion to Convert**").

13.     On December 3, 2024, the Court entered the *Order Converting Case to Chapter 7* [Dkt. No. 1349], granting the Trustee Motion to Convert, with conversion to take place on December 20, 2024.

14.     On December 20, 2024, the Chapter 11 Case was converted from chapter 11 to 7. *See* Dkt. No. 1363

15.     Also on December 20, 2024, the UST appointed the Trustee as chapter 7 trustee. *See* Dkt. No. 1362.

### B.  The Interim Applications, Awards, and Partial Payment

16.     After protracted briefing on each Interim Application, as initiated by the Debtor, Matthew, and Greenleaf, the Court allowed, on an interim basis, the vast majority of the compensation sought by the Interim Applications, subject to certain reasonable discounts and adjustments. By way of summary, the Interim Applications, the compensation and expenses sought thereby, and the amount ultimately allowed by the Court on an interim basis is summarized in the below chart:

1370145_2

| | Compensation Sought | Expenses Sought | | Compensation Allowed | Expenses Allowed |
|---|---|---|---|---|---|
| **First Interim Application [Dkt No. 308] filed 09/03/2021, covering period 04/01/2021 to 07/31/2021** | $148,146.30 | $1,307.47 | **Order [Dkt No. 386] entered 10/25/2021** | $137,704.70 | $1,307.47 |
| **Second Interim Application [Dkt No. 481] filed 02/28/2022, covering period 08/01/2021 to 12/31/2021** | $167,272.00 | $626.32 | **Order [Dkt No. 604] entered 04/25/2022** | $153,035.65 | $626.32 |
| **Third Interim Application [Dkt No. 686] filed 10/03/2022, covering period 01/01/2022 to 07/31/2022** | $213,680.50 | $1,246.58 | **Order [Dkt No. 842] entered 03/17/2023** | $202,099.00 | $1,246.58 |
| **Fourth Interim Application [Dkt No. 1034] filed 09/29/2024, covering period 08/01/2022 to 08/31/2023** | $336,251.50 | $309.83 | **Order [Dkt No. 1159] entered 01/08/2024** | $327,354.50 | $309.83 |
| **Fifth Interim Application [Dkt No. 1221] filed 02/28/2024, covering period 09/01/2023 to 01/31/2024** | $318,456.50 | $21,866.10 | **Order [Dkt No. 1258] entered 06/03/2024** | $313,814.60 | $21,866.10 |
| **Subtotal** | $1,183,806.80 | $25,356.30 | | $1,134,008.45 | $25,356.30 |
| **Total Compensation and Expenses Sought** | $1,209,163.10 | | **Total Compensation and Expenses Allowed** | $1,159,364.75 | |

17.      By this Application, the Movant seeks final allowance of all interim compensation and reimbursement of expenses previously allowed by the Court, in the aggregate amount of $1,159,364.75, i.e. the Aggregate Interim Award. To be clear, the Movant accepts, and waives any dispute or reconsideration of, all of the Court's discounts, adjustments, and denials of allowance of any compensation previously sought on an interim basis, despite the Court previously stating in open court the Movant would be afforded the opportunity to seek reconsideration of the Court's prior rulings on the Interim Applications.

18.      The Interim Applications contain detailed information regarding the Interim Period and relevant to this Final Application and are therefore expressly incorporated herein by reference.

1370145_2

*See e.g.* Dkt. Nos. 308 at ¶¶ 3-20; 481 at ¶¶ 3-43; 686 at ¶¶ 3-38; 1034 at ¶¶ 19-37; 1221 at ¶¶ 22-23.

19.    In total, the Court has awarded the Movant $1,159,364.75 in fees and expenses. Of that, Debtor has paid Movant $508,530.52, and $650,834.23 remains unpaid.

### C.  The Final Period

20.    During the Final Period, the Movant continued to render services to the Committee, as detailed more fully in the sections that follow.

21.    Unlike the services performed and compensation sought during and for the Interim Period, services and compensation for the Final Period are before the Court for first time in this Final Application.

## IV.    OVERVIEW OF LEGAL SERVICES RENDERED AND COMPENSATION SOUGHT FOR FINAL PERIOD

22.    During the Final Period, Movant rendered legal services to the Committee having a value of $187,895.50 in fees, calculated at Movant's usual and customary hourly rates as more specifically set forth herein.  In addition, Movant advanced $44.79 towards necessary expenses which arose during the Chapter 11 Case for which Movant presently seeks reimbursement.  By this Final Application, and in addition to the Aggregate Interim Award, the Movant seeks the allowance and payment of $187,895.50 in fees and $44.79 in expenses, for a total of $187,940.29 in the aggregate for the Final Period.

4.    During the Final Period, Movant expended 585.5 hours in the aggregate performing services for the Committee.  The following is a schedule setting forth each of Movant's attorneys, law clerks, and paraprofessionals who performed services during the Final Period, the position in which each individual is employed, the hourly billing rate charged for services performed by each

9

individual, the aggregate number of hours expended and fees billed therefor, and the year in which

each professional was licensed to practice law in Illinois (if applicable):[4]

| Name | Position | Admitted to Illinois Bar | Hourly Rate | Hours | Total Fees |
|------|----------|--------------------------|-------------|-------|------------|
| Howard L. Adelman | Partner | 1977 | $525 | 53.40 | $28,035.00 |
| Nicholas R. Dwayne | Partner[5] | 2012 | $315 | 468.40 | $147,546.00 |
| Dina A. Kostrow | Associate[6] | 2022 | $315 | 22.8 | $7,182.00 |
| Sandra Rodela | Paralegal | n/a | $135 | 2.0 | $270.00 |
| Alec Klimowicz | Law Clerk | n/a | $125 | 29.40 | $3,675.00 |
| Svitlana Kalmanovsky | Law Clerk | n/a | $125 | 9.50 | $1,187.50 |
| **TOTAL** | | | | **585.5** | **$187,895.50** |

## V.   **LEGAL SERVICES RENDERED DURING FINAL PERIOD**

23.    The activities performed by Movant during the Final Period fell within six (6)

principal categories, each generally coinciding with a certain task or landmark in the case, which

include services relating to the:

    a.  <u>Chapter 11 Case Administration</u>, for which Movant seeks allowance of

        $15,911.00 in fees and $44.79 in expenses;

---

[4] All individuals for whose work Movant seeks compensation were licensed attorneys during the Application Period with the exception of Ms. Sandra Rodela, Mr. Alec Klimowicz, and Mrs. Svitlana Kalmanovsky. Ms. Rodela is a licensed paralegal. Her $135 hourly rate complies with the recognized hourly rates for paraprofessionals in the Northern District of Illinois. Mr. Klimowicz and Mrs. Kalmanovsky served as law clerks with the Movant and during their tenure with the Movant were law school students, not yet admitted to the bar in any jurisdiction. Both law clerk's hourly rate of $125 complies with the recognized hourly rates for law clerks in the Northern District of Illinois. Movant is not seeking compensation for services performed by other non-attorneys, such as secretarial and other support staff.

[5] Effective January 1, 2024, the Movant elevated Mr. Dwayne from associate to partner. This promotion, however, has no material effect on the compensation sought by the Movant in Chapter 11 Case. Throughout the case, Movant has maintained the same hourly rate for each of its professionals as disclosed in its initial application for retention. *See* Dkt. No. 112 at ¶ 13. Movant has maintained its 2020 rates in the case, notwithstanding its standard practice of increasing annually its rates.

[6] Ms. Kostrow joined the Movant as an associate in September 2024. Accordingly, Ms. Kostrow was not specifically included in the Movant's original retention application. *See* Dkt. No. 112. At present, Ms. Kostrow serves as the Movant's junior associate, a designation held by Mr. Dwayne at the time the Movant was first retained by the Committee. Accordingly, notwithstanding the current rates charges by the Movant for Ms. Kostrow's services, the Movant has elected to charge the estate the same hourly rate as Mr. Dwayne in the Chapter 11 Case, matching the rate structure as originally approved by this Court.

1370145_2

b. <u>Committee Administration</u>, for which Movant seeks allowance of $11,224.50 in fees;

c. <u>Appeals</u>, for which Movant seeks allowance of $33,735.00 in fees;

d. <u>Conversion</u>, for which Movant seeks allowance of $96,099.00 in fees;

e. <u>Chapter 11 Trustee Interface and Settlement Negotiations</u>, for which Movant seeks allowance of $17,356.50 in fees;

f. <u>Asset Preservation</u>, for which Movant seeks allowance of $5,474.00 in fees;

g. <u>Fee Applications</u>, for which Movant seeks allowance of $8,095.50 in fees; and

h. <u>Voluntary Write Offs</u>, in which the Movant performed services valued at $25,238.50, but for which the Movant is not seeking allowance.

24.    The tasks performed with respect to each category are detailed below, setting out: (a) the nature of the services performed; (b) the necessity of such services; and (c) the benefit to the creditors and the estate resulting from such services. Where a time entry concerns more than one of the categories, Movant has endeavored to classify it under whichever subject, in Movant's judgment, predominated.

**A.    Chapter 11 Case Administration**

25.    The following table details the hours Movant committed rendering general administrative services to the Committee during the Final Period:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Howard L. Adelman | 4.20 | $525 | $2,205.00 |
| Nicholas R. Dwayne | 37.10 | $315 | $11,686.50 |
| Dina A. Kostrow | 5.80 | $315 | $1,827.00 |
| Sandra Rodela | 0.50 | $135 | $67.50 |
| Svitlana Kalmanovsky | 1.0 | $125 | $125.00 |
| **TOTAL** | **48.60** | | **$15,911.00** |

11

26.     Movant expended 48.60 hours during the Final Period in connection with numerous administrative matters arising in the Chapter 11 Case.  Attached hereto as <u>Exhibit A</u> are billing records and time entries describing each task performed by Movant in the Chapter 11 Case Administration category.

27.     During the Final Period, Chapter 11 Case Administration generally involved routine services required to be furnished on behalf of a creditors' committee in a chapter 11 case and incident to the statutory duties of such a committee. For example, during the Final Period, these efforts included the following:

      a.  <u>Hearing Attendance</u>.  Movant prepared for, and appeared at, each hearing held in the Chapter 11 Case during the Final Period, generally arguing in favor of the Committee's position where appropriate, and specifically prosecuting motions and other pleadings filed by the Committee.  Generally, Mr. Dwayne attended and participated in all hearings on behalf of the Committee; though, from time to time, Mr. Adelman also attended such hearings.  In accordance with its practice in prior fee applications, the Movant has elected to write off *__all__* time for Mr. Adelman related to hearing preparation and participation, in an exercise of billing judgment as further detailed herein;

      b.  <u>Interface with Creditors and Parties in Interest</u>. Throughout the Final Period, Movant was in contact with counsel to numerous creditors and other parties in interest concerning the ongoing administration and status of the Chapter 11 Case. These creditors and other parties in interest were generally those against whom the Debtor was litigating in other fora. Throughout the Chapter 11 Case, but perhaps most acutely upon the commencement of the Trial and during the Final Period, the Committee became the de facto liaison for parties in interest

12

adverse to the Debtor to remain informed about the Chapter 11 Case. The Movant submits its effort in this regard were reasonable, necessary, and appropriate under the circumstances;

c.  <u>Interface with U.S. Trustee</u>. Movant was in routine contact with the UST regarding all aspects of the Chapter 11 Case. Open lines of communication and cooperation between the UST and the Committee were critical throughout the Chapter 11 Case and the Final Period in particular, given the Committee and UST's shared position with respect to confirmation of the Plan, the Chapter 11 Trustee Motion, and the Conversion Trial generally. Moreover, the Committee continued to collaborate with the UST upon the Court's granting of the Chapter 11 Trustee Motion and the ensuing search for an individual to serve as chapter 11 trustee;

d.  <u>Interface with Debtor</u>.  Throughout the Final Period, the Movant maintained open channels of communication with the Debtor, through counsel, on all manner of ordinary administration of the Chapter 11 Case;

e.  <u>Strategy Conferences</u>. Members of the Movant would routinely confer internally regarding current status of the Chapter 11 Case, recent filings and orders, and therein developed strategy for further administration of the Chapter 11 Case. In most respects, as detailed throughout this Application, Mr. Dwayne (at his lower billable rate) generally participated firsthand in hearings and interface with parties in interest in the Chapter 11 Case. As a matter of course, Mr. Dwayne thereafter would confer with Mr. Adelman to keep him informed of recent developments and the two would collaborate to develop strategies in light of the same. This approach was effective in minimizing the time

13

commitments of Mr. Adelman (at his higher billable rate) but nevertheless captured the value of Mr. Adelman's extensive experience in litigation and chapter 11 practice in the development of strategy for further representation of the Committee. The Movant respectfully submits its staffing of the Chapter 11 Case in this manner, and the resultant necessity for interoffice strategy conferences was reasonable, necessary, and appropriate and otherwise in compliance with Movant's prior practices and the Court's own precedent established in this matter. *See In re Spiegel*, No. 20BK21625, 2023 WL 2564028, at *9 (Bankr. N.D. Ill. Mar. 17, 2023) ("The Application sets out the topics that were addressed at these conferences and it appears to the court that the Committee was engaged in strategy conferences. . . . Therefore, the court overrules any objection as to the duplication of the hours spent related to the participation in intra-office conferences.") (citations omitted);

f.  <u>Monitoring of Litigation in Other Fora</u>.  As the Court is aware, the Debtor was a party to myriad litigation in other fora contemporaneously with the protracted administration of the Chapter 11 Case. This satellite litigation took place in both state and federal courts at the trial and appellate levels. Many bankruptcy claims were at issue in this satellite litigation—either directly or indirectly—and the results of the satellite litigation were otherwise understood to likely impact administration of the Chapter 11 Case. Accordingly, the Movant endeavored to monitor all satellite litigation as efficiently as possible through review and analysis of relevant pleadings and orders, as well as interface with those parties adverse to the Debtor in such litigation;

1370145_2

g. <u>Operating Reports</u>. During the Final Period, the Movant undertook efforts to review and analyze the Debtor's monthly reports, identifying discrepancies, irregularities, and deficiencies therein.  In light of the fact that monthly reports "are 'the life blood' of chapter 11, enabling creditors to keep tabs on the debtor's post-petition operations", the Movant endeavored to conduct a robust review and analysis of the same. *In re Aurora Memory Care, LLC*, 589 B.R. 631, 639 (Bankr. N.D. Ill. 2018) (citations omitted). The Movants practices in this regard have been consistent throughout the Chapter 11 Case;

h. <u>Docket Monitoring</u>.  Throughout the Final Period, the Movant continued its ongoing monitoring of the Chapter 11 Case docket and review and analysis of relevant motions, orders, and other documents appearing on the same. Movant submits its efforts in this regard were necessary to remain informed and current on status of the Chapter 11 Case, and a necessary condition to the development of strategy for continued representation of the Committee in the Chapter 11 Case.

i. <u>Miscellaneous</u>. Movant also performed numerous other miscellaneous tasks required for the Committee's compliance with its duties and obligations under the Bankruptcy Code throughout the Final Period; and

j. <u>Catch-all/Multiple Categories</u>. To the extent that any task undertaken by the Movant fell within one or more of the categories listed in this paragraph, the Movant has categorized them as Chapter 11 Case Administration, unless the task primarily involved another more appropriate categorization.

28.     As demonstrated by the foregoing and the detailed <u>Exhibit A</u>, Movant was required to expend significant efforts in the Chapter 11 Case Administration category. Movant's services

15

included those which are typical in chapter 11 cases, as well as those which are atypical in chapter 11 cases but were warranted here given the unusual circumstances of this case—particularly, Debtor's extreme antagonism. Movant asserts that under the circumstances, its services rendered in this category were warranted, actual, necessary, reasonable, and benefitted the estate.

### B.    Committee Administration

29.    The following table details the hours Movant worked in connection with the administration of internal Committee affairs during the Final Period:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Howard L. Adelman | 5.0 | $525 | $2,625.00 |
| Nicholas R. Dwayne | 27.30 | $315 | $8,599.50 |
| **TOTAL** | **32.30** | | **$11,224.50** |

30.    Movant expended 32.30 hours during the Final Period in connection with administration of internal Committee affairs.  Attached hereto as <u>Exhibit B</u> are billing records and time entries describing each task performed by Movant in the Committee Administration category.

31.    These tasks included attendance at regular meetings of the Committee, and telephone conferences and email exchanges with members of the Committee and their counsel regarding status of various issues in the Chapter 11 Case.  The Movant strived to keep the Committee members informed and cognizant of the evolving circumstances and procedural posture of, and the effects of filings in, the Chapter 11 Case.  The Movant and members of the Committee regularly interfaced with respect to overall strategy in the Chapter 11 Case.  The members of the Committee were most critically involved in and concerned with the Conversion Trial which concluded and ruled upon during the Final Period. Substantial efforts by the Movant were put forth to educate and apprise the Committee members on potential and eventual actual outcomes of the Conversion Trial, and the resultant rights of creditors and the Debtor flowing

1370145_2

therefrom. The Movant submits that such efforts were reasonable and necessary in so far as they are customary responsibilities of any committee of unsecured creditors.

    **C.**    **Appeals**

    32.    The following table details the hours Movant worked in connection with numerous appeals of orders entered by this Court in the Chapter 11 Case:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Howard L. Adelman | 10.0 | $525 | $5,250.00 |
| Nicholas R. Dwayne | 84.50 | $315 | $26,617.50 |
| Dina A. Kostrow | 3.30 | $315 | $1,039.50 |
| Sandra Rodela | 0.30 | $135 | $40.50 |
| Alec Klimowicz | 0.60 | $125 | $75.00 |
| Svitlana Kalmanovsky | 5.70 | $125 | $712.50 |
| **TOTAL** | **104.40** | | **$33,735.00** |

    33.    Movant expended 104.40 hours in the Appeals category. Attached hereto as Exhibit C are billing records and time entries describing each task performed by Movant in the Appeals category.

    34.    Throughout the Chapter 11 Case, the Debtor, Matthew, and/or Greenleaf commenced numerous appeals of the various orders of this Court to the United States District Court for the Northern District of Illinois (the "**District Court**"). Certain appeals were conclusively and previously resolved before the commencement of the Final Period. Further Certain appeals commenced by the Debtor and his insiders neither named the Committee as a party nor were the issues therein acutely relevant to the Committee's interests. Certain other appeals, however, specifically named the Committee as a party or were otherwise specifically relevant to the interests of the Committee and were active during the Final Period. These relevant appeals (the "**Appeals**") are as follows:

        a.    Notice of Appeal filed by Matthew on February 8, 2024, concerning Dkt. No. 1207 the Court's order disallowing in full a scheduled in favor of Matthew,

17

commencing case number 24 cv 1138 in the District Court (the "**Matthew Claim Appeal**"). *See* Dkt. No. 1211;

b.   Notice of Appeal filed by the Debtor on October 10, 2024, concerning Dkt. Nos. 1274 and 1279 the Court's Order appointing a chapter 11 trustee, commencing case number 24 cv 9811 in the District Court (the "**Debtor Trustee Appeal**"). *See* Dkt. No. 1298;

c.   Notice of Appeal filed by Matthew on October 10, 2024, concerning Dkt. Nos. 1274 and 1279 the Court's Order appointing a chapter 11 trustee, commencing case number 24 cv 9913 in the District Court (the "**Matthew Trustee Appeal**"). *See* Dkt. No. 1304; and

d.   Notice of Appeal filed by the Debtor on December 13, 2024, concerning Dkt. No. 1349 the Court's order converting the Chapter 11 Case to chapter 7, commencing case number 24 cv 12860 in the District Court (the "**Debtor Conversion Appeal**"). *See* Dkt. No. 1355.

35.   Services detailed on Exhibit C encompass all efforts undertaken by the Movant on behalf of the Committee regarding any of the Appeals. Most expansive, however, were the Movant's efforts in connection with the Matthew Claim Appeal. The Matthew Claim Appeal was, in fact, commenced in the first week of the Final Period, was fully briefed or otherwise litigated during the Final Period, but the District Court had yet to issue any ruling as of the close of the Final Period.

36.   Via the Matthew Claim Appeal, Matthew requested the District Court's review of the Court's *Memorandum Decision* [Dkt. No. 1206] and *Order* [Dkt. No. 1206] (together, the "**Disallowance Order**") which set forth the Court's reasoning for, and ultimate conclusion to, disallow the claim of Matthew (the "**Matthew Claim**") asserted in the Debtor's amended schedule

18

E/F filed on February 16, 2023 [Dkt. No. 805] (the "**Amended Schedules**"). The Committee was the impetus of the Disallowance order through its filing and prosecution through trial of the *Objection of the Official Committee of Unsecured Creditors to the Claim of Matthew Spiegel* [Dkt. No. 855] (the "**Claim Objection**"). Accordingly, the Committee was a party to the Matthew Claim Appeal and the Movant was therefore called to represent the Committee therein. The Movant's efforts in representing the Appellant in the Matthew Appeal are detailed hereafter.

37.      On February 23, 2024, Matthew filed his designation of the record and issues on appeal. *See* Dkt. No. 1219. Therein, Matthew designated numerous issues on appeal which stretched far beyond those relating to the Claim Objection or the Disallowance Order. Rather, issues 9-11 requested the District Court review certain prior rulings of the Court relating to interim compensation allowed to the Movant and the standing and very existence of the Committee itself. *See* Dkt. No. 1219 at pp. 5-6. These issues had been fully adjudicated by the Court prior to the commencement of the Matthew Claim Appeal, and were, accordingly, no longer appealable. In light of this, the Movant undertook efforts to conduct legal research on the inappropriateness of raising these issues in the Matthew Claim Appeal and to draft and file a motion to dismiss the Matthew Claim Appeal on the grounds that it exceeded the appropriate scope of review as set forth in the applicable Bankruptcy Rules and other law (the "**Motion to Dismiss Appeal**"). *See* Matthew Claim Appeal Dkt. No. 9.

38.      At presentment of the Motion to Dismiss Appeal, the District Court heard extensive arguments of the Movant regarding Matthew's attempt to improperly expand the scope of the Matthew Claim Appeal and, in the Movant's view, the District Court was receptive to the same. Consistent with its ordinary practice in bankruptcy appeals, however, the District Court informed the parties that it did not ordinarily accept motion practice in such cases, but rather wished only to review briefs and would take up the issue of the appropriate scope of issues on appeal if raised in

the briefs. Accordingly, the Committee voluntarily withdrew the Motion to Dismiss Appeal. *See* Matthew Claim Appeal Dkt. No. 11.

39.    Thereafter briefing commenced in earnest with the filing of Matthew's opening brief on May 3, 2024. *See* Matthew Claim Appeal Dkt. No. 15. The Movant undertook efforts to review and analyze Matthew's initial brief and all authority cited therein. Upon review of the brief, the Movant promptly confirmed Matthew had indeed exceeded the appropriate scope of the Matthew Claim Appeal by making numerous arguments regarding this Court declining to: (a) disband the Committee; and (b) disallow all compensation previously sought by Movant, notwithstanding the District Court's prior admonishment in connection with the Motion to Dismiss Appeal.

40.    Accordingly, the Movant was forced to draft a responsive brief that addressed and rebutted these ancillary arguments as well as the more appropriate core challenge to this Court's underlying rulings in disallowing the Matthew Claim. This writing process encompassed all ordinary and customary tasks attendant to appellate brief writing including conducting extensive legal research on procedural and substantive law, review and analysis of underlying pleadings and ruling and other documents in the record on appeal, and extensive proofing of work product. All told, the Movant completed and filed its brief on June 3, 2024. *See* Matthew Claim Appeal Dkt. No. 21. Briefing in the Matthew Claim Appeal concluded on June 28, 2024, with the filing of Matthew's final brief. *See* Matthew Claim Appeal Dkt. No. 26.

41.    The Movants respectfully submit their efforts relating to litigating and briefing the Matthew Claim Appeal were reasonable, necessary, and appropriate under the circumstances and for two acute reasons. First, the Committee did not initiate the Matthew Claim Appeal, but rather was the Appellee therein and therefore was forced to defend this Court's Disallowance Order, and the Committee's own action in bringing the Claim Objection. In other words, the Movants' efforts

20

(like many of those efforts in the Chapter 11 Case) were made necessary by the conduct of the Debtor and his affiliates and insiders (in this case, Matthew). Second, the Movant submits its work product in the Matthew Claim Appeal speaks for itself. The Motion to Dismiss Appeal and the Committee's brief set forth the facts and law at issue in a coherent and persuasive manner and complied with the litany of hyper-technical rules appliable to bankruptcy appellate practice (i.e. the 8000 Bankruptcy Rules). Moreover, while the Movants do not believe the allowance or disallowance of their compensation should turn on a hindsight review of the results achieved thereby, it is worthy to note the District Court recently issued a detailed memorandum and opinion affirming the Disallowance Order in toto. *See* Matthew Claim Appeal Dkt. Nos. 29 and 30.

42.    While Movant's work on the Matthew Claim Appeal represents the lion's share of compensation sought in the Appeals category, the Movant additionally committed efforts to other appeals which were acutely relevant to the interests of the Committee—namely each of the Debtor Trustee Appeal, the Debtor Conversion Appeal, and the Matthew Trustee Appeal (collectively, the "**Late-Stage Appeals**"). In each of these appeals, the Debtor/Matthew sought to overturn the Court's decisions flowing from resolution of the Committee Motion to Convert; whether it be the Court's appointment of the Chapter 11 Trustee or the Chapter 11 Trustee's ultimate conclusion that the Chapter 11 Case should be converted to chapter 7, as thereafter ordered by the Court.

43.    While none of the Late-Stage Appeals have proceeded in substantive briefing, numerous events relevant to the Committee's interests unfolded during the Final Period. As an initial matter, the Movant's experience in the Chapter 11 Case led the Movant to the reasonable conclusion that one or more appeals would flow from the Court's ruling following the Conversion Trial. Additionally, the Movant reasonably concluded these appeals would be paired with efforts by the Debtor and his affiliates to stay the Court's orders converting the Chapter 11 Case or appointing a chapter 11 trustee. Based upon these conclusions, the Movant undertook limited

21

prophylactic efforts to conduct legal research and develop a strategy for opposing these efforts to
come.

44.    Ultimately, the Movant's anticipation of appeals and motions to stay orders pending
appeal came to pass via each of the Late-Stage Appeals, and corresponding motions to stay pending
appeal (the "**Stay Motions**"). *See* Dkt. Nos. 1320, 1321 and 1359. The Movant undertook efforts
to review, analyze, and develop a strategy for opposition to each of the Stay Motions. While the
Stay Motions were never briefed, the Movant did have opportunity to oppose the same in open
court, and, eventually, each of the Stay Motions were denied or mooted as the case may be. *See*
Dkt. Nos. 1342, 1360 and 1361.

45.    In addition to opposing the Stay Motions, substantial effort by the Movant was
necessitated by other unique issues arising in the Late-Stage Appeals. For example, when
commenced, it was unclear who was named as a party to each of the Late-Stage Appeals. A review
of the dockets thereof demonstrates that seemingly every party in interest in the Chapter 11 Case
was named as an "Appellee." *See e.g. Matthew Spiegel v. Marshall Spiegel, Official Committee of
Unsecured Creditors, 1618 Sheridan Road Condominium Association, Wintrust Bank, N.A.,
Duane Morris, L.L.P., Corinne McClintic, Michael C. Kim & Associates, Citizens Insurance
Company of America, 16-00022 Greenleaf Building, LLC, Gina B. Krol, Trustee, Adam G. Brief,
Acting United States Trustee*, 24-CV-09913 (N.D.Ill 2004). These circumstances required analysis
by the Movant and its coordination with numerous of the other-named Appellees. It was imperative
to the Committee's interests that the Late-Stage Appeals were defined by the appropriate party or
parties, but the Debtor (and Matthew's) designation of Appellees made this task onerous and
convoluted.

46.    Upon the docketing of respective designations of the record and issues on appeal
(the "**Designations**") in each of the Late-Stage Appeals, confusion abounded. *See* Dkt. Nos. 1322,

1370145_2

Case 20-21625    Doc 1421    Filed 03/05/25    Entered 03/05/25 15:16:33    Desc Main
Document    Page 28 of 60

1323 and 1367. In lieu of narrowing the potential scope of the Late-Stage Appeals, the Designations served to expand to widest conceivable lens, designating the entire Chapter 11 Case's docket. *See e.g.* Dkt. No. 1367.

47.      In addition to the above, as of the date of filing of this Final Application, no brief has been filed in any of the Late-Stage Appeals. No motions have been filed to extend briefing deadlines either. Accordingly, it appeared to the Movant that the Debtor (and Matthew) missed their deadlines to file a brief in each of the Late-Stage Appeals. This observation accordingly necessitated legal research to determine the procedural effect of missing such deadlines, and the development of strategy with respect to the same.

48.      Notwithstanding the fact that no material advancement has been made in the Late-Stage Appeals as of the close of the Final Period, the Movant's work in connection with the Late-Stage Appeals was reasonable, necessary, and appropriate to protect the interests of the Committee.

49.      As demonstrated by the foregoing and the detailed Exhibit C, Movant was required to expend significant efforts in the Appeals category. Movant's services included those necessary as a party and Appellee to the Matthew Claim Appeal in order to protect the integrity of the Court's ruling via the Disallowance Order and the Committee efforts in facilitating the same. In addition Movant's services in the connection with the Late-Stage Appeals were necessary to protect the Committees efforts in connection with the Conversion Trial and the Court's rulings flowing therefrom. Movant asserts that under the circumstances, its services rendered in this category were warranted, actual, necessary, reasonable, and benefitted the estate.

   **D.      Conversion**

1370145_2

50.    The following table details the hours Movant worked on matters relating to the consolidated contested matter concerning the Committee Motion to Convert, Chapter 11 Trustee Motion, and Plan during the Final Period:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Howard L. Adelman | 22.20 | $525 | $11,655.00 |
| Nicholas R. Dwayne | 257.80 | $315 | $81,207.00 |
| Sandra Rodela | 1.20 | $135 | $162.00 |
| Alec Klimowicz | 24.60 | $125 | $3,075.00 |
| **TOTAL** | **305.80** | | **$96,099.00** |

51.    Movant expended 305.80 hours in the Conversion category.  Attached hereto as Exhibit D are billing records and time entries describing each task performed by Movant in the Conversion category.

52.    As of the commencement of the Final Period, the Conversion Trial was well underway, and in fact, near conclusion. All that remained was a single trial date, added to the trial schedule upon the request of the Debtor, who required more time to obtain funding commitments necessary to render his Plan arguably feasible.

53.    During the break in trial dates between January 26 and March 18, 2024, the Movant remained in "trial mode," continuing its ongoing preparation for the final trial date. This preparation included extensive review and analysis of the then-newly-available transcripts for the initial weeks of trial. This review was necessary, as it was anticipated that Matthew and the Debtor (as well as the Debtor as designee for Greenleaf) would take the stand once again, as they did during the earlier trial sessions. This necessitated the Movant's review and analysis of prior trial transcripts in order to identify potential opportunities for impeachment during continued testimony.

54.    On a parallel track the Movant undertook efforts to identify the scope of the record already created during the initial trial sessions, and confirm and identify additional facts which

24

would need to be established on the final trial day. This required extensive review and redrafting of trial outlines and other trial materials. During this preparation, the Movant additionally refamiliarized itself with previously introduced trial exhibits, and endeavored to review and analyze new documents produced by the Debtor in real time, pre-marking additional exhibits for introduction on the final trial day. In light of the unique nature of the continued Conversion Trial, coupled with the fact that events relevant to that very trial were unfolding in contemporaneous real time, the Movant's trial preparation efforts were necessarily unique, complicated, and extensive.

55.     Ultimately when the Conversion Trial continued and concluded on March 18, 2024, the Movant was able to extract further valuable testimony thanks to its extensive preparation. On the final trial day, the Movant defended the direct examination testimony of each of Greenleaf, the Debtor, and Matthew, as introduced by the Debtor. The Movant further cross-examined each of the same. Finally, the Movant represented the interests of the Committee during the final trial day in all other necessary respects, as is well known to the Court who presided over the final trial day.

56.     Upon conclusion of the Conversion Trial, extensive efforts were still required, as the Court ordered post-trial briefing on the issues raised by the applicable pleadings and the record established over the fifteen (15) day trial. *See* Dkt. No. 1239. Specifically, the parties were ordered to draft and file written closing statements (the "**Closing Statement**") and proposed findings of fact and conclusions of law (the "**PFFCL**"). Drafting of the PFFCL, in particular, proved laborious.

57.     Movant began its post-trial efforts by conducting a comprehensive review and analysis of the final record on appeal. This included each of the fifteen (15) trial transcripts corresponding with each trial day, which measured a total of three thousand and eighty-six (3,086) pages. Additionally, it proved necessary to review and analyze deposition transcripts of each of the trial witnesses in an effort to identify impeachable contradictory prior testimony. Transcript

Case 20-21625    Doc 1421    Filed 03/05/25    Entered 03/05/25 15:16:33    Desc Main
Document    Page 31 of 60


review was coupled with a review of all admitted exhibits, forming a complete picture of the record at issue. In connection with the same, the Movant undertook a detailed review and analysis of all pleadings governing the consolidated contested matter.

58.     From here, the Movant undertook efforts to develop an outline of the Committee's post-trial case. Because the Conversion Trial encompassed numerous requests for relief and countless issues to consider in connection therewith, coherent outlining was necessary in order to corral all necessary facts and issues which would need to be addressed in the PFFCL. The Conversion Trial was, by no means, a straightforward inquiry as to whether a plan should be confirmed or case be converted. Rather, the Conversion Trial opened numerous esoteric inquiries regarding the proper purposes of chapter 11, the equitable scope of property of the estate, and interplay between contemporaneous transactions, actions, and proceedings taking place in- and outside of this Court, often controlled by the Debtor by fiat. Marshalling the vast swath of relevant facts and law was no small task.

59.     As a corollary to the vastness of issues presented by the disputes in the Conversion Trial, extensive legal research was additionally necessary in connection with drafting of the PFFCL. The Movant undertook efforts to re-familiarize itself with the standards for confirmation and conversion, through in-depth analysis of governing case law, specifically that concerning individual chapter 11 debtors. Beyond these issues it was also necessary for the Movant to delve into certain applicable federal tax law, in order to adequately analyze issues presented by the Debtor's questionable income tax preparation practices. On this issue, the Movant, in part, relied on assistance from the Committee's accountants. Another hallmark issue relevant to the PFFCL was the true meets and bonds of the estate as defined by section 541 of the Bankruptcy Code. On this topic, the Movant was able to identify binding Seventh Circuit authority which held, in similar factual circumstances, that title to property held by a non-debtor nominee nevertheless constituted

1370145_2

property of the estate when the debtor retained all equitable interest therein. Through application of this research finding, the Movant strenuously argued in the PFFCL that Greenleaf is, in fact, property of the estate.

60.    The actual drafting process of the PFFCL was also laborious and, justifiably extensive. In order to adequately comply with the Court's orders with respect to the post-trial briefing and otherwise protect the interests of the Committee, the PFFCL needed to include robust recitations of the myriad facts established at trial. The PFFCL also required extensive articulation of the Committee's arguments with respect to relief being sought by the Committee, including analysis of applicable law, application of the law to the facts, and explanations of the basis for relief. Given the breadth of relevant facts and applicable law, and complexity of issues and relief sought, it was impossible for the Movant to adequately capture the same in a brief matter. To the contrary, it was necessary for the PFFCL to be voluminous and ultimately measure a total of one hundred and twenty-three (123) pages, exclusive of the Closing Statement. *See* Dkt. No. 1251-1. With the work completed on the PFFCL, the Closing Statement proved to be a more straightforward drafting process, as the Closing Statement served as essentially an executive summary of the PFFCL. The Closing Statement ultimately measured in at twenty (20) pages—the limitation imposed by the Court. *See* Dkt. No. 1251.

61.    The Movants respectfully submit their efforts in drafting the PFFCL and Closing Statement was reasonable, necessary, and appropriate, as demonstrated by the resulting product itself, and the ultimate results achieved as discussed below.

62.    Between the date of filing of the Closing Statement and PFFCL (May 13, 2024) and the Court's ultimate ruling on the issues in the Conversion Trial (September 5, 2024), the Movant's efforts in the Conversion category were relatively limited. In substance, the Movant committing time to reviewing and analyzing the post-trial briefing of the other parties to the

Conversion Trial—the Debtor and the UST. Certain matters raised in the Debtor's post-trial briefing necessitated additional consideration, such as the fact that the Debtor admitted the financing arrangement, which formed the basis for his case on feasibility of the Plan, had fallen through. Accordingly, the Debtor's post-trial briefing alleged the Debtor intended to move to re-open the evidence in the Conversion Trial and introduce evidence of alternative financing. These circumstances required analysis and formulation of a responsive strategy, with the Committee coordinating with the UST on the same.

63.     Throughout all of the Movant's efforts detailed above, the Movant additionally fielded several inquiries and overtures made by counsel to the Debtor regarding settlement of the issues in the Conversion Trial and the Chapter 11 Case writ large. The Movant engage is perfunctory settlement negotiations with the Debtor, reiterating the Committee's ongoing willingness to compromise on resolution of the matter pursuant to terms similar to those discussed throughout the Chapter 11 Case. None of these efforts gained any traction, however, as the Debtor remained committed to his position of preserving all ongoing litigation and appeals against substantially all of his creditors—in other words, the Debtor was not interested in settlement at all.

64.     On September 5, 2024, the Court issued a ruling in the Conversion Trial. *See* Dkt. Nos. 1273 and 1274. Therein the Court denied confirmation of the Plan, and related requested relief to retroactively approve an amendment to Greenleaf's operating agreement. The Court further found extensive cause to convert the Chapter 11 Case, as established by the Movant on behalf of the Committee. The Court, however, held the very same cause to convert demonstrated by the Committee formed a basis to appoint a chapter 11 trustee in the Chapter 11 Case. Accordingly, the Court granted the Chapter 11 Trustee Motion.

65.     Remaining work in the Conversion category was limited to review and analysis of the Court's holdings. The ensuing substantive efforts of the Movant on behalf of the Committee

28

during the remaining portions of the Final Period are detailed in other sections hereof and time

therefore recorded in other categories.

66.    Given the seminal nature of the Conversion Trial in the context of the Chapter 11

Case, and the results achieve therethrough, the Movant submits its efforts in the Conversion

category were actual, reasonable, and necessary under the circumstances. Moreover, they provided

an acute and material benefit to the estate and should accordingly be allowed in full.

**E.    Chapter 11 Trustee**

67.    The following table details the hours Movant worked on matters flowing

immediately from the Court's holdings in the Conversion Trial and, specifically, appointment of a

chapter 11 trustee:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Howard L. Adelman | 10.80 | $525 | $5,670.00 |
| Nicholas R. Dwayne | 30.20 | $315 | $9,513.00 |
| Dina A. Kostrow | 6.90 | $315 | $2,173.50 |
| **TOTAL** | **47.90** | | **$17,356.50** |

68.    Movant expended 47.90 hours in the Chapter 11 Trustee category.  Attached hereto

as Exhibit E are billing records and time entries describing each task performed by Movant in the

Chapter 11 Trustee category.

69.    As the Court is aware, it ordered the UST to appoint a chapter 11 trustee in the

Chapter 11 Case. *See* Dkt. Nos. 1274 and 1279. It is the Movant's understanding that the UST

moved swiftly in compliance with such orders and sought the input of relevant parties in interest,

including the Committee, as to preferred candidates for the position. In compliance with this

request, the Movant undertook efforts to identify and interview potential candidates for the

position of chapter 11 trustee in the Chapter 11 Case. This process concluded with the Committee

making its recommendation to the UST of its preferred candidates for chapter 11 trustee on September 10, 2024.

70.     Shortly thereafter, the UST revealed it had selected Gina Krol as the chapter 11 trustee (defined above as, the "Trustee"). From the outset, the Movant endeavored to work collaboratively with the Trustee. This included bringing the Trustee up to speed on the protracted history of the Chapter 11 Case that preceded her appointment, identifying remaining assets of the estate of potential value for creditors, and providing the Committee's recommendations for further administration of the case.

71.     A critical question being asked at the outset of the Trustee's appointment was whether and, if so, why the case should remain in Chapter 11. In certain limited respects, the Movant conducted legal research and analysis in order to determine and understand the powers and duties of the Trustee under the circumstances and while the case continued to pend in chapter 11. The Committee brainstormed with the Trustee on potential paths for the case, including analysis of what power the Trustee held to dispose of and/or resolve pending litigation commenced by the Debtor, the opaque issues of control over Greenleaf exercised by the Debtor, and the estate's interest in the Condo. The Movant submits its efforts in "transitioning" the case to the Trustee were reasonable and necessary under the circumstances of this unique Chapter 11 Case.

72.     Other than initial due diligence, the Trustee additionally made it a first day priority to investigate and hopefully negotiate a comprehensive resolution to the Chapter 11 Case—much the same as the Committee did throughout its tenure. Throughout this process, the Committee both substantively supported the Trustee in her efforts and participated in its own right in the settlement negotiations. As an example of the former, the Movant worked as a liaison between the Trustee and attorneys for numerous creditors and other parties in interest in the Chapter 11 Case. As an example of the former, the Movant negotiated on behalf of the Committee with the Trustee and

the Debtor regarding the Committee demands and position with respect to settlement terms and structure. This took the shape of participation in numerous conferences and the exchange of numerous correspondence and settlement proposals.

73.    Ultimately, despite best efforts, no settlement was reached with the Debtor during the tenure of the Trustee (as chapter 11 trustee). This unfortunate reality was rendered official upon the effectiveness of conversion of the Chapter 11 Case on December 20, 2024. Notwithstanding the same, the Movant submits its efforts in the Final Period relating to interface and settlement negotiations with the Chapter 11 Trustee were reasonable, necessary, and appropriate under the circumstances.

**F.    Asset Preservation**

74.    The following table details the hours Movant worked in an effort to preserve concrete (but concealed) and inchoate assets of the estate—primarily regarding Greenleaf:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Howard L. Adelman | 1.20 | $525 | $630.00 |
| Nicholas R. Dwayne | 5.80 | $315 | $1,827.00 |
| Dina A. Kostrow | 6.80 | $315 | $2,142.00 |
| Alec Klimowicz | 4.20 | $125 | $525.00 |
| Svitlana Kalmanovsky | 2.80 | $125 | $350.00 |
| **TOTAL** | **20.80** | | **$5,474.00** |

75.    Movant expended 20.80 hours in the Asset Preservation category.  Attached hereto as Exhibit F are billing records and time entries describing each task performed by Movant in the Asset Preservation category.

76.    An omnipresent issue in the Chapter 11 Case has been the specious position put forth by the Debtor that Greenleaf is not property of estate, despite the Debtor apparent total control over, and enjoyment of all income produced by, the same. In fact, the Committee's efforts throughout the Chapter 11 Case have been focused upon, ultimately, securing a ruling from the

1370145_2

Court that Greenleaf is, in fact, property of the estate for the benefit of all creditors. The Committee and Movant remain confident there are numerous substantive and procedural mechanisms by which Greenleaf can be recovered for the benefit of the estate. At this juncture, that responsibility falls upon the Trustee. The Committee, however, found it to be reasonable and necessary to undertake certain limited efforts to preserve these claims for the benefit of the Trustee prior to and in the initial stages of her tenure. The Movant respectfully submits these efforts were in the best interests of the unsecured creditors, the constituents of the Committee.

77.    These efforts, in large part, manifested as legal research and analysis regarding potential claims which the estate might hold against Greenleaf. Legal research and analysis was necessary in light of the unique factual circumstances of the case, including but not limited to the passage of time since the Petition Date and the initial creation of Greenleaf. Moreover, it was pivotal to explore the possibility of seeking an injunction or temporary restraining order to prevent Greenleaf from disposing of its cash on hand, and encumbering or otherwise absconding with its real property. The unsecured creditors have a vested and material interest in disassembling the façade erected by the Debtor with respect to the separateness between him and Greenleaf. The value of Greenleaf is due and owing to the estate, and the Movant's efforts in the Asset Preservation category were reasonable, necessary, and appropriate to position the estate to receive such relief in the near future.

### G.    Fee Applications

78.    The following table details the hours Movant worked on fee applications during the Final Period:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Nicholas R. Dwayne | 25.70 | $315 | $8,095.50 |
| **TOTAL** | **25.70** | | **$8,095.50** |

1370145_2

79.     Movant expended 25.7 hours[7] in the Fee Applications category.  Attached hereto as Exhibit G are billing records and time entries describing each task performed by Movant in the Fee Applications category.

80.     Movant seeks compensation for services performed in the Final Period in connection with the drafting of the Fifth Interim Application, as such application was filed in the Final Period, subject to extensive voluntary write offs.  While the Movant expended arguably compensable time in connection with briefing on the Fifth Interim Fee Application necessitated by the Debtor's objection to the same, *see* Dkt. No. 1242, such time has been written off in an exercise of Movant's billing judgment. Similarly, certain preliminary work was performed during the Final Period on this Final Application, but has been voluntarily written off by the Movant. The vast majority of time spent on preparation of this Final Application occurred after conversion of the Chapter 11 Case and resultant existence of the Committee. Accordingly, the Movant does not seek compensation for the same.

81.     Courts generally "permit professionals reasonable compensation for time spent in preparing fee applications." *In re Wildman*, 72 B.R. 700, 710-11 (Bankr. N.D. Ill. 1987).  The Movant submits the efforts in drafting the Fifth Interim Fee Application, review, proofing, revising, and compiling of the billing records attached thereto, and the compensation therefore was reasonable and appropriate under the circumstances.

82.     In addition, courts in this district generally apply a cap on the amount of allowable compensation relating to work in preparation of a fee application, which is between 3-5% over the total compensation sought by such application. *See Wildman*, 72 B.R. at 711 (3%); *see also In re Spanjer Bros., Inc.*, 203 B.R. 85, 93 (Bankr. N.D. Ill. 1996) (5%). After application of certain

---

[7] After accounting for certain extensive voluntary write offs accounted for on Exhibit H introduced below.

voluntary write offs as detailed above, compensation sought in the Fee Application category totals $8,095.50, representing approximately 4.3% of the overall compensation sought in the Final Period of $187,895.50. Accordingly, the Movant respectfully submits this compensation is in line with the caps generally applied by courts in this district and, specifically, this Court in the Chapter 11 Case.

### H. Voluntary Write Offs

83.     The following table details the hours Movant worked during the Final Period, but for which the Movant has voluntarily written off in an exercise of its billing judgment:

| PROFESSIONAL | HOURS | HOURLY RATE | TOTAL FEES |
|---|---|---|---|
| Howard L. Adelman | 5.60 | $525 | $2,940.00 |
| Henry B. Merens | 0.20 | $525 | $105.00 |
| Nicholas R. Dwayne | 58.80 | $315 | $18,522.00 |
| Dina A. Kostrow | 3.60 | $315 | $1,134.00 |
| Alec Klimowicz | 8.70 | $125 | $1,087.50 |
| Svitlana Kalmanovsky | 11.60 | $125 | $1,450.00 |
| **TOTAL** | **88.50** | | **$25,238.50** |

84.     Movant expended 88.5 hours in the Final Period which it has determined, in its sound billing judgment, to voluntarily write off and otherwise decline to seek the allowance thereof.  Attached hereto as Exhibit H are billing records and time entries describing each task performed by Movant for which compensation *is not* sought.

85.     A large portion of the time written off by the Movant includes work it was forced to perform in connection with the Attorney Registration and Disciplinary Commission's (the "**ARDC**") disciplinary proceeding against John Xydakis ("**Xdyakis**"), one of the Debtor's counsel (the "**Xydakis ARDC Proceeding**"). The Xydakis ARDC Proceeding concerned Xydakis's conduct in connection with his representation of the Debtor in: (a) the prepetition litigation with the Association; and (b) the Chapter 11 Case. The ARDC was particularly interested in Xydakis's role in the back-dating of the Greenleaf operating agreement—a fact uncovered by the Movant. In

34

light of the same, the ARDC and Xydakis, respectively, called Mr. Dwayne of the Movant as a witness in the Xydakis ARDC Proceeding. This necessitated the Movant's retention of counsel, production of documents, testimony at a deposition, and testimony at the ultimate hearing in the Xydakis ARDC Proceeding. While the Movant did dedicate substantial time, and incur substantial expenses, in connection with its participation in the Xydakis ARDC Proceeding, recoupment for none of the same is sought against the estate.

86.     For context, the voluntary write offs voluntarily applied by the Movant constitute approximately 11.8% of the overall compensation which would be sought without application of the write offs. The Movant respectfully submits its write offs are in recognition of the Court's prior precedent within the Chapter 11 Case as to the allowance of compensation, account for arguable but unavoidable duplication of efforts, and otherwise demonstrate the Movant has discharged its obligations to exercise good billing judgment as required by applicable law.

## VI.    SUMMARY OF LEGAL SERVICES RENDERED DURING ENTIRE APPLICATION PERIOD

87.     As set forth above, the Movant seeks final allowance of both: (a) the Aggregate Interim Award; and (b) compensation for services rendered and reimbursement of expenses during the Final Period. Movant seeks no reconsideration of certain modifications, discounts, and disallowance of certain discrete entries to compensation previously sought on an interim basis. Stated another way, Movant now seeks final allowance of the Aggregate Interim Award in the total amount thereof, $1,159,364.75. In addition, Movant seeks interim and final allowance of those fees and expenses accrued during the Final Period in the aggregate amount of $187,940.29. Accordingly, the total amount of fees and expenses for which final allowance is sought is $1,347,305.04, which constituted reasonable compensation for all services performed, and reimbursement of all actual and reasonable expenses incurred, during the Application Period.

1370145_2

88.     Consistent with the Court's comments throughout the Chapter 11 Case, the Movant is cognizant that the Court anticipated undertaking a wholistic analysis of the services performed by the Movant throughout the Chapter 11 Case in consideration of this Final Application. In the interest of brevity and to aid the Court in its task, the Movant incorporates herein each of the Interim Applications by express reference. *See* Dkt. Nos. 308, 481, 686, 1034, and 1221. Notwithstanding such incorporation but to provide a high-level synopsis of work performed during the Interim Period with the benefit of certain hindsight of the results achieved, an abbreviated summary of the work performed by the Movant during the totality of the Chapter 11 Case is as follows.

89.     As the Court is aware via the Interim Applications, the central theme of Movant's services and compensation therefor was that they were made necessary by the obstreperous actions of the Debtor and his cohorts. This trend began at the commencement of the case when the Debtor filed his original schedules and statement of financial affairs. *See* Dkt. Nos. 16 and 17. Thereby the Debtor commenced his case-long charade and concealment of the estate's primary asset: Greenleaf. In schedule A/B the Debtor disclosed a 1% interest in Greenleaf which he valued at zero dollars ($0). *See* Dkt. No. 16 at p. 4. Notwithstanding the ostensible valuelessness of the Debtor's interest in Greenleaf, schedule I disclosed monthly income derived therefrom in the aggregate amount of $8,572.00.[8] *See* Dkt. No. 16 at p. 15. This paradox, which would never be adequately explained by the Debtor, became the impetus of extensive efforts put forth by the Committee through the Movant.

90.     In its first major effort, the Committee sought to conduct Bankruptcy Rule 2004 discovery regarding the Debtor's financial affairs. *See* Dkt. No. 134. As would become common

---

[8] Though, this of course proved to be a conservative estimate. *See* Dkt. No. 1282 (the Debtor's last monthly operating report as debtor in possession disclosing $19,500 in income from Greenleaf).

1370145_2

place with any action taken by the Committee, this motion was contested by each of the Debtor, Matthew, and Greenleaf, forcing the Committee to brief the ordinarily routine and ministerial request. *See* Dkt. Nos. 162, 166, and 169. The protracted litigation regarding customary discovery, however, would be far from over upon the Court's granting of the Committee's motion. *See* Dkt. Nos. 182 and 184.

91.    Upon issuance of authorized subpoenas, the Committee received no documents or good faith negotiations regarding the authorized discovery. Instead, the Committee got nothing but pushback from the Debtor, Matthew, and Greenleaf. Other than outright refusal to produce documents, the Committee's discovery efforts prompted a motion to quash from Matthew and Greenleaf. *See* Dkt. No. 190. This dispute necessitated a motion to compel from the Committee. *See* Dkt. No. 201. Related briefing on both motions thereafter ensued, culminating with the Court' issuance of an order generally compelling Matthew and Greenleaf's compliance. *See* Dkt. No. 246. Still, however, Matthew and Greenleaf refused to comply, and further motion practice was required. For example, each of the Debtor, Matthew, and Greenleaf refused to produce documents unless and until a protective order was in place regarding the same. The Debtor parties, however, were wholly unreasonable in their demands with respect to the scope of such protective order, suggesting a form thereof that completely eviscerated the utility of any discovery. This dispute resulted in further motion practice. *See* Dkt. Nos. 291 and 460.

92.    Even upon the entry of a protective order, *see* Dkt. No. 324, Matthew and Greenleaf still refused to comply with the discovery requests, necessitating a second motion to compel. *See* Dkt. No. 361. The Court granted the second motion to compel, *see* Dkt. No. 403, and in connection therewith also entered sanctions against Matthew and Greenleaf for their obstreperousness in connection with the same. *See* Dkt. No. 522. Matthew and Greenleaf, unsuccessfully, sought sanctions against the Committee for attempting to conduct the very discovery authorized by the

1370145_2

Court. *See* Dkt. No. 420. The Court's allocation of discovery sanctions became the subject of an appeal commenced by Matthew and Greenleaf, which the Committee was forced to defend. *See* Dkt. No. 540. The Debtor, Matthew, and Greenleaf additionally sought, unsuccessfully, to stay all discovery. *See* Dkt. Nos. 409 and 423.

93.     When a deposition of Matthew finally proceeded (nearly a year after it was originally authorized by the Court), Matthew's counsel extensively and materially disregarding applicable rules and norms of decorum, making a mockery of the proceeding, which, as noted by the Court itself, was some of the worst deposition conduct it had seen. This necessitated the Committee seeking relief from the Court to reconvene the deposition. *See* Dkt. No. 466. The Court granted this motion as well, though the relief came approximately a year after the discovery was originally authorized, through the fault of the Debtor, Matthew, and Greenleaf in their specious resistance and motion practice detailed above.

94.     It was around this point in the case (the summer of 2022) that Matthew and Greenleaf replaced their counsel. The Committee remained optimism that new counsel would bring with it reasonable discovery compliance as had been sought by the Committee for more than a year. Instead what flowed was further obfuscation and capricious delay tactics. Ongoing discovery disputes between Matthew and Greenleaf, on the one hand, and the Committee on the other, however did not directly manifest as motions before the Court in the context of Bankruptcy Rule 2004 Discovery.[9] Rather, the Committee concluded further efforts to complete, what should have been, straightforward and customary discovery efforts were fruitless. The creditors could not be subjected to further delays in the relief to which they were entitled. Accordingly, as well as for

---

[9] Numerous discover disputes, however, manifested under the banner of Rules 30, 37, and 45 during the Committee's discovery efforts in connection with Committee Motion to Convert as a contested matter. *See e.g.* Dkt. No. 1101 (the Committee's motion to compel regarding the Debtor's production of emails for the first time on the eve of the Conversion Trial, but none the less withholding nearly 400 emails on the basis of a blanket assertion of the attorney-client privilege as extended by the common interest doctrine).

1370145_2

the other reasons set forth below, the Committee concluded it would proceed through alternative procedural discovery means in connection with the Committee Motion to Convert.

95.    The above is not to say the Committee was singularly focused on conversion throughout the Chapter 11 Case. To the contrary, the Committee repeatedly sought, in good faith, to build consensus with the Debtor with a view towards mutual and amicable settlement of the Chapter 11 Case. The Committee thoughtfully drafted extended no less than three (3) formal settlement letters to the Debtor throughout the Chapter 11 Case. The core components of all three were constant and twofold: (a) leverage the value of Greenleaf to pay all creditors; and (b) dismiss all pending satellite litigation and appeals with prejudice. The Debtor never bothered to respond to any of the Committee's overtures towards settlement until the Conversion Trial was actually underway or complete.

96.    As bore out by the numerous plans submitted by the Debtor throughout the Chapter 11 Case (eight in total), the Debtor was comfortable with component (a) of the Committee's proposed settlement structure: Greenleaf funding payment of the Debtor's creditors. What the Debtor refused to consider, however, was abandonment of his litigation crusade against all perceived rivals. This position, frankly, defied rational explanation, as the very litigation at the center of relevancy was the Debtor's pending state court action against his condo association and related parties—the prosecution of which resulted in a more than one-million-dollar sanction being entered against the Debtor which ostensibly precipitated the filing of the Chapter 11 Case in the first place. The Debtor's hardheadedness on finality with respect to litigation proved an impenetrable obstacle to settlement. Moreover, the facts that each of the Debtor's plans preserved all specious litigation, enjoined creditors from defending and/or asserting counterclaims in such litigation, and ultimately served as nothing more than a makeshift appeal bond, necessitated the Committee's opposition to confirmation throughout the Chapter 11 Case. The Debtor's refusal to

39

put forth a reasonable and confirmable plan was another reason the Committee proceeded with the Committee Motion to Convert.

97.     On a parallel track with the Debtor's refusal to put forth confirmable plans, the Debtor focused his efforts on litigating with his creditors both inside and outside of the Chapter 11 Case. The numerosity of satellite state court proceedings is difficult to accurately calculate, as certain matters moved back and forth to and from trial courts to appellate courts throughout the pendency of the Chapter 11 Case. Claims were additionally split between the Debtor and his volunteer counsel, Xydakis, over whom the Debtor appeared to exercise some manner of control to the point of material personal detriment to Xydakis.[10] It is the Movant's understanding the Debtor perpetuated litigation and appeals against, at least, the Condo Association and each of the members thereof, Citizens Insurance, and the city of Wilmette during the Chapter 11 Case. Parallel and arguable duplicative proceedings against all such rivals were also commenced in the Bankruptcy Court through contested matters, adversary proceedings, and District Court appeals. Additional targets of the Debtor in the Bankruptcy Court included Wintrust Bank, the Association's management company, and, of course, the Committee itself. The Debtor erected a vast labyrinth of litigation against seemingly all parties he did any business with, needlessly expending both state and federal judicial resources, resulting in no benefit to the estate. Given this pattern, the Movant rendered reasonable and necessary services to the Committee in attempts to unwind the morass. In connection therewith the Committee rightly concluded it had no choice but to proceed with the Committee Motion to Convert.

98.     A particularly specious litigation tactic, and one that was specifically relevant to the Committee, was the Debtor's attempts to dissolve the Committee itself. *See* Dkt. No. 926. The

---

[10] Xydakis was the joint and several obligor on the sanctions entered against the Debtor pre-petition. Additionally the Xydakis ARDC Proceeding concerned Xydakis's conduct in representing the Debtor.

1370145_2

Committee was forced to brief this motion and its own existence. Ultimately the Court denied the motion, only to have the Debtor try again. *See* Dkt. No. 1026. When the Court gave the Debtor an ultimatum as to the second motion—namely that the Committee Motion to Convert would proceed on a parallel track with the second motion to disband instead of the Plan—the Debtor voluntarily withdrew the second motion to disband. *See* Dkt. No. 1031. The Debtor's decision with respect to the second motion disband serves to illustrate its true purpose: to delay and deflect from the Committee Motion to Convert by attacking the movant thereof instead of its underlying grounds. Moreover, the specious attempts by the Debtor to disband the Committee serve to illustrate the propriety of the Committee Motion to Convert, as the creditors would receive no justifiable relief so long as the Debtor remained debtor in possession.

99.     An omnipresent theme in the Chapter 11 Case was any action taken by the Debtor occurred in duplicate or triplicate, thanks to Matthew and Greenleaf taking the very same action. For example, each of the Debtor, Matthew, and Greenleaf objected to each of the Interim Applications. The issue of Matthew and Greenleaf's interference in the administration of the Chapter 11 Case came to a head with the Movant's Third Interim Application when, once again, Matthew and Greenleaf objected thereto. Through briefing, the Movant argued that Matthew and Greenleaf lacked standing to object to the Third Interim Application and to generally participate in the Chapter 11 Case, because they held no claim against the estate and otherwise had no pecuniary interest in its outcome. At the conclusion of such briefing and upon the Court's ruling on the Third Interim Application, the Court found Greenleaf lacked standing in Chapter 11 Case and that Matthew would have lacked such standing but for an amendment to the Debtor's schedules more than two years after the Petition Date and during the very briefing on Matthew's standing. *See* Dkt. No. 842.

41

100.    The purported Matthew Claim, which was absent from the first two years of the Chapter 11 Case, first appeared on Amended Schedules. *See* Dkt. No. 805. Matthew allegedly held an unsecured claim in the amount of $475,000, but little detail beyond those bare elements was provided. *See Id.* In light of the suspicious timing of the Matthew Claim and lack of details disclosed thereabout, the Committee concluded it necessary to object to the same. *See* Dkt. No. 855. Rather than disclose the basis for the Matthew Claim in the Amended Schedules, the purported basis of the claim came to light only through briefing on the Claim Objection. The basis for the Matthew Claim, however, remained insufficiently substantiated by the record developed through briefing, and accordingly the Court ordered an evidentiary hearing on the Claim Objection. *See* Dkt. No. 992.

101.    The ensuing trial on the Claim Objection (the "**Claim Trial**") and efforts in preparation therefor and summation thereof proved to be a laborious undertaking for the Movant. For example, the Movant deposed and requested documents from each of the Debtor and Matthew (the two proposed witnesses in the Claim Trial). With the benefit of discovery, the Movant developed a comprehensive trial strategy and outline. The Claim Trial itself proceeded for five (5) days of testimony, bookended on either side with opening and closing statements. Following the Claim Trial, the Movant was ordered by the Court to submit post-trial briefing in the form of proposed findings of fact and conclusions of law. All of the Committee's efforts in connection with the Claim Trial proved fruitful as the Court entered an opinion and order disallowing the Matthew Claim in full. *See* Dkt. Nos. 1206 and 1207.[11]

102.    While all efforts in connection with the Claim Objection were reasonable, necessary, and appropriate, they did serve to further delay adjudication of the Committee Motion

---

[11] As detailed above, the Committee's work in connection with the Matthew Claim, however, did not end there. Rather, the Committee was forced to participate in the Matthew Claim Appeal, necessitating further extensive efforts by the Movant.

1370145_2

to Convert. For the reasons set forth in the Committee Motion to Convert itself, as well as those articulated above, the Committee drafted and then filed the Committee Motion to Convert on November 8, 2022. *See* Dkt. No. 705. To be clear, the Committee Motion to Convert was filed as a last resort, and only upon the Committee's conclusion, after good faith efforts, that the Debtor would never entertain reasonable settlement parameters or put forth a fair, equitable, and confirmable plan. To the contrary, the Debtor's actions in the Chapter 11 Case proved, conclusively, that he saw this Court as yet another venue to perpetuate spurious litigation against effectively all parties in interest. Accordingly, the only viable avenue for meaningful recovery for the creditors (i.e. resolution of all litigation and unconditional payment of claims) was the appointment of a trustee—of either chapter 7 or 11 variety. Therefore, in addition to filing the Committee Motion to Convert, the Committee joined the Chapter 11 Trustee Motion. The Committee similarly opposed confirmation of the Plan.

103.    The Movant expended considerable efforts in connection with protracted briefing on each of the above-discussed requests for relief, as ordered by the Court. The Movant further provided extensive services to the Committee in connection with a full suite of pre-trial and trial preparation tasks in advance of the Conversion Trial. This included depositions of four witnesses, the identification and analysis of more than one hundred (100) exhibits, and preparation of a comprehensive trial strategy and outline. From the perspective of the Movant, there is no substitute for preparation in connection with trial work. The Movant therefore endeavored to provide the Committee with the highest standard of legal services possible in connection with the Conversion Trial which necessarily included extensive trial preparation efforts.

104.    The Conversion Trial finally commenced on November 13, 2023, nearly three (3) years after the Petition Date, and more than a year after it was originally filed. *See* Dkt. No. 705 (filed November 8, 2022). Needless to say, as it was witnessed firsthand by the Court, the Movant

43

1370145_2

provided extensive and valuable services to the Committee in actually trying the Committee's case in the Conversion Trial. This work included presentation of the Committee's opening statement, participation in examination of seven (7)[12] witnesses through both direct and cross examination, and the attendant oral arguments, presentations, discussions, and other work necessary and incident to a contested trial. Because the detail regarding the Movant's work in connection with the final trial day and post-trial briefing is detailed in other sections hereof, it will be omitted here.

105.    The Committee Motion to Convert and the Conversion Trial represented the culmination of the Movant's efforts in representation of the Committee. Throughout the Chapter 11 Case, the Movant labored tireless to build a comprehensive case for relief that the Debtor clearly demonstrated was the only means for the creditors to obtain closure with respect to decades long disputes with the Debtor. In addition to building a case in the abstract, the Movant endeavored to articulate the same through the, admittedly, voluminous Committee Motion to Convert. The breadth thereof, however, was absolutely necessary given the Debtor's myriad unscrupulous conduct throughout the Chapter 11 Case, and propensity to conceal information and leave no argument, colorable or otherwise, unasserted. Through the Conversion Trial, it was also necessary to develop a sufficiently robust record of facts to support the Court's eventually ruling, and perhaps more critically, to protect the same from appellate review which was sure to follow.

106.    Following the short tenure of the Trustee as chapter 11 trustee, the case was converted to chapter 7, ultimately arriving at the relief sought by the Committee Motion to Convert. For this reason, the Movant submits the Committee has accomplished its ultimate goal in the Chapter 11 Case. While the relief obtained is imperfect and may not result in immediate

---

[12] The Debtor testified both in his individual capacity and on behalf of Greenleaf, technically lowering the number of actual individual witnesses to six (6), but nevertheless highlighting the Debtor's control over Greenleaf.

1370145_2

resolution of the quagmire of rights, claims, and assets as purposefully constructed by the Debtor, the matter is certainly on a faster track to closure under the stewardship of the Trustee.

107.    Given the complexity of this matter, the good faith and valuable services rendered by the Movant to the Committee, and results achieved, the Movant submits the compensation sought hereby is reasonable, necessary, and appropriate under the circumstances. Most critically, the Movant submits the services rendered to the Committee provided a material and substantial benefit to the estate and the creditors. For that reason, the Movant respectfully requests all compensation and reimbursement of expenses sought hereby be finally allowed in full.

## VII.    LEGAL STANDARD APPLICABLE TO REVIEW OF APPLICATION

108.    Section 330 of the Bankruptcy Code describes the applicable standard for evaluating this Final Application. As one bankruptcy court in this jurisdiction has observed:

> Under Sections 330 and 331 of the Code, professionals applying for fees must demonstrate *in writing* that their services were (1) actual; (2) necessary, and (3) reasonable. Once services have been performed, Bankruptcy Rule 2016 requires that:
>
>> A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a *detailed* statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.
>
> These detailed applications establish the "actual," while an accompanying narrative explanation of the "how" and "why" establishes the "necessary."
> The primary objective of any fee petition is to reveal sufficient data to enable the Court to determine whether the services rendered were reasonable, actual and necessary.

*In re Pettibone Corp.*, 74 B.R. 293, 301 (Bankr. N.D. Ill. 1987) (emphasis in original) (internal citations and parentheticals omitted).

109.    While the Court has wide discretion in reviewing a fee petition, such authority must be dispensed "with great care and fairness," *In re Wildman*, 72 B.R. at 704, while keeping in mind

that the well accepted goal is to encourage and induce capable attorneys to practice in the Bankruptcy Court. *See In re Pettibone*, 74 B.R. at 306.

110.    In analyzing a fee petition, the Court must determine "what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 568 (7th Cir. 1992). Moreover, as the First Circuit has articulated, the court should focus on the benefits to the estate and the quality of the performance of counsel in the context of the case as a whole:

> Given these circumstances, it is important for a court to maintain "a sense of overall proportion," *Gabriel v. Southworth*, 712 F.2d 1505, 1507 (1st Cir. 1983), and not "become enmeshed in meticulous analysis of every detailed facet of the professional representation," *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir. 1976). It is easy to speculate in retrospect that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner. On the other hand, it is also possible that B&M would not have enjoyed the success it did had its counsel managed matters differently. Fee-cutting "ideally should be tempered with a view towards the *need for the services at the time they were rendered*." *In re Casco*, 25 B.R. 747, 756 (B.A.P. 1st Cir. 1982) (emphasis added).

*Boston and Maine Corp. v. Moore*, 776 F.2d 2, 10 (1st Cir. 1985).

111.    Movant has endeavored to prepare this Final Application in accordance with the standards and guidelines outlined in section 330 of the Bankruptcy Code, Bankruptcy Rule 2016, Local Rule 5082-1, and the applicable caselaw, including *Pettibone* and *Wildman*. Specifically:

a.    Itemized Daily Entries. Each project category contains detailed entries listing the subject activity, the date, the time spent, the nature of the services rendered, and the purpose for the same. Explanations are included to inform the reader of the circumstances giving rise to the activity.

b.    Telephone Conferences. Entries for telephone conferences detail the topic of discussion, person called, and reason for the call. Telephone conferences are

beneficial to the estate as they are the most efficient way to handle the numerous matters arising in the case.

c.  <u>Meetings and Office Conferences</u>. Movant spent considerable time in meetings and conferences as a means of performing the services required. Meeting descriptions include the people present and topics discussed. Such meetings and conferences were reasonable and necessary because of the unique and complex nature of the Chapter 11 Case. Moreover, inter-office conferences primarily took place between a more senior member of the Movant and a less senior member of the Movant. Such conferences allowed less senior members to complete laborious tasks at their lower billable rate with the benefit of guidance from a senior member.

d.  <u>Drafting</u>. Each entry for the drafting of a document, letter, motion or order includes a clear description of the task. The complexity of the case and the numerous parties involved often necessitated many draft revisions.

e.  <u>Legal Research</u>. While the members of Movant have devoted substantially all their professional careers to the practice of commercial law, bankruptcy, insolvency, and corporate reorganizations, the nuances and complexities of this case required the members to conduct in-depth legal research on numerous occasions. A lawyer who does not spend considerable time conducting legal research is doing a disservice to their client and will soon find out that the rapidly evolving field of bankruptcy law is leaving them behind. Indeed, the Seventh Circuit has recognized the need and requirement for constant research and preparation by attorneys, even in their own specialized areas of concentration. *See Continental Illinois Securities*, 962 F.2d 566, 570 (7th Cir.

47

1992) (addressing the fee request of securities lawyers in a class-action securities lawsuit and noting that "no one carries the whole of federal securities law—not only the many detailed statutes and regulations but the thousands of decided cases—around in his head, and a lawyer who tries to respond to a motion or brief without conducting fresh research is courting sanctions or a malpractice suit").

f.  <u>Minimum Time</u>. Movant does not apply a uniform amount of time to a particular activity. The time entries herein have been kept on a tenth-of-an-hour basis. The Court should be sensitive, however, to the reality that bankruptcy cases do not lend themselves to meticulous time keeping. Oftentimes, a lawyer's need to concentrate, the pressure of time, and the emotion and energy involved in cases interfere with keeping time with exacting detail. Great care has been taken to keep reasonably accurate time. Movant asks this Court to bear in mind the "big picture" context as instructed by the First Circuit in *Boston and Maine Corp.*, 776 F.2d at 10.

g.  <u>Lumping</u>. Movant has endeavored to avoid grouping unrelated activities into the same time entry. The Court should, however, keep in mind that in a case as complex as this one, meetings or telephone conferences will involve the discussion of numerous topics, and several telephone calls may be made to multiple parties in rapid succession and regarding one or more topic areas. The entries include details on each activity, such as the parties involved, the purpose of the activity, and in many cases, the need for the activity. While grouping is unavoidable, Movant has made its best efforts to include explanations that delineate how its time was spent.

48

## VIII.    Billing Judgment and Avoidance of Duplication of Services

112.    An implicit element of the compensation process under section 330 of the Bankruptcy Code is the prudent exercise of "billing judgment." *Pettibone*, 74 B.R. at 303. Attorneys must exercise billing judgment to avoid burdening the bankruptcy estate with compensation for duplicative or otherwise unnecessary services.

113.    Movant is a small firm, which helps to prevent significant duplication of services. The matter was primarily staffed by Mr. Adelman (a partner), Mr. Dwayne (originally an associate, subsequently elevated to partner), and Ms. Kostrow (an associate). In addition, the attorneys on file enlisted the support of Ms. Rodela (a paralegal), Mr. Klimowicz and Mrs. Kalmanovsky (both law clerks)[13]. Typically, to prevent an unnecessary overlap in representation, a given task was assigned to a single attorney with the appropriate level of experience. At times, multiple attorneys were involved in a single task due to the complexity of the matter, the press of business, or if a member of the firm was handling a matter in some way connected with another member's activity.

114.    To the extent necessary and beneficial to the Committee, inter-office conferences occurred between members of the Movant of different seniority and experience. The Committee benefitted from such conferences because they permitted necessary tasks to be performed competently at the less-senior attorney's lower rate, while freeing the more-senior attorney to provide other needed services. Joint participation among attorneys of differing seniority, provided it is undertaken judiciously, results in better, more efficient representation. The Seventh Circuit and the Northern District of Illinois have also held that, as long as the fees are reasonable, inter-office conferences are compensable in fee petitions:

> Courts may award fees for inter-office communications so long as the time spent communicating is "reasonably expended." *Tchemkou v. Mukasey*, 517 F.3d 506, 511–12

---

[13] Mr. Klimowicz and Ms. Kalmanovsky were the only law clerks working on the matter during the Final Period, though other law clerks worked on the matter during the Interim Period as disclosed on the Interim Applications.

1370145_2

(7th Cir. 2008); *see also, e.g., Bd. of Educ. of Chi. v. Walker*, 800 F.Supp.2d 917, 925 (N.D. Ill. 2011). In fact, the Seventh Circuit has recognized that "[t]he practice of law often, indeed usually, involves significant periods of consultation among counsel." *Tchemkou*, 517 F.3d at 511. This is because "[t]alking through a set of authorities or seeking advice on a vexing problem is often significantly more efficient than one attorney's trying to wade through the issue alone." *Id.* at 511–12. To ensure that the amount of time billed to internal communications was "reasonably expended," attorneys should "identify explicitly the subject matter of their discussions . . . ." *Id*. at 512.

*Stragapede v. City of Evanston*, 215 F. Supp. 3d 708, 716–17 (N.D. Ill. 2016).

115.    Practically speaking, a small firm such as Movant does not often have the luxury of having more than one attorney handle a particular task. But at times, especially in a chapter 11 case of this complexity, certain problems require the collective judgment and experience of several attorneys. The detailed time entries submitted with this application show that collaborative work among members of Movant was kept to a minimum, was used only when appropriate, and generated cost benefits for the Debtor's estate.

116.    The court in *Pettibone* identified "illustrative examples of the appropriate exercise of billing judgment in bankruptcy cases." 74 B.R. at 303. Each of those examples is evident in the work Movant performed, including:

a.    Individual Responsibility for Tasks. For nearly every discrete undertaking during the Application Period—be it research, drafting, correspondence with counsel and Committee members, document review, or any other legal task—a single member of Movant performed the vast majority of the work and took responsibility for the outcome. Inter-office conferences and other collaboration only occurred when efficient and beneficial to the Committee and the unsecured creditors.

b.    Appropriate Level of Skill. Movant utilized the services of its more senior partner, Mr. Adelman, only in those areas requiring the services of such an

50

experienced practitioner. To take advantage of his lower billing rates, the vast majority of work performed during the Application Period was handled by Mr. Dwayne, billing at an associate rate both prior and subsequent to his promotion. Additionally, several research tasks were delegated to the Movant's non-attorney law clerks with an even lower billing rate.

c.    <u>Legal Research</u>. Whenever possible, legal research was performed by members of Movant with lower hourly rates to further reduce the amount of fees. Movant does not seek reimbursement for fees for the use of legal research tools such as Westlaw and LexisNexis.

## IX.    <u>QUALIFICATIONS OF MOVANT; PRECLUSION OF OTHER EMPLOYMENT</u>

117.    Adelman & Gettleman, Ltd. was established in 1983 and has been listed in the Martindale-Hubbell Bar Register of Preeminent Lawyers since approximately 1985. Movant is one of the few Chicago boutique bankruptcy firms recognized annually in Illinois Super Lawyers, Illinois Leading Lawyers Network, Best Lawyers in America, and Chambers and Partners.

118.    During the pendency of the Final Period, Movant has brought to bear the collective skill and experience of the following members of the firm:

- <u>HOWARD L. ADELMAN (HLA)</u> – Partner. Mr. Adelman is a 1977 *cum laude* graduate of St. Louis University School of Law, and is licensed to practice in the states of Illinois and Missouri. Upon his graduation from law school, Mr. Adelman was law clerk to the Honorable Robert G. Dowd, Chief Judge of the Missouri Court of Appeals, St. Louis District, and later became the Executive Judicial Assistant to the Missouri Court of Appeals, St. Louis District.

  In 1978, Mr. Adelman joined the firm of Schwartz, Cooper, Kolb & Gaynor, and was made a partner in 1981. In 1983 Mr. Adelman formed the law firm of Adelman & Gettleman, Ltd. with Chad H. Gettleman. Since entering private practice in 1978, he has devoted his entire professional practice to areas of commercial litigation, bankruptcy, insolvency, and corporate reorganization. He has participated in major bankruptcy cases since 1978 as counsel to debtors as well as serving as counsel to trustees, creditors' committees, financial

51

institutions and other parties, has confirmed numerous plans of reorganization, and has tried and argued cases in the bankruptcy court and the United States district court. He has appeared in the Seventh Circuit Court of Appeals on numerous occasions.

Mr. Adelman has been listed for more than twenty five (25) years in Naifeh and Smith's "The Best Lawyers in America." He has been chosen as one of America's Leading Lawyers for Business by Chambers USA American Leading Lawyers from 2004 to 2017; as an Illinois Leading Lawyer from 2003 to present; as one of the top 100 Illinois Leading Lawyers Business Lawyers from 2006 to 2009 and one of the Top 10 Illinois Leading Lawyers Commercial Bankruptcy Lawyers in Illinois in 2014; one of the Top 100 Illinois Super Lawyers in 2006 through 2018, and one of the Top 10 Illinois Super Lawyers, regardless of specialty, for seven (7) consecutive years (2012 through 2018).

In October of 1999, Mr. Adelman was appointed by Chief Justice William Rehnquist to serve as a member of the Judicial Conference Advisory Committee on the Federal Rules of Bankruptcy Procedure. He served on the Advisory Committee from 1999 through 2005 through the implementation of BAPCPA. Mr. Adelman is also a Fellow of the American College of Bankruptcy, as part of its Twelfth Class.

- <u>Nicholas R. Dwayne (NRD) – Partner</u>.  Mr. Dwayne first joined Movant as an associate in April 2017, and was elevated to partner effective January 1, 2024. His practice is focused on lending, bankruptcy, reorganization, and commercial litigation. Mr. Dwayne completed his undergraduate studies at Marquette University in 2007.  He then graduated *cum laude* from the University of Illinois College of Law in 2012.  During law school, Mr. Dwayne focused his studies on the areas of bankruptcy and commercial law, taking on a leadership role in the University of Illinois' bankruptcy moot court program. Mr. Dwayne was also an associate member of the *Elder Law Journal*.

   Throughout his career, Mr. Dwayne has represented both debtors and creditors in all manner of transactional and litigation challenges.  Mr. Dwayne has represented individuals and businesses ranging in size from small family-owned firms to Fortune 500 companies.  Mr. Dwayne has attained successful results for his clients in federal, bankruptcy, and state court, but also in out-of-court workouts, settlements, and asset sales. In recognition of his exceptional service to his clients, Mr. Dwayne has been named as an "Emerging Lawyer" in the 2018-2024 editions of *Leading Lawyers*, and a "Rising Star" in the 2022-2024 editions of *Super Lawyers*.

- <u>Dina A. Kostrow (DAK) – Associate</u>.  Ms. Kostrow joined Movant as an associate attorney in September of 2024. Her practice includes lending, bankruptcy, reorganization, and commercial litigation. Ms. Kostrow graduated

52

from the University of Minnesota Law School in 2022, where she served as an editor for the Minnesota Law Review and an instructor for the school's legal research and writing course. Prior to joining Movant, Ms. Kostrow served a one-year term as law clerk to the Honorable A. Benjamin Goldgar of the U.S. Bankruptcy Court for the Northern District of Illinois. Before that, she worked as an attorney in Legal Aid Chicago's consumer practice group, representing clients in consumer bankruptcy proceedings and cases related to unfair collections and fraud.

- Alec Klimowicz (AK) – Law Clerk. Mr. Klimowicz worked for the Movant as a law clerk from October 2023 to March 2024. Mr. Klimowicz was a student at the University of Illinois College of Law and graduated therefrom in May 2024. During law school, Mr. Klimowicz focused his studies on bankruptcy and commercial law enrolling in, among others, Secured Transactions, Bankruptcy, Bankruptcy Seminar, International Bankruptcy, Business Associations, Mergers & Acquisitions, and Federal Income Tax. Mr. Klimowicz served as Managing Editor for the *University of Illinois Journal of Law, Technology and Policy* and competed in the Duberstein Bankruptcy moot court competition in 2022 and 2023, winning best brief in 2022. Mr. Klimowicz also served as President of the College's Bankruptcy Law Society as well as research assistant to multiple professors. Additionally, Mr. Klimowicz has published in multiple journals including the *American Bankruptcy Institute Journal*. Mr. Klimowicz formerly served as a judicial extern to the honorable Judge Franklin U. Valderrama of the United States District Court for the Northern District of Illinois.

- Svitlana Kalmanovsky (SK) – Law Clerk. Mrs. Kalmanovsky began working for Movant as a law clerk in October 2024. Mrs. Kalmanovsky graduated *magna cum laude* from the Brennan School of Business at Dominican University and is currently a third-year student at Chicago-Kent College of Law, expected to graduate in May 2025. During law school, Mrs. Kalmanovsky focused her studies on bankruptcy and commercial law, enrolling in courses such as Bankruptcy, Secured Transactions, Business Organizations, Federal Income Tax, and Securities Regulation. In 2024, Mrs. Kalmanovsky competed in the Philip C. Jessup International Moot Court Competition, where she now serves as Vice President and Student Coach. Additionally, Mrs. Kalmanovsky is a member of the Moot Court Honor Society and will be competing in the American Bar Association National Appellate Advocacy Competition in February 2025. Mrs. Kalmanovsky currently serves as the Treasurer of the Chicago-Kent Corporate Law Society. Mrs. Kalmanovsky's prior legal experience includes working as a law clerk for the C-K Law Group – Estate Planning, Probate, and Transactional Law Clinic in 2023 and as a summer intern for Weissberg and Associates, Ltd. in 2024.

119.    As a result of the acceptance of employment as counsel to the Committee in the

Chapter 11 Case, Movant was precluded from rendering services in other substantial legal matters.

53

During the Application Period, Mr. Dwayne in particular, has spent a significant portion of his time on matters relating to the Chapter 11 Case.

X.    **Statement pursuant to sections 329 and 504 of the Bankruptcy Code and Bankruptcy Rule 2016**

120.    Except with respect to the sharing of compensation authorized under Section 504(b) of the Bankruptcy Code, Movant has not shared or agreed to share any award of fees received in connection with this Chapter 11 Case with any person, firm, or entity. There does not exist any agreement or understanding between Movant, associates, or employees, and any other person, firm, or entity, with respect to the sharing of compensation herein.

XI.    **Notice**

121.    Pursuant to Bankruptcy Rule 2002(a)(6), notice of this Final Application has been provided pursuant to the Bankruptcy Rules on no less than twenty-one (21) days' notice by CM/ECF to: (a) the Debtor; (b) the Trustee; (c) the Office of the United States Trustee for the Northern District of Illinois; and (d) any other parties who have requested notice and service of pleadings, and by first class mail to all creditors of the Debtor's estate who would not otherwise receive CM/ECF notice.  Movant submits that such notice is adequate under the circumstances, and requests that no further notice be required.

WHEREFORE, in consideration of the time and labor required and performed in this Chapter 11 Case; Movant's experience, reputation and ability and the results achieved; Movant respectfully requests: (a) allowance on a final basis of all compensation and expenses requested for the Application Period, such compensation and reimbursement having been determined to be reasonable, actual, and necessary, in the amounts of $1,159364.75 (representing the Aggregate Interim Award), plus $187,940.29 (representing the Final Period Amount Sought), for a total amount of $1,347,305.04 (representing the Total Final Amount Sought); (b) payment of the unpaid

1370145_2

portion of the Total Final Amount Sought, after deduction of $508,530.52 which has been

previously paid to the Movant, for a total remaining unpaid balance of $838,774.52; and (c) such

other and further relief as is just.

Respectfully Submitted,

ADELMAN & GETTLEMAN, LTD.

By: /s/ Nicholas R. Dwayne
        One of its attorneys

Howard L. Adelman, Esq. (ARDC #0015458)
Nicholas R. Dwayne, Esq. (ARDC #6308927)
Adelman & Gettleman, Ltd.
53 West Jackson Boulevard, Suite 1050
Chicago, Illinois 60604
(312) 435-1050
***Counsel for the Committee***

1370145_2